David E. Bower (SBN 119546)
**MONTEVERDE & ASSOCIATES PC**
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (213) 446-6652
Fax: (212) 202-7880
dbower@monteverdelaw.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KURT ZIEGLER, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> GW PHARMACEUTICALS, PLC, JUSTIN GOVER, GEOFFREY GUY, CABOT BROWN, DAVID GRYSKA, CATHERINE MACKEY, JAMES NOBLE, ALICIA SECOR, and LORD WILLIAM WALDEGRAVE, <br><br> Defendants. | Civil Action No. **'21 CV 1019 BAS MSB** <br><br> **COMPLAINT** <br><br> **CLASS ACTION** <br><br> **DEMAND FOR JURY TRIAL** <br> 1. **VIOLATIONS OF SECTION 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934** <br> 2. **VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |

Plaintiff Kurt Ziegler ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1.     This action is brought as a class action by Plaintiff against GW Pharmaceuticals, PLC ("GW" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with GW, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed acquisition (the "Merger") of GW by Jazz Pharmaceuticals, PLC and its subsidiaries ("Jazz").

2.     On February 3, 2021, GW entered into an agreement and plan of merger pursuant to which the holders of GW ordinary shares will receive $16.66^{2/3} in cash plus an amount of Jazz ordinary shares equal to an exchange ratio that will be calculated based upon Jazz's share price, and holders[1] of GW American Depositary Shares ("GW ADSs") will receive approximately $200 per share in cash and $20 in Jazz stock in consideration for their shares (the "Merger Consideration").

3.     On March 15, 2021, to convince GW shareholders to vote in favor of the Merger, Defendants caused a materially false and misleading Definitive Proxy Statement, subsequently amended and supplemented on April 14, 2021 (as amended and supplemented, the "Proxy"), to be filed with the SEC and disseminated to GW's shareholders. As set forth below, the Proxy was materially false and misleading with respect to GW's financial projections and operations, the value of GW shareholders' stock, and the fairness of the Merger Consideration.

4.     The Proxy provided a materially false and misleading valuation picture of GW by disseminating unreasonably low financial projections for 2021-2035 (the "December Projections"), which were used to frame the Merger Consideration as

---

[1]  Holders of GW ordinary shares and holders of GW ADSs are referred to herein as shareholders.

CLASS ACTION COMPLAINT

"fair." In reality, the Merger Consideration significantly undercompensated GW shareholders provided them with substantially less than the intrinsic fair value of their shares.

5. The changes made to and the numbers reflected in the December Projections are contradicted by and inconsistent with statements made by the Company and management leading up to the Merger, and reflect just a fraction of the actual value of the Company.

6. The December Projections were created solely for use by GW's financial advisors, Goldman Sachs & Co. LLC ("Goldman Sachs") and Centerview Partners LLC ("Centerview" and together with Goldman Sachs, the "Financial Advisors"), to perform the valuation analyses underlying their fairness opinions. Without the December Projections, which Defendants authorized Goldman Sachs and Centerview to use despite knowing that the December Projections did not accurately reflect the Company's long-term financial prospects and value, Goldman Sachs and Centerview would have been unable to issue fairness opinions, Defendants would have been unable to claim that the Merger Consideration provided shareholders with fair value for their holdings, and Goldman Sachs and Centerview would have been forced to forego at least $69 million of the $72 million in fees they received.

7. As set forth below, (i) the stated changes justifying the December Projections, (ii) the statements in the Proxy conveying that the December Projections and their underlying assumptions were "reasonably prepared" and reflected the Company's "best currently available estimates," and (iii) the implied present value per GW ADS ranges that were predicated on the December Projections misled GW shareholders about the fair value of their shares, caused them to vote in favor of the Merger, and accept the unfair Merger Consideration.

8. The Merger closed on May 5, 2021, and GW shareholders were surrendered via the Merger for the inadequate Merger Consideration.

CLASS ACTION COMPLAINT

9.      For these reasons and as set forth in detail herein, Defendants violated Sections 14(a) and 20(a) of the Exchange Act. Accordingly, Plaintiff seeks to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

10.      This Court has original jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

11.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over the Defendants by this Court permissible under traditional notions of fair play and substantial justice.

12.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as pursuant to 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) GW maintained its US headquarters in this District and each of the Individual Defendants, Company officers and/or directors, either resides in this District or has extensive contacts within this District; (iii) a substantial portion of the Mergers and wrongs complained of herein occurred in this District; (iv) most of the relevant documents pertaining to Plaintiff's claims are stored (electronically and otherwise), and evidence exists, in this District; and (v) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## CLASS ACTION ALLEGATIONS

13.      Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other holders of GW (the "Class"). Excluded from the Class are

CLASS ACTION COMPLAINT

Defendants and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

14.    This action is properly maintainable as a class action because:

a.    The Class is so numerous that joinder of all members is impracticable.    As of April 23, 2021, 378,535,952 ordinary shares were outstanding, including 368,966,160 ordinary shares held as GW ADSs, each representing twelve Ordinary Shares, and 9,569,792 Ordinary Shares, held by hundreds to thousands of individuals and entities scattered throughout the country. The actual number of GW shareholders will be ascertained through discovery;

b.    There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)    whether Defendants misrepresented material information in the Proxy, in violation of Section 14(a) of the Exchange Act;

ii)    whether the Individual Defendants violated Section 20(a) of the Exchange Act; and

iii)    whether Plaintiff and other members of the Class were harmed by the misleading Proxy;

c.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect

CLASS ACTION COMPLAINT

to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.    A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## PARTIES

15.    Plaintiff is, and at all relevant times has been, a shareholder of GW.

16.    Defendant GW is a company that was incorporated in the United Kingdom and maintained its principal executive offices at Sovereign House, Vision Park, Chivers Way, Histon, Cambridge CB24 9BZ, United Kingdom. The Company maintained its U.S. headquarters and an administrative office in Carlsbad, California. The Company's U.S. subsidiary, Greenwich Biosciences, Inc. is also located in Carlsbad, California. The Company's ADSs traded on the Nasdaq stock exchange under the ticker symbol "GWPH".

17.    Individual Defendant Justin Gover was, at all relevant times, the Chief Executive Officer and Executive Director of the Company. In 2015, Gover relocated to open the company's U.S. headquarters in Carlsbad, California and build the Company's in-house U.S. commercial infrastructure, at least in part to capitalize on the regulatory climate regarding CBD.

18.    Individual Defendant Geoffrey Guy was, at all relevant times, the founder and Executive Chairman of the Company and Chairman of the Board.

19.    Individual Defendant Cabot Brown was, at all relevant times, a non-executive director of the Company.

20.    Individual Defendant David Gryska was, at all relevant times, a non-executive director of the Company.

6

CLASS ACTION COMPLAINT

21.    Individual Defendant Catherine Mackey was, at all relevant times, a non-executive director of the Company.

22.    Individual Defendant James Noble was, at all relevant times, the Lead Independent Director and Deputy Chairman of the Company.

23.    Individual Defendant Alicia Secor was, at all relevant times, a non-executive director of the Company.

24.    Individual Defendant William Waldegrave was, at all relevant times, a non-executive director of the Company.

25.    The Individual Defendants referred to in ¶¶ 17-24 are collectively referred to herein as the "Individual Defendants" and/or the "Board", and together with GW they are referred to herein as the "Defendants".

## SUBSTANTIVE ALLEGATIONS

**I.    Background of the Company and the Merger**

26.    GW, founded in 1998, is a biopharmaceutical company focused on discovering, developing, and commercializing novel therapeutics from their proprietary cannabinoid product platform in a broad range of disease areas. GW commercialized the world's first plant-derived cannabinoid prescription drug, Sativex, which is approved for the treatment of spasticity due to multiple sclerosis in 25 countries. The Company has two primary, more developed products: Epidiolex and Nabiximols (Sativex). GW also has a deep pipeline of additional cannabinoid product candidates and novel compounds, including compounds in Phase 1, Phase 2, and Phase 3 trials.

27.    The Company's lead cannabinoid product is Epidiolex, a pharmaceutical formulation comprising highly purified plant-derived cannabidiol, or CBD, for which they retain global commercial rights. GW initially launched Epidiolex in the U.S. in November 2018 for the treatment of seizures associated with Lennox-Gastaut syndrome (LGS) and Dravet syndrome for patients two years of age and older. In July

CLASS ACTION COMPLAINT

2020, the U.S. Food and Drug Administration (FDA) expanded the approval of Epidiolex, adding a new indication of seizures associated with Tuberous Sclerosis Complex (TSC). The FDA also approved the expansion of all existing indications, LGS, Dravet syndrome and TSC, to patients one year of age and older. LGS and Dravet syndrome are severe childhood-onset, drug-resistant epilepsy syndromes. TSC is a rare genetic disorder that causes non-malignant tumors to form in many different organs and affects approximately 50,000 individuals in the United States and one million worldwide.

28.    GW's most advanced pipeline asset in the United States is Nabiximols, for which it has commenced two out of five clinical trials for the treatment of spasticity due to multiple sclerosis. The three other studies are expected to commence in the first half of 2021. GW believes that any one of these studies could enable a new drug application ("NDA") with the FDA, potentially as early as the fourth quarter of 2021 and anticipates commercializing Nabiximols in the U.S. using their in-house commercial organization. Nabiximols is already approved in over 25 countries outside the U.S. for the treatment of spasticity due to multiple sclerosis under the brand name Sativex. GW is advancing plans to commence an additional clinical program for Nabiximols in spasticity due to spinal cord injury in 2021 and evaluating Nabiximols for post-traumatic stress disorder.

29.    GW offers a diverse and promising development pipeline for other drug candidates and indications, including GWP 42003 in Schizophrenia, GWP42006 (CBDV) in Autism Spectrum Disorder, Intravenous GWP42003 in Neonatal Hypoxic-Ischemic Encephalopathy (NHIE), GWP4202541 in Neuropsychiatric symptoms, and Novel Compounds in Epilepsy. Aside from the novel compounds, each of the development candidates has show strong results in Phase 1 or Phase 2 clinical trials or studies.

CLASS ACTION COMPLAINT

30.    Jazz, a public limited company incorporated in the Republic of Ireland, is a global biopharmaceutical company dedicated to developing and commercializing medicines, with a focus in neuroscience, including sleep and movement disorders, and in oncology, including hematologic malignancies and solid tumors. The Company's corporate headquarters are located in Dublin, Ireland, with U.S. operations located in Palo Alto, California and Philadelphia, Pennsylvania. Jazz ordinary shares are listed on Nasdaq stock exchange under the ticker symbol "JAZZ".

*The Background of the Merger*

31.    On June 30, 2020, GW announced its strategy for bringing Nabiximols to the U.S. market and its plans to commence a Phase 3 clinical program, including, MS Spasticity Clinical program, Spinal Cord Injury spasticity program and Post Traumatic Stress Disorder program which will provide multiple opportunities for an NDA submission as early as 2021. In the press release, Defendant Gover stated:

> We were pleased with the strength of U.S. Epidiolex sales in the second quarter in spite of the COVID-19 pandemic. Further, the recent approval and imminent launch of Epidiolex for the treatment of seizures associated with TSC provides a meaningful new opportunity to accelerate momentum through the second half of 2020 and beyond. We also continue to be excited about the potential of our product pipeline, in particular nabiximols, for which we recently outlined our accelerated US development strategy in the treatment of spasticity in patients with MS and other conditions. We look forward to commencing the nabiximols Phase 3 program as well as multiple other pipeline clinical trials in the second half of the year.

32.    On July 6, 2020 Jazz reached out to Defendant Gover, and on July 8, 2020, Jazz made an initial offer to purchase the Company for $172 per GW ADS.

33.    On July 16, 2020, the Board met and discussed the Jazz offer. At the meeting, Scott Giacobello, GW's Chief Financial Officer, presented background on Jazz based on public information, including information about its business and certain financial metrics. Giacobello reviewed with the GW Board certain forecasts that had been prepared by GW management prior to the receipt of Jazz's July 8, 2020 proposal as part of its strategic planning process (the "July Projections"). Giacobello then

9

presented regarding consideration of available strategic alternatives and financial analyses prepared by Company management utilizing the July Projections.

34.    After these presentations, the GW Board unanimously concluded that Jazz's offer fundamentally undervalued GW and the GW Board expressed confidence in GW's standalone plan and prospects.

35.    On July 20, 2020, Evercore analysts issued a $275 price target for GW.

36.    On July 31, 2020, GW announced that the FDA approved a new indication Epidiolex oral solution to treat seizures associated with tuberous sclerosis complex (TSC) in patients one year of age and older.

37.    On August 6, 2020, the Company announced its Second Quarter 2020 financial results and operational progress, reporting a 68% increase in total revenue and a decrease in costs of sales from 9% of net product sales to only 7% of net product sales. These improvements were driven by the substantial increase in Epidiolex net sales. In the press release, Defendant Gover stated:

> We were pleased with the strength of U.S. Epidiolex sales in the second quarter in spite of the COVID-19 pandemic. Further, the recent approval and imminent launch of Epidiolex for the treatment of seizures associated with TSC provides a meaningful new opportunity to accelerate momentum through the second half of 2020 and beyond. We also continue to be excited about the potential of our product pipeline, in particular nabiximols, for which we recently outlined our accelerated US development strategy in the treatment of spasticity in patients with MS and other conditions. We look forward to commencing the nabiximols Phase 3 program as well as multiple other pipeline clinical trials in the second half of the year.

38.    On August 13, 2020, Jazz made another offer, which the Board again rejected. On September 11, 2020, Jazz reiterated its revised August 13 offer and indicated that it was willing to consider an increase in its proposal if GW would permit Jazz to conduct limited due diligence. Although the Board again rejected this proposal on September 17, 2020, privately, it became interested in exploring a sale and engaged the Financial Advisors following Jazz's August 13, 2020 proposal.

CLASS ACTION COMPLAINT

39.    Having apparently decided to pursue a potential sale, in October 2020, GW engaged Radford, the independent compensation consultant of the Remuneration Committee to review GW's severance plans and programs, relating to both *change in control* and non-change in control scenarios, and to make recommendations regarding potential changes to those plans and programs.

40.    On November 3, 2020, the Company announced its Second Quarter 2020 financial results and operational progress, outperforming revenue and earnings estimates, and reporting a sequential increase to revenue (up 51%) and decrease to costs (down to 6% of net product sales). In the press release, Defendant Gover stated:

> We are pleased to report strong revenue growth in the 3rd quarter despite the challenges presented by COVID-19. Epidiolex meets a serious unmet need within the field of epilepsy and we expect the product to demonstrate continued strong growth in the months and years ahead. The recent expanded indication for the treatment of seizures associated with TSC has been very well received by patients, clinicians and payers. We have also now commenced the pivotal Phase 3 program for nabiximols in the treatment of multiple sclerosis spasticity, which provides multiple opportunities for an NDA submission, including as early as next year. Beyond nabiximols, we are advancing several clinical-stage pipeline candidates, including the recent start of a Phase 2 trial in schizophrenia.

41.    On December 1, 2020, Jazz made a renewed offer for $205 per GW ADS.

42.    A week later, on December 8, 2020, the GW Board met with members of management, financial advisors, and legal advisors. At the end of the meeting, after considering the $205 per GW ADS offer, GW concluded that it needed new, lower financial projections for Goldman Sachs and Centerview to use to prepare the valuation analyses that would eventually underlie their fairness opinions.

43.    On December 13, 2020, the GW Board met again with members of management, financial advisors, and legal advisors. Armed with newly minted and drastically reduced financial projections (the "December Projections") Goldman Sachs and Centerview presented financial analyses of GW based upon the December Projections, and discussion ensued regarding the analyses, the drivers and

CLASS ACTION COMPLAINT

assumptions underlying them, and various sensitivities presented by each financial advisor. Even after reviewing these drastically lowered financial valuations of GW, the Board was forced to concede that the latest Jazz offer still fundamentally undervalued GW.

44.   On December 23, 2020, Jazz increased its proposal to $220 per GW ADS, consisting of $200 in cash with the remainder in Jazz ordinary shares.

45.   On January 11, 2021, one day ahead of the 39th Annual J.P. Morgan Healthcare Conference, GW announced *improved* guidance for 2021 financial performance that *exceeded* expectations. In the press release, Defendant Gover stated:

> Epidiolex sales increased by over 70% in 2020 despite the challenges of COVID-19, reflecting the positive impact this medicine has on patients as well as the performance of our commercial team. We remain encouraged by our patients' experience on this product, as demonstrated by high persistence and refill rates. This, combined with our expansion of payer coverage and the recently approved Tuberous Sclerosis Complex indication, leads us to expect continued strong growth in 2021 in both the US and Europe. Our goals in 2021 include driving further Epidiolex growth and advancing multiple US pivotal trials for nabiximols in the treatment of MS spasticity, with the first data readout expected this year. In addition to our previously announced pipeline activities, we are leveraging our world leadership in cannabinoid science to design and synthesize novel cannabinoid molecules and expect our first novel product candidate to enter the clinic in 2021.

46.   As negotiations with Jazz drew closer, Radford made certain recommendations, which the Renumeration Committee discussed and ultimately adopted, including GW entering into a new employment agreement with Defendant Gover—the CEO ultimately in charge of both the financial projections and negotiations with Jazz. Indeed, on January 25, 2021, as negotiations with Jazz reached finality, the Renumeration Committee specifically identified the adoption of a company-wide severance program as had been recommended by Radford and discussed at previous meetings, matters relating to GW's incentive programs and other employee benefits matters as relating to the proposed transaction with Jazz, and authorized senior management to discuss and negotiate these matters with Jazz.

CLASS ACTION COMPLAINT

Thereafter, Defendant Gover and others negotiated these matters from January 26 through February 2, during which Jazz requested that members of GW management remain with the combined company after the completion of the Merger, some on a transitional basis and some on a more long-term basis, with Defendant Gover remaining for a transitional period—for a $7,600,00.00 fee.

47.    On February 2, 2021, during the same meeting at which they approved the Merger Agreement, the Board's counsel reviewed the employee compensation and benefits related matters that had previously been discussed, including GW's ability to implement a company-wide severance program as recommended by Radford and as previously discussed, the timing of GW's 2021 long-term incentive grants and the treatment of incentive awards and other employee benefit programs in the Merger, as well as certain contractual provisions and incentives that had been negotiated with Jazz so that the senior management team would remain with the combined company.

48.    The following day the parties executed the Merger Agreement. Then, later in February 2021, the Board adopted the Greenwich Biosciences Amended and Restated Change in Control and Severance Benefit Plan and the GW Change in Control and Severance Benefit Plan.

49.    Through the combination of these changes and the Merger, GW's officers and directors earned millions of dollars, not shared with GW holders. Moreover, in addition to the re-negotiated severance agreements, GW granted each executive officer a special transition incentive bonus: Defendant Gover—$7,600,000; U.S. Chief Commercial Officer Darren Cline—$2,300,000; CFO Giacobello—$2,550,000; Chief Legal Officer Douglas Snyder—$2,600,000; and CMO Knappertz—$2,600,000. As a result of these incredibly lucrative arrangements made at the time of the Merger, Defendant Gover was classified as a "Tier 1" benefit recipient entitling him nearly $40 million in benefits—more than any other GW executive officer:

CLASS ACTION COMPLAINT

| Name | Cash ($) | Equity ($) | Perquisites / Benefits ($) | Total ($) |
|------|----------|------------|----------------------------|-----------|
| Geoffrey Guy | $ 1,215,113 | $14,667,437 | $ 6,210 | $15,888,760 |
| Justin Gover | $10,071,472 | $28,944,224 | $ 42,240 | $39,057,936 |
| Scott Giacobello | $ 3,637,101 | $ 8,621,346 | $ 46,680 | $12,305,127 |
| Volker Knappertz | $ 3,798,681 | $ 9,326,794 | $ 46,680 | $13,172,155 |
| Douglas Snyder | $ 3,742,806 | $ 8,953,618 | $ 46,680 | $12,743,104 |

## II.    The Materially Misleading Proxy

50.    On March 15, 2021, Defendants filed the materially misleading Proxy with the SEC to solicit shareholder approval of the Merger.

51.    Each of the Defendants reviewed the Proxy before it was disseminated to the Company's shareholders, as they each had a duty to review the Proxy and ensure it did not contain any materially false or misleading statements. Defendants caused the materially false and misleading Proxy to be filed with the SEC and disseminated to GW's shareholders. Indeed, the Proxy could not have been disseminated without Defendants' approval, and it repeatedly discussed the actions and beliefs of the full GW Board, and stated that for the reasons described in the Proxy the Board unanimously recommended that the Company's shareholders vote in favor of the Merger. As set forth herein, the Proxy contained materially false and misleading statements which influenced GW shareholders' decision concerning how to vote their shares, in violation of Section 14(a) and SEC Rule 14a-9.

52.    In conjunction with approving the Merger, Defendants elected to obtain a "fairness opinion" from their financial advisors, Goldman Sachs and Centerview. Fairness opinions are not required by law, but are often obtained by boards of directors anyway so that they can be touted to shareholders as evidence that the merger they approved is purportedly fair. As has been well documented, fairness opinions are often "deeply flawed", as they "are frequently prepared utilizing methodologies [and inputs] that simply do not jibe with best practices. These defects are exacerbated by the recurring problem of investment banks who are conflicted in their provision of fairness opinions." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U. L. Rev. 1557,

CLASS ACTION COMPLAINT

1573-78 (2006). As one scholar put it, "obtaining a fairness opinion has become like the practice of buying indulgences prior to the Protestant Reformation, but for sins that one is about to commit instead of for past sins. The practice is very widespread but is not entirely legitimate." Jonathan R. Macey, *The Regulator Effect In Financial Regulation*, 98 CORNELL L. REV. 591, 618-19 (March, 2013).

53.    For acting in their roles as financial advisors and providing fairness opinions to the board, each of the Financial advisors was paid $36 million. However, only $1.5 million was paid upon execution of the Merger Agreement. The remaining $34.5 million owed to each Financial Advisor was contingent upon the consummation of the Merger. Therefore, 95.8% of the Financial Advisors' compensation (a combined $69 million) would only be paid to them if they provided the Board with a fairness opinion blessing the Merger as "fair" from a financial point of view to GW shareholders.

54.    As stated herein, the Financial Advisors would not have been able to provide, and the Defendants would not have been able to obtain, a fairness opinion without the significantly lower December Projections.

*The Financial Projections*

55.    In connection with GW's ordinary strategic planning process, Defendant Gover and his management team prepared the July Projections reflecting the Company's anticipated future operations as a standalone entity. The July Projections included management projections for the following products and product candidates: (i) Epidiolex in Lennox-Gastaut Syndrome, Dravet Syndrome, Rett Syndrome (US only) and tuberous sclerosis complex, (ii) Nabiximols / Sativex in multiple sclerosis spasticity, spinal cord injury spasticity, post-traumatic stress disorder ("PTSD") and additional broad spasticity indications, (iii) development organic products in schizophrenia, irritability in adult autism, agitation in dementia, canine epilepsy and

CLASS ACTION COMPLAINT

epilepsy and (iv) potential cannabinoid science-based product candidates in development in unspecified indications.

56.    However, after receiving multiple low offers from Jazz, the Board realized that the July projections would not allow Goldman Sachs and Centerview to provide the desired liability shielding fairness opinion.

57.    Accordingly, in December 2020, the Board directed Defendant Gover and his management team to prepare the significantly lower December Projections[2] to provide to the financial advisors for use in their fairness opinions. The December Projections incorporated drastic slashes to both revenues and earnings projections for years 2021-2035 averaging a 15% reduction per year for revenue and a 20% reduction per year for EBIT:

|  | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|
| Revenue | -4.6% | -2.5% | -5% | -4.9% | -4.8% | -10.2% | -12.6% | -13.1% |
| EBIT | -58.6% | -6.4% | -7% | -6% | -5.7% | -11% | -13.7% | -14.3% |

|  | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | **AVG** |
|---|---|---|---|---|---|---|---|---|
| Revenue | -14.1% | -15.2% | -22.6% | -23.6% | -25.9% | -35.2% | -38.1% | **-15.5%** |
| EBIT | -15.0% | -15.6% | -25.8% | -26.0% | -28.6% | -39.0% | -42.5% | **-21.0%** |

58.    The Company told Centerview that the December Projections were reasonably prepared on bases reflecting the best currently available estimates and judgments of the management of GW. The Company told Goldman Sachs that the December Projections and the NOL Projections were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of

---

[2] The December Forecasts included management projections for the following products and product candidates: (i) Epidiolex in Lennox-Gastaut Syndrome, Dravet Syndrome and tuberous sclerosis complex, (ii) nabiximols / Sativex in multiple sclerosis spasticity and spinal cord injury spasticity, (iii) development organic products in schizophrenia, irritability in adult autism, agitation in dementia, canine epilepsy and epilepsy and (iv) development platform in unspecified indications.

CLASS ACTION COMPLAINT

GW. Then, the GW Board and GW's management directed Centerview and Goldman Sachs to use and rely on the December Projections in connection with their financial analyses and respective opinions.

59.    However, as set forth herein, Defendants did not genuinely believe in the December Projections, knew that the numbers reflected therein were far below their genuine expectations regarding the Company's future financial performance, and were contrary to GW's experienced growth between the creation of the July Projections and December Projections. Indeed, the Company posted consecutive quarters of positive financial results in August 2020 and November 2020. The Company then increased its financial guidance in January 2021. The Defendants knew about the Company's positive financial performance during this time as reflected in Defendant Gover's comments during GW's Q3 2020 Earnings Call on November 3, 2020, just a month before the Company's projections were slashed:

> Overall, I'm very pleased to report a strong quarter with total revenue in Q3 of $137 million, the sequential growth the 13% over the prior quarter and 51% over the prior year quarter. Year-to-date, total revenue is $379 million, representing 87% growth over the prior year.

> While the pandemic makes for more challenging commercial backdrop, we are confident that Epidiolex has all the characteristics to continue to exhibit strong growth in the months and years to come.

> In the close to two years since launch in the U.S., we estimate that Epidiolex has to-date achieve penetration of approximately 30% of LGS patients, 40% of Dravet patient, 10% of TSC patients and less than 10% of other refractory childhood onset epilepsies. While this level of penetration is significant, it is clear that there are tens of thousands of U.S. patients that remain potential candidates for Epidiolex.

> In the second half of August, our U.S. sales organization started actively promoting the TSC indication. Receptivity to-date has been very positive and we believe that this indication will offer strong support to the commercial momentum of Epidiolex as we move through the remainder of the year and into 2021.

> We have also seen important progress in recent months and expanding payer coverage, and overall, consider ourselves to be very well-positioned to deliver on the full potential of Epidiolex.

CLASS ACTION COMPLAINT

Outside the U.S., Epidiolex delivered a strong quarter, demonstrating a strong recovery from a COVID impacted Q2 and we continue to make important progress in pricing and reimbursement in key European market.

As we have stated on previous calls, we see Epidiolex as representing the beginning of a new era for cannabinoid science and we are committed to it advancing GW's cannabinoid pipeline to develop important new treatments for patients with a particular focus on the field of neurology and neuropsychiatry.

In recent weeks, we have commenced a new Phase 3 program in MS, the start of a new Phase 2 program in schizophrenia and the first inhuman dosing in a Phase 1 trial of a new drug candidates targeted within neuropsychiatry.

Notably, we announced today that the nabiximols Phase 3 clinical program is now underway, where the first MS spasm study now recruiting patient. A second Phase 3 study on track to commence shortly and three other studies set to begin in 2021. As we have previously stated, any one of these studies could lead us to an NDA submission with FDA and data from the first study is expected in 2021.

***

In closing, we are very pleased with the performance of GWS overall business in Q3. The essential elements to support future Epidiolex revenue growth are in place, in particular, an expanded indication and efficacy profile, broadening payer coverage and near universal adoption by key prescriber target. We fully expect Epidiolex to follow the same long-term growth path seen with previous highly successful anti-epilepsy drugs. We continue to enhance the exclusivity position of Epidiolex.

In addition to the 13 patents currently listed in the orange book, 12 of which expire in 2035, two further orange book listable patents are expected to be allowed or granted by Q1 2021 and additional applications beyond this are in prosecution. We also believe that the addition of the composition patent currently under review will provide an additional layer of protection.

And beyond Epidiolex, as I mentioned in my opening remarks, we are committed to advancing GW's cannabinoid pipeline to develop important new treatments for patients. GW is the unparalleled world leader in this field of science and our early mid- and late-stage pipeline taking shape.

This is most evident for nabiximols where we have multiple opportunities for our NDA submission as early as mid next year. The commercial potential and long-term exclusivity prospects for this product in the U.S. are truly exciting.

18

CLASS ACTION COMPLAINT

60.    Moreover, the reasons provided in the Proxy for downgrading the financial metrics from the July Projections to the December Projections are unsupported by or inconsistent with Defendant Gover's and the Company's statements regarding their genuine beliefs about the Company's future prospects.

61.    As set forth in the Proxy, the reductions made to derive December Projections were predicated on the following false and misleading inputs and assumptions:

- the removal of Rett Syndrome as a target indication for Epidiolex in light of the suspension of GW's ongoing Phase 3 clinical trial of Epidiolex in children with Rett Syndrome due to the impacts of the COVID-19 pandemic;

- the removal of PTSD as a target indication for nabiximols / Sativex given GW's decision after the July Forecasts had been prepared to delay the initiation of a planned study of nabiximols in PTSD and reassess the study in the second half of 2021;

- the removal of broad spasticity as a target indication for nabiximols / Sativex given that GW had already incorporated multiple sclerosis spasticity and spinal cord injury spasticity as target indications and a clinical program for broad spasticity had not yet been determined;

- the decrease in the POS assigned to development platform from 12% to 5%, reflecting GW management's assessment that the POS should be lower to reflect the risks associated with these assets, taking into account commonly used POSs in the industry for pipeline assets of this nature, given that the development platform assets were generally in research, pre-clinical or early clinical trial phases of development;

As set forth below, each of these reasons are refuted from contemporaneous statements made by GW or their management.

62.    First, while it appears to be true that the pandemic impacted the Epidiolex-Rett Syndome clinical trial, the Company's use of Epidiolex to help neurodevelopmental disorders was not abandoned, but rather shifted focus to a much broader and more profitable indication. As stated in the November 3, 2020 Q3 Earnings Call:

19

CLASS ACTION COMPLAINT

We also remain committed to more broadly understand the potential of cannabinoids in neurodevelopmental disorders. Until now these efforts have been centered around the study of Epidiolex and Rett syndrome and an investigator sponsored trial of CBDV in autism.

The pandemic has caused meaningful feasibility challenges for the Rett study and we have therefore decided not to resume recruitment into this trial. Rather, we will further the understanding of the behavioral and cognitive effects of CBD in the broader autism population with a new study.

This new 160-patient placebo controlled trial is expected to commence in Q1 2021 and we'll address the core symptoms of autism with the CBD formulation.

*** 

**Neena Bitritto-Garg**

Hey, guys. Thanks for taking my question. I just wanted to ask about, Dravet syndrome study, I know you said that you face some challenges and you've decided not to -- continue to enroll patients in that study. But I guess, could you just elaborate a little bit more on what some of the complications you or the challenges that you've faced or given that I thought many of these assessments were essentially patient diaries and could be done remotely? And I guess, do you expect any of those challenges to translate into the CBD formulation studies that you're planning to start in autism? Thanks.

**Justin Gover**

Thanks, Neena. Volker?

**Dr. Volker Knappertz**

Yeah. So it was a difficult decision for us to stop Dravet study. As you may recall, Rett is a rare, almost ultra-rare condition that affects predominantly girls and women. I think the estimate for the United States today is about 60,000 total patients prevalent in the United States. And so it's a very different proposition to try to recruit a population that has -- that is so rare under these conditions.

So it was challenging to recruit Rett before the pandemic started and during the pandemic, I think, the concerns also about the patient safety and bringing patients to the sites for the assessments, despite our best efforts to try to do things by telemedicine within the constraints of the of the protocol and within the constraints of what is actually feasible with regards to the guidances that regulators and the FDA have issued on this. That have really shown to us that this is a study that we don't believe we can recruit in a reasonable timeframe.

And our interest in Rett has always been that it's a monogenic disease that has a lot of features, while not itself an autism spectrum disorder has a lot of the features that are also seen in autism spectrum disorder.

20

CLASS ACTION COMPLAINT

And after some very careful considerations, we believe, the much higher prevalence of autism spectrum disorder that will lend itself better to get these very important non-seizure neurodevelopmental outcomes for which we have a lot of anecdotal reports, especially in the syndromatic epilepsies for which we are already approved that these non-seizure neurodevelopmental features and the core features of autism can be addressed there.

So it's really a question of safety, a question of feasibility and it was a difficult decision to make, and we are confident that with regards to autism, we have a much better path forward there and get to some of the similar answers that we're looking for the effect of CBD.

63.   Yet, neither the July Projections nor the December Projections reflect any input for autism as a target indication for Epidiolex. Rather, the December Projections deleted a line of revenue without adding in its replacement. Given the stated optimism and confidence that an autism indication is a "much better path forward," this unilateral deletion of revenue projections artificially decreased the value of the Company represented in the December Projections. Accordingly, this adjustment does not reflect the Company's actual value, the Company's contemporaneous public statements, nor the Individual Defendants' understanding of the Company's actual value.

64.   Second, the December Projections removed both PTSD and broad spasticity as target indications for Nabiximols / Sativex, despite the Company's clear plans to keep pursuing these areas.

65.   The following comment from Defendant Gover's presentation at the Stifel Virtual Healthcare Conference, on November 18, 2020, indicates GW's persistence in pursuing broad spasticity as a target indication for Nabiximols:

**Paul Matteis**

Well, maybe do you want to just finish off by laying out the other pipeline catalysts to look forward to over say the next 12 to 18 months?

**Justin Grover**

Yes, just very briefly, right, we've got nabiximols is not just limited to MS, of course. So this is we, we believe based on FDA discussions that we can get a broader spasticity label, which would be a huge win for the company.

21

CLASS ACTION COMPLAINT

66.    The following slides and comments from Defendant Gover's presentation at the 39th Annual JPMorgan Virtual Healthcare Conference on January 12, 2021 indicate GW's persistence in pursuing broad spasticity and PTSD as target indications for Nabiximols:



On slide 22, as we think about the life cycle beyond MS spasticity, we see real opportunities within the broader spasticity market. There are as many as 3 million patients in the United States with spasticity associated with various conditions.

In discussions with the FDA, we are confident that a broad spasticity label is achievable for this product. And beyond MS, our next target was the spinal cord injury spasticity, which is similar in size to the commercial opportunity for multiple sclerosis. The addition of this indication may in fact be sufficient to achieve the broad spasticity label.

And beyond spasticity, we're also looking now at PTSD. And there is great interest within the PTSD community around cannabis and the potential for an FDA approved option. We are currently preparing a phase 2 clinical trial in this indication.

22

CLASS ACTION COMPLAINT

## Opportunity to Achieve Broad Spasticity Label As Well as Other Lifecycle Opportunities

○ Broader spasticity population
  ○ >3M U.S. patients including spinal cord injury, post-stroke, ALS, traumatic brain injury, cerebral palsy

○ Spasticity associated with Spinal Cord Injury (SCI)
  ○ Approx. 250K chronic SCI patients (~65%) suffer from spasticity
  ○ Likely single pivotal trial required
  ○ Sales potential ~$350M

○ Post Traumatic Stress Disorder (PTSD)
  ○ Impacting ~11.7M people with ~55% diagnosed
  ○ Anxiety is one of the top 3 reasons for self-medication with cannabis
  ○ Nabiximols offers potential to reduce sleep disturbance symptoms, anxiety and irritability

Sources: DiPiro. Spinal Cord. 2018; McGuire. Spasticity: Diagnosis and Management, 2011; Nicholson. Muscle Nerve. 2018; AANS Website; UpToDate; Physician Interviews; ClearView Analysis. Goldstein. Soc Psychiatry Psychiatr Epidemiol 2016; Kessler. Arch Gen Psychiatry. 2012; Kessler. Arch Gen Psychiatry. 2005; UpToDate; Physician Interviews; ClearView Analysis

22                    J.P. Morgan Healthcare Conference | January 12, 2021                    GW

67.    Slides 13 and 15 from Jazz Pharmaceutical's February 2021 Investor Presentation on the Merger further indicate GW's persistence in pursuing broad spasticity and PTSD as target indications for Nabiximols:

## Nabiximols: Next U.S. Commercial Opportunity



- Derived from the whole cannabis plant containing a clinically proven, balanced dose of THC and CBD along with other cannabinoid and non-cannabinoid plant components
- **Approved in >25 countries** outside the U.S. as Sativex® for the treatment of spasticity due to multiple sclerosis (MS); sold via marketing partners
- **Near-term opportunity** in MS Spasticity
  - Positive efficacy, safety and abuse/diversion data
  - US pivotal clinical program now recruiting
- **Broad potential** in spasticity beyond MS
- Complex botanical formula strengthens exclusivity
- **In Phase 3 development in the US** and aiming to submit a NDA to the FDA in the next 1-2 years

Jazz Pharmaceuticals                                                        13 | February 2021

23



68.    Accordingly, removing all revenue from broad spasticity and PTSD indications for Nabiximols does not reflect the Company's actual value, the Company's contemporaneous public statements, nor the Individual Defendants' understanding of the Company's actual value.

69.    Third, the dramatic reduction in the probability of success ("POS") from 12% in the July Projections to 5% in the December Projections represents an unwarranted slashing to the future value of the Company. Based on contemporaneous rosy statements from the Company, GW's probability of success improved—not deteriorated—in both their clinical and developmental assets.

70.    The following comments from Defendant Gover's presentation at the 39th Annual JPMorgan Virtual Healthcare Conference, on January 12, 2021, indicate GW's *increased* probability of success for its clinical trials (emphasis added):

> And so on slide 20 over the last 18 months, we have had multiple informative and collaborative meetings with the FDA to agree the route to an NDA submission for nabiximols in MS.

In essence, we expect to bridge from the three positive trials carried out in Europe by supplementing the file with one additional trial with primary data and a more proximate spasticity endpoint, either addressing muscle tone or spasms. Although we only expect to need data from one additional trial, we have decided to pursue a multiple shots on goal strategy with five trials planned. And I'm pleased to announce that the first two of these five trials are now underway. *This multiple shots on goal strategy not only **increases the probability of success**,* but we also see that the abundant clinical data generated will prove useful to physicians and patients as we bring this product to the United States. And beyond MS spasticity, we have also discussed with FDA the potential for expanding into other indications.

71.     And statements from Volker Knappertz, the Company's Chief Medical Officer, made in the November 3, 2020 Q3 Earnings Call indicate that the Company is moving strongly forward with its developmental pipeline:

Regarding CBDV, an autism spectrum disorder, recruitment has resumed in the investigator led 100 patient placebo controlled trial.

During September we were pleased to initiate a Phase 2b study in schizophrenia. This randomized double-blind placebo controlled trial will investigate the safety and efficacy of GWP42003 versus placebo as adjunctive therapy in participants with schizophrenia experiencing inadequate response to ongoing anti-psychotic treatments. Additionally, a study of an intravenous form of cannabidiol to treat neonatal hypoxic ischemic encephalopathy or NHIE continues to recruit.

Finally, I'm excited to introduce a new botanical cannabinoid product candidate, GW541. GW541 is a complex botanical formulation that contains many known constituents of the cannabis sativa plant, but differs in cannabinoid composition from nabiximols.

The relative amounts of the target cannabinoids have been optimized to treat conditions within the field of neuropsychiatry. The Phase 1 study to assess the safety, tolerability and pharmacokinetics of GW541 in healthy and elderly volunteers has recently commenced. This is one of several new candidates that our discovery team has been evolving and we expect additional new cannabinoid products to enter the clinic in 2021.

72.     In other words, there was no indication that the Company's developmental platform was downgraded or that any intervening event would have caused the Company's probability of success to drop drastically from July to December. Such an event would certainly have been material information and would

25

CLASS ACTION COMPLAINT

have been disclosed to shareholders. Accordingly, the drastic reduction to POS does not reflect the Company's actual value, the Company's contemporaneous public statements, nor the Individual Defendants' understanding of the Company's actual value.

*The Challenged Misleading Statements*

73. Plaintiff identifies the following statements as actionably false or misleading statements of material fact.

74. **First**, the changes in assumptions identified in the Proxy on pages 83-84 for drastically lowering the July Projections to create the December Projections were false and misleading. These assumptions are contradicted by the contemporaneous Company statements identified above and misled shareholders to conclude that these changes were reasonable or accurately reflected changes in the Company's value.

75. **Second**, the statements in the Proxy conveying that the December Projections and their underlying assumptions were "reasonably prepared" and reflected the Company's "best currently available estimates" ((i) Proxy at 68: "that the Internal Data (including, without limitation, the December Forecasts) were reasonably prepared on bases reflecting the best currently available estimates and judgments of the management of GW;" and (ii) Proxy at 75: "that the December Forecasts and the NOL Forecasts were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of GW.") were materially false and misleading because, as set forth herein, Defendants did not genuinely believe that the December Projections and the assumptions upon which they were generated were reasonable, as Defendants knew that the Company's long-term prospects were more accurately reflected by the assumptions and valuations set forth in the July Projections.

76. **Third**, the implied per share value reference ranges calculated by the Financial Advisors using the reduced December Projections (Proxy at 70-73, 76-79)

CLASS ACTION COMPLAINT

misled GW shareholders as to the inherent value of their shares. Moreover, the failure to include the original financial analyses performed by GW management using the July Projections exacerbates these misrepresentations. The earlier performed analyses using the projections that accurately reflecting the Company's value would have illustrated to shareholders that the Merger Consideration was a depletion of value from their holdings.  However, all GW shareholders had to rely on was the misleading ranges using the drastically lowered December Projections causing them to falsely believe that the Merger Consideration fell into a range of fair value.

77.    Defendants did not actually believe in the December Projections, and knew they were false and misleading because they: (i) were predicated upon unreasonable assumptions that contradicted the July projections that were prepared in the ordinary course of business and reflected the Company's actual expected financial outlook; (ii) were predicated upon unreasonable assumptions that contradicted the Company's and Defendant Gover's positive statements made during the months after July Projections up through the announcement of the Merger; (iii) were incongruous with the Company's and Defendant Gover's positive statements made during the months after July Projections up through the announcement of the Merger regarding the Company's positive financial trends and strong growth prospects; and (iv) were not used during the Company's negotiation with Jazz and were created solely for use by the Financial Advisors to provide their fairness opinions. Therefore, the statements supporting the December Projections as reasonably prepared and reflecting the Company's best available estimates were false and misled GW shareholders regarding the Company's future prospects and value.

78.    The summary of Goldman Sachs' and Centerview's financial analyses and the resulting implied equity value ranges were materially misleading because the range was calculated utilizing unsound forecasting methodologies, was based on the unreasonably low December Projections that were drastically below Defendants'

CLASS ACTION COMPLAINT

genuine expectations regarding the Company's future, and therefore presented the value of shareholders' shares in a misleadingly low manner.

## III. The Defendants Were Negligent for Authorizing the Dissemination of the Materially Misleading Proxy

79.    As directors and/or officers of the Company, each of the Individual Defendants had a duty to carefully review the Proxy before they authorized its dissemination to ensure it did not contain any materially false or misleading statements. The Individual Defendants failed to fulfill their duty by allowing the Proxy to contain the materially false and misleading statements referenced above. As a result, shareholders were misled to voting in favor of the Merger, thereby causing them to receive less than full value for their shares and lose out on millions of dollars of value in the Company.

80.    Each Individual Defendant was negligent because, as directors of the Company, they were responsible for and significantly involved in the preparation and dissemination of the Proxy. Furthermore, as directors of the Company, each of the Individual Defendants were aware of the July Projections, and management's comments and views regarding the Company's financial condition and prospects that were conveyed during the Company's press releases, earnings calls, and presentations. Therefore, each of the Individual Defendants was aware of the fact that the December Projections significantly slashed the Company's revenue and earnings projections as set forth in the July Projections, despite the fact that such a significant slash was in no way warranted or justified by the Company's and management's outlook or any negative changes to the Company's long-term business prospects. And that such reductions were contradicted by the Company's increases to its financial outlook. The Individual Defendants also reviewed the financial analyses and fairness opinions with Goldman Sachs and Centerview, knew that the sole purpose for the creation of the unreasonable December Projections was for Goldman Sachs and Centerview to

CLASS ACTION COMPLAINT

generate fairness opinions, and knew that Goldman Sachs and Centerview's financial analyses were predicated on the unreasonably low December Projections. Nevertheless, Defendants negligently approved and authorized the dissemination of the Proxy, which contained the unreasonably low December Projections and related false and misleading statements set forth above.

81. Instead of acknowledging that the December Projections were inappropriate for use in valuing the Company because they were predicated on unsound and unreasonable assumptions and inputs, the Individual Defendants allowed Goldman Sachs and Centerview to utilize the December Projections for purposes of their valuations, and negligently allowed the resulting materially false and misleading valuations to get disseminated to shareholders in the Proxy.

**IV.   The Materially Misleading Proxy Statement Caused GW shareholders Economic Harm**

82. The Merger, which could not have been accomplished without the Proxy that misled shareholders regarding the value of their shares, shortchanged GW shareholders at a price well below the fair value of their GW shares.

83. Multiple sources indicate that fair value of GW stock was more than $270 per ADS, far in excess of the $220 Merger Consideration.

84. Indeed, had the valuations performed by the Financial Advisors been calculated utilizing the legitimate July Projections, GW's valuation would have entirely exceeded the value of the Merger Consideration. In other words, the Merger Consideration would have fallen outside the range of fairness and the Financial Advisors would ***not*** have been able to issue their fairness opinions touting the Merger Consideration as fair to GW shareholders.

85. GW's revenue for years 2021-2035 was slashed by an average of 15% from the July Projections to the December Projections. GW's EBIT for years 2021-

CLASS ACTION COMPLAINT

2035 was slashed by an average of 20% from the July Projections to the December Projections.

86.    Centerview's Discounted Cash Flow Analysis ("DCF")[3] resulted in a range of implied equity values per GW ADS of $200.20 to $247.95.

87.    Goldman Sachs' DCF resulted in a range of implied equity values per GW ADS of $199 to $244.

88.    Typically, reductions to top line revenue are amplified on down the line numbers as costs, both fixed and variable, take their toll on the metrics. Stated simply, a 15% cut in revenue will have a greater than 15% impact on earnings and free cash flows (the necessary metric to perform a DCF). This point is illustrated here by the difference in changes between revenue and EBIT metrics from the July Projections to the December Projections. For years 2021-2035, revenue metrics decreased by an average of **15%** causing EBIT projections to be decreased by **20%**. Accordingly, free cash flows would have been decreased even further than 20%.

89.    However, even utilizing the conservative 15% and 20% numbers, it is clear that the results of both Financial Advisors' DCF analyses would have shown the value to the Company to entirely exceed the value of the $220 Merger Consideration:

|  | Centerview | | Goldman | |
|---|---|---|---|---|
|  | Low | High | Low | High |
| Results from Proxy | $ 200.20 | $ 247.95 | $ 199.00 | $ 244.00 |
| Reflecting 15% Change | $ 235.53 | $ 291.71 | $ 234.12 | $ 287.06 |
| Reflecting 20% Change | $ 250.25 | $ 309.94 | $ 248.75 | $ 305.00 |

---

[3]    "Discounted cash flow (DCF) forms the core of finance…. Though professionals may employ other methods of valuation, such as relative valuation and the contingent claims approach, DCF forms the basis for all other valuations. Underscoring the importance of DCF valuation is the fact that it provides a linchpin to link various fields of finance." The Valuation Handbook: Valuation Techniques from Today's Top Practitioners. Ed. Rawley Thomas and Benton E. Gup. Hoboken: John Wiley & Sons, 2010. 110

CLASS ACTION COMPLAINT

90.     Moreover—and supporting the $270.09 average of these higher valuations—expert Wall Street analysts maintained price targets for GW of up to $270 and $275.  This further indicates that shareholders suffered economic loss as a result of the materially false and misleading Proxy that was utilized to procure approval of the unfair Merger.

## COUNT I

**Claims Against Defendants for Violations of Section 14(a) of the Exchange Act**

91.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

92.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

93.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

94.     GW and the Individual Defendants violated Section 14(a) and Rule 14a-9 because they negligently caused or allowed the Proxy to be disseminated to GW shareholders to solicit them to vote in favor of the Merger, and the Proxy contained

misleading statements of material fact that a reasonable and director or officer would have corrected prior to approving, signing, and disseminating the Proxy.

95.   GW and the Individual Defendants were negligent in allowing the Proxy to be disseminated with the above-referenced materially misleading statements regarding the Company's projections, the value of the Company, and the purported fairness of the Merger. As directors and officers of GW, the Individual Defendants had a duty to carefully review the Proxy before it was disseminated to the Company's shareholders to ensure that it did not contain untrue or misleading statements of material fact. The Individual Defendants were negligent in carrying out their duty because, as set forth herein, the Proxy contains materially false and misleading statements.

96.   GW is imputed with the negligence of the Individual Defendants, who were officers and directors of the Company.

97.   As a direct result of GW and the Individual Defendants' negligent preparation, review, and dissemination of the misleading Proxy, GW shareholders were induced to vote in favor of the Merger and accept the inadequate Merger Consideration. The misleading Proxy used to solicit votes impeded Plaintiff and other GW shareholders from making a fully informed decision regarding the Merger and was an essential link in consummating the Merger, which deprived them of full and fair value for their GW shares.

98.   At all times relevant to the dissemination of the materially false and/or misleading Proxy, GW and the Individual Defendants were aware of and/or had access to the true facts concerning the process involved in selling GW, the public statements made leading up to the Merger, the projections for GW, and GW's true value, which was greater than the Merger Consideration GW shareholders received.

99.   The misrepresentations in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote their shares in the

Merger. In addition, a reasonable investor would view a full and accurate disclosure as having significantly altered the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

100.   As a direct and proximate result of the dissemination of the misleading Proxy GW and the Individual Defendants used to obtain shareholder approval of the Merger, Plaintiff and the Class have suffered damages and actual economic losses (*i.e.* the difference between the value they received as a result of the Merger and the true value of their shares) in an amount to be determined at trial. By reason of the misconduct detailed herein, GW and the Individual Defendants are liable pursuant to Section 14(a) of the Exchange Act.

## <u>COUNT II</u>

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

101.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

102.   The Individual Defendants acted as controlling persons of GW within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of GW and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements contained in the Proxy, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contend are false and/or misleading.

103.   Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

CLASS ACTION COMPLAINT

104.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of the Individual Defendants to approve the Merger and the signature of each the CEO and Executive Chairman. The Individual Defendants were thus directly involved in the making of the Proxy.

105.    By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act.

106.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange Act, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff demands relief in his favor and against the Defendants jointly and severally, as follows:

A.    Declaring this action a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as Class Representatives and their counsel as Class Counsel;

B.    Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

C.    Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.    Granting such other and further relief as this Court may deem just and proper.

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: May 27, 2021

**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, New York 10118
Tel: 212-971-1341
Fax: 212-202-7880
jmonteverde@monteverdelaw.com

*Counsel for Plaintiff*

Respectfully submitted,

*/s/ David E. Bower*
David E. Bower

David E. Bower SBN 119546
**MONTEVERDE & ASSOCIATES PC**
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (213) 446-6652
Fax: (212) 202-7880
dbower@monteverdelaw.com

*Counsel for Plaintiff*

CLASS ACTION COMPLAINT