David E. Bower (SBN 119546)
**MONTEVERDE & ASSOCIATES PC**
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (213) 446-6652
Fax: (212) 202-7880
dbower@monteverdelaw.com

*Lead Counsel for Lead Plaintiffs and the Putative Class*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KURT ZIEGLER and DANIEL BRADY, on Behalf of Themselves and All Others Similarly Situated,<br><br>                              Plaintiffs,<br><br>          v.<br><br>GW PHARMACEUTICALS, PLC, JUSTIN GOVER, GEOFFREY GUY, CABOT BROWN, DAVID GRYSKA, CATHERINE MACKEY, JAMES NOBLE, ALICIA SECOR, and LORD WILLIAM WALDEGRAVE,<br><br>                              Defendants. | Case No. 3:21-cv-01019-BAS-MSB<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Lead Plaintiffs Kurt Ziegler and Daniel Brady (together, "Plaintiffs"), by their undersigned attorneys, allege upon personal knowledge with respect to themselves, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

-1-

FIRST AMENDED CLASS ACTION COMPLAINT

## NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiffs on behalf of themselves and the other former public holders GW Pharmaceuticals, PLC ("GW" or the "Company") against GW and GW's former executive officers and/or members of its board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with GW, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiffs' claims arise in connection with the acquisition (the "Merger") of GW by Jazz Pharmaceuticals, PLC and its subsidiaries ("Jazz").

2.      On February 3, 2021, GW entered into an agreement and plan of merger pursuant to which Jazz acquired GW and the holders of GW American Depositary Shares[1] ("GW shareholders") had their holdings extinguished in exchange for $200 in cash and $20 in Jazz stock (0.120360 shares) for each GW ADS they owned (the "Merger Consideration"). Despite knowing that the Merger Consideration grossly undervalued the Company, Defendant Geoffrey W. Guy (founder, Executive Chairman, and Chairman of the Board of his namesake GW) sought an exit from the responsibility of running a public Company and wanted to free up time and money to begin work on his latest project. So, when Jazz offered to acquire GW during the pandemic in late 2020, it was perfect timing and he pounced on the opportunity to cash out. Using his powerful influence over his handpicked Board, he authorized nearly $100 million dollars in change in control payments for Company management and steered GW towards a sale.

---

[1] An American Depository Share ("ADS") represents an ownership interest in a foreign deposited security (much like a share of stock represents an ownership interest in a corporation) that has been deposited with a depository, such as a United States bank or trust company. ADSs are traded in the United States in much the same way as equity securities issued by domestic companies.

FIRST AMENDED CLASS ACTION COMPLAINT

3.     On March 15, 2021, to convince GW shareholders to vote in favor of the unfair Merger, Defendants caused a materially false and misleading Definitive Proxy Statement (as amended and supplemented, the "Proxy"), to be filed with the SEC and disseminated to GW shareholders. As set forth below, the Proxy was materially false and misleading with respect to GW's operations and financial projections, the value of GW shareholders' stock, and the fairness of the Merger Consideration.

4.     The Proxy provided a materially false and misleading valuation picture of GW by disseminating unreasonably low financial projections for 2021-2035 (the "December Projections"), which were used to frame the Merger Consideration as "fair." In reality, the Merger Consideration significantly undercompensated GW shareholders and provided them with substantially less than the fair value of their holdings.

5.     The changes made to, and the numbers reflected in, the December Projections are entirely unreasonable, disconnected from the reality of GW's business operations, contradicted by contemporaneous statements made by the Company and its executive officers, and reflect just a fraction of the actual value of the Company.

6.     The December Projections were created solely for use by GW's financial advisors, Goldman Sachs & Co. LLC ("Goldman Sachs") and Centerview Partners LLC ("Centerview" and together with Goldman Sachs, the "Financial Advisors"), to perform the valuation analyses underlying their fairness opinions—which were then summarized in the Proxy to convince GW shareholders the Merger Consideration was fair. Without the December Projections, which Defendants authorized Goldman Sachs and Centerview to use despite knowing that the December Projections did not accurately reflect the Company's long-term financial prospects and value, the Financial Advisors would have been unable to issue fairness opinions, Defendants would have been unable to claim that the Merger Consideration provided shareholders

FIRST AMENDED CLASS ACTION COMPLAINT

with fair value for their holdings, and the Financial Advisors would have been forced to forego the $72 million in fees they received.

7. As set forth below, (i) the pretextual stated changes purportedly justifying the slashes to the December Projections, (ii) the statements in the Proxy conveying that the December Projections and their underlying assumptions were "reasonably prepared" and reflected the Company's "best currently available estimates," and (iii) the present value per GW ADS ranges that were predicated on the downward manipulated December Projections misled GW shareholders about the fair value of their ADSs, causing them to vote in favor of the Merger and accept the unfair Merger Consideration.

8. The Merger closed on May 5, 2021, and GW ADSs were surrendered via the Merger in exchange for $200 in cash and 0.120360 Jazz ordinary shares per each ADS. Notably, cash was provided in lieu of any fractional amount of Jazz stock owned. Accordingly, only owners of at least 9 ADSs were allowed to keep at least 1 share of Jazz stock and maintain any continued ownership interest in the Company.

9. For these reasons and as set forth in detail herein, Defendants violated Sections 14(a) and 20(a) of the Exchange Act. Plaintiffs seek to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

10. This Court has original jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiffs allege violations of Sections 14(a) and 20(a) of the Exchange Act.

11. Personal jurisdiction exists over each Defendant either because the Defendant conducted business in or maintained operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction

FIRST AMENDED CLASS ACTION COMPLAINT

over the Defendant by this Court permissible under traditional notions of fair play and substantial justice.

12.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as pursuant to 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) GW maintained its US headquarters in this District and each of the Individual Defendants, Company officers and/or directors, either reside in this District or have extensive contacts within this District; (iii) a substantial portion of the Merger and wrongs complained of herein occurred in this District; (iv) relevant documents pertaining to Plaintiffs' claims are stored (electronically and otherwise), and evidence exists, in this District; and (v) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## **PARTIES**

13.    Plaintiff Kurt Ziegler was a holder of GW ADSs at all relevant times.

14.    Plaintiff Daniel Brady was a holder of GW ADSs at all relevant times.

15.    Defendant GW is a company that was incorporated in the United Kingdom. The Company maintained its U.S. headquarters and an administrative office in Carlsbad, California. The Company's U.S. subsidiary, Greenwich Biosciences, Inc. was also located in Carlsbad, California. Prior to the Merger, the Company's ADSs traded on the Nasdaq stock exchange under the ticker symbol "GWPH".

16.    Individual Defendant Geoffrey W. Guy was GW's Executive Chairman and Chairman of GW's Board. He founded the eponymous GW Pharmaceuticals in 1998 shortly after being removed from control of his first two companies in late 1997. He spent the next several months securing a license from the UK Home Office to grow and supply cannabis for the research and development of medicine and GW was off to the races. Learning from the experience of his previous companies, Defendant Guy surrounded himself at GW with those he could control. When Jazz made its initial

FIRST AMENDED CLASS ACTION COMPLAINT

offer in July 2020, Defendant Guy was ready to exit the Company, and so the Company was sold.

17.    Individual Defendant Justin Gover was both GW's Chief Executive Officer and a director on GW's Board. He has known and worked for Defendant Guy for nearly 30 years. He grew from being Defendant Guy's assistant at their first Company, Ethical Pharmaceuticals, to exiting his position as GW CEO in the Merger with a $40 million payday. When GW went public in 2013, and Defendant Guy needed someone he could trust to run the day-to-day operations of a US publicly traded company, he advanced Defendant Gover from Managing Director to CEO.

18.    Individual Defendant Cabot Brown was a non-executive director of the Company since its IPO. Defendant Brown has a close and longstanding relationship with Defendant Guy that spans a quarter of a century. When GW went public in 2013, and Defendant Guy needed someone he could trust to support him, he named Defendant Brown to GW's Board of Directors.

19.    Individual Defendant David Gryska was, at all relevant times, a non-executive director of the Company. Defendant Gryska is the least tenured member of the Board and was appointed unilaterally by the existing Board (with no outside shareholder approval) in September 2020 specifically for his experience in strategic transactions.

20.    Individual Defendant Catherine Mackey was, at all relevant times, a non-executive director of the Company. Defendant Mackey was unilaterally appointed to the GW Board in 2017 when the Company still operated as a foreign private issuer and was not subject to US proxy rules and regulations.

21.    Individual Defendant James Noble was, at all relevant times, a non-executive director of the Company. Defendant Noble has a longstanding relationship with Defendant Guy and was one of the three initial non-executive directors appointed to the Board when GW went public in 2013.

-6-

FIRST AMENDED CLASS ACTION COMPLAINT

22. Individual Defendant Alicia Secor was, at all relevant times, a non-executive director of the Company. Defendant Secor was unilaterally appointed to the GW Board in 2017 when the Company still operated as a foreign private issuer and was not subject to US proxy rules and regulations.

23. Individual Defendant William Waldegrave was, at all relevant times, a non-executive director of the Company. Defendant Waldegrave was unilaterally appointed to the GW Board in 2017 when the Company still operated as a foreign private issuer and was not subject to US proxy rules and regulations.

24. The Individual Defendants referred to in ¶¶ 16-23 are collectively referred to herein as the "Individual Defendants" and/or the "Board", and together with GW they are referred to herein as the "Defendants".

## **RELEVANT NON-PARTIES**

25. Jazz, a public limited company incorporated in the Republic of Ireland, is a global biopharmaceutical company dedicated to developing and commercializing medicines, with a focus in neuroscience, including sleep and movement disorders, and in oncology, including hematologic malignancies and solid tumors. The Company's corporate headquarters are located in Dublin, Ireland, with U.S. operations located in Palo Alto, California and Philadelphia, Pennsylvania. Jazz ordinary shares are listed on Nasdaq stock exchange under the ticker symbol "JAZZ".

26. Goldman Sachs & Co. LLC ("Goldman Sachs") is a well-known investment bank, with a history of serving as GW's investment banker, and was hired as a financial advisor to the GW Board for the purposes of completing the Merger. For acting as financial advisor to the GW Board, Goldman Sachs was paid $36 million wholly contingent upon GW executing a merger agreement and/or the consummation of the Merger. Specifically, $1.5 million of the $36 million was payable upon the announcement of the Merger and the remaining $34.5 million was contingent on GW shareholders approving the Merger and the consummation of the Merger. Notably,

FIRST AMENDED CLASS ACTION COMPLAINT

after GW's announcement of its blockbuster development plans for its drug product Sativex/nabiximols and GW's strong Second Quarter 2020 financial results, *Goldman Sachs issued a price target for GW of **$271 per ADS***—but that was before being paid $36 million to provide a fairness opinion of $220 per GW ADS. Finally, at the time of the Merger, Goldman Sachs was a lender to Jazz under its 2018 revolving credit facility. To finance the merger Jazz entered into new debt arrangements, which involved re-financing its existing credit facility. Accordingly, Goldman was set to profit from both sides of the Merger, and was therefore doubly incentivized to push through a deal.

27.    Centerview Partners LLC ("Centerview") is a well-known investment bank that served as a financial advisor to the GW Board for the purposes of completing the Merger. For acting as financial advisor to the GW Board, Centerview was paid $36 million wholly contingent upon GW executing a merger agreement and/or the consummation of the Merger. Specifically, $1.5 million of the $36 million was payable upon execution of the merger agreement and the remaining $34.5 million was contingent on GW shareholders approving the Merger and the consummation of the Merger.

## **SUBSTANTIVE ALLEGATIONS**

## **I.    Background of the Company and the Merger**

*Founding of GW*

28.    Defendant Geoffrey W. Guy founded the eponymous GW in 1998 as a biopharmaceutical company focused on discovering, developing, and commercializing novel therapeutics from proprietary cannabinoid products in a broad range of disease areas.

29.    GW was the third biopharmaceutical company founded by Defendant Guy and the second biopharmaceutical company he took public.

FIRST AMENDED CLASS ACTION COMPLAINT

30. In 1997, the year before GW was founded, Defendant Guy agreed to step down as Chairman of his private company PhytoPharma to allow his public Company, Ethical Pharmaceuticals ("Ethical"), to be able to sell at least some of its controlling position in PhytoPharma. That summer, in anticipation of Ethical's secondary listing on the London Stock Exchange (Ethical was already trading on the Nasdaq), Ethical took on new outside directors that were more well-known to the UK market. Shortly after the new board members joined Ethical, Defendant Guy faced a coup and was pushed out of both of the companies he founded.

31. Defendant Guy learned from his mistakes in allowing outsiders to control his companies. With GW, Defendant Guy made concerted efforts to not repeat those mistakes and to become the man in control of the Board and not the man the Board controlled. When an outside Board became necessary to list GW shares for trade on the Nasdaq as ADSs, Defendant Guy handpicked each member of the Board to stock it with directors beholden to him that would do and vote as instructed.[2] Take Defendants Gover and Brown for example.

32. Defendant Guy met Defendant Gover in China when the latter was just 21 years old. Defendant Guy told Defendant Gover that if he was ever back in London, that Defendant Gover should come work for Defendant Guy. When Defendant Gover returned to London, Defendant Guy hired him as his executive assistant at Ethical following the Nasdaq Listing. The two have known each other for so long that Defendant Guy refers to Defendant Gover as his right-hand man and has said that the

---

[2] In fact, none of the Individual Defendants' initial selection to the Board came via open election from the full body of GW shareholders. Defendants Guy, Gover, Brown, and Noble were all appointed as directors prior to the initial offering. Defendants Mackey, Secor, and Waldegrave were all appointed to the Board in 2017 and ratified when GW was still a foreign private issuer that was exempt from compliance with US proxy and voting rules and procedures. Finally, Defendant Gryska was only appointed in September 2020 specifically for his experience with strategic alternatives and never stood for election as a director.

FIRST AMENDED CLASS ACTION COMPLAINT

two share a very special relationship to the point that it is almost telepathic. So naturally, when GW was going public in 2013—and Defendant Guy, as Chairman would take a step back from control of the day-to-day operations—Defendant Guy elevated his right-hand man from Managing Director to Chief Executive Officer.

33. Similarly, Defendant Brown met Defendant Guy in the early 1990s when Defendant Brown helped Defendant Guy enormously in taking Ethical public on the Nasdaq. The two gelled instantly and developed a close relationship. Defendant Guy appreciated that Defendant Brown acknowledged straight away and deferred to Defendant Guy's understanding of *his* company. Defendant Guy has even referred to himself and Defendant Brown as fellow musketeers. So naturally, when Defendant Guy needed to bring in outside directors to take his namesake GW public (particularly those with close relationships that would defer to his decision-making), Defendant Guy selected Defendant Brown.

*GW's Business and Its Products*

34. GW was the world's first pharmaceutical company to commercialize a plant-derived cannabinoid prescription drug and, leading up to the Merger, the Company was the leading player in the medical field for cannabis products. GW has two primary products with current sales, either domestically or internationally, and in the final stages of U.S. Food and Drug Administration ("FDA") approval: Epidiolex (also known as Epidyolex) and Sativex (also known as nabiximols). GW also has a deep pipeline of additional cannabinoid product candidates and novel compounds in various FDA trial phases and development.

35. Epidiolex is a pharmaceutical formulation comprising highly purified plant-derived cannabidiol, or CBD, for which GW retains global commercial rights. GW initially launched Epidiolex in the U.S. in November 2018 for the treatment of seizures associated with Lennox-Gastaut syndrome ("LGS") and Dravet syndrome for patients two years of age and older. In July 2020, the FDA expanded the approval of

-10-

FIRST AMENDED CLASS ACTION COMPLAINT

Epidiolex, adding a new indication of seizures associated with Tuberous Sclerosis Complex ("TSC"). The FDA also approved the expansion of all existing indications, LGS, Dravet syndrome, and TSC, to patients one year of age and older. LGS and Dravet syndrome are severe childhood-onset, drug-resistant epilepsy syndromes. TSC is a rare genetic disorder that causes non-malignant tumors to form in many different organs and affects approximately 50,000 individuals in the United States and one million worldwide. In the months leading up to the Merger, GW was actively pursuing increasing the scope of Epidiolex both in existing sales to European and other international countries and in growing indications to drastically expand the drug's addressable market.

36.    Sativex, the world's first plant-derived cannabinoid prescription drug, is a complex botanical medicine formulated from extracts of the cannabis plant that contains the principal cannabinoids THC and CBD. The primary focus of Sativex is the treatment of spasticity:

### The Real-World Assessment of Spasticity

**What are we talking about when we say spasticity?**

**Classic Definition**
(Lance, 1980)

"Spasticity is a motor disorder, characterized by a velocity-dependent increase in tonic stretch reflexes (muscle tone) with exaggerated tendon jerks, resulting from hyper-excitability of the stretch reflex as one component of the upper motor neuron (UMN) syndrome."

**Patient-Centered Descriptions**
(Rizzo et al, 2004)

Uses lay language to describe a broader range of clinical characteristics of spasticity:
- Unusual tightening of muscles that feels like leg stiffness — early symptom
- Jumping of the legs — spasms or myoclonic jerks
- A repetitive bouncing of the foot (clonus)
- Muscle cramping in legs or arms — spasms or cramps
- Legs going out tight and straight — extensor spasms
- Legs drawing up — flexor spasms

2    JUNE 30, 2020                    GW

FIRST AMENDED CLASS ACTION COMPLAINT

Sativex is approved in 25 countries for the treatment of spasticity due to multiple sclerosis ("MS")—with demonstrated efficacy in multiple positive pivotal trials conducted in Europe.

37.    In the United States, Sativex (under the name nabiximols) is in Phase III of FDA trials for the treatment of spasticity due to MS, which would have enabled GW to submit a new drug application ("NDA") with the FDA, potentially as early as the fourth quarter of 2021. MS is the most prevalent inflammatory neurological disease of young adults affecting approximately 1 million people in the United States and over 2 million worldwide, with diagnoses growing at ~2% per year. 80% of MS patients experience spasticity, with 60% experiencing pain. The domestic MS market would provide huge potential for Sativex/nabiximols, where the existing treatments focus almost exclusively on reducing relapses and delaying disease progression, rather than focusing on relieving specific symptoms, such as spasticity.

38.    However, GW recognized far greater indications for Sativex/nabiximols than MS spasticity. GW had plans, both short and long term, to unlock Sativex's "blockbuster" revenue potential, including indications for: spinal cord injury (250-500k new cases per year, 80% spasticity, 80% pain); cerebral palsy (over 17 million people worldwide, 70% spasticity); stroke (over 7 million people, 30-80% spasticity, 60% pain); traumatic brain injury (over 10 million people, 17-20% spasticity); and post-traumatic stress disorder ("PTSD") (estimated annualized population prevalence is 1.8% for men and 5.2% for women).

39.    GW also had a diverse and promising development pipeline for other drug candidates, some of which were already showing strong results in Phase 1 or Phase 2 clinical trials or studies.

*Events Leading Up to the Merger*

40.    In February 2020, Remuneration Committee of GW's Board met in the normal course of its business with the Company's independent compensation

-12-

FIRST AMENDED CLASS ACTION COMPLAINT

consultant, Anderson Pay Advisors ("Anderson"), to consider the ordinary salary increases to be awarded to Executive Directors and Executive Officers. After assessing and awarding the bonus pool based on the achievement of 2019 calendar year objectives, the Remuneration Committee approved the bonus objectives to be achieved by the Executive Directors during 2020 and agreed to the terms of the 2020 equity grants for the Long Term Incentive Plan ("LTIP") awards to the Directors and Executive Officers.

41.     On May 11, 2020, GW announced its stellar financial results for the First Quarter 2021, including record revenues of $120.6 million (up 207% year-over-year) that *exceeded* expectations. Defendant Gover celebrated these results:[3]

> In the first quarter of 2020, we have seen continued strength of the Epidiolex brand in both the U.S. and Europe and *remain confident about prospects for growth in the remainder of the year*. Having been granted priority review by the FDA for our proposed label expansion to include TSC, our US commercial team is actively preparing for the launch of this indication in August. In this current environment caused by COVID-19, we have been able to support the epilepsy community remotely and maintain production of Epidiolex, while taking necessary steps to maintain the wellbeing of our employees. *Looking ahead, GW is well placed to emerge strongly from the COVID-19 crisis with significant growth prospects for Epidiolex in the US and Europe, important pipeline clinical trials ready to execute, a strong balance sheet, and an unparalleled leading position in cannabinoid science.*

42.     On the earnings call that followed later that day, Defendant Gover explained how GW was uniquely situated to keep growing during the pandemic:

> We have not had any interruptions in ensuring that our medicines are available to those who rely on them for their daily health and we continue to make progress across all areas of the business. We at GW control our own manufacture and supply chain, which has proven to be very beneficial. *This control has not only enabled GW to ensure manufacturing continuity, but it has, in fact, allowed us to increase Epidiolex production in recent weeks.* I will ask Chris to provide more detail on the specific actions his team have taken regarding production as well as his thoughts on the progress of Epidiolex commercialization in Europe later in the call.

---

[3] Unless otherwise indicated, all emphasis has been added.

-13-

FIRST AMENDED CLASS ACTION COMPLAINT

Our commercial teams continue to actively interact with clinicians, albeit virtually. We are fortunate that going into this COVID-19 situation, Epidiolex brand awareness was very high among both patients and physicians. Our specialty pharmacy model, which features direct home delivery for the vast majority of our patients has been in place since launch and continues to work well.

\*\*\*

As you have heard, Epidiolex continues to demonstrate strong receptivity in both the U.S. and in Europe. *And even in the COVID-19 environment, we see major growth opportunities in 2020, particularly as we expand the products used to include the seizures associated with TSC, significantly broadening its overall utility in epilepsy.*

We continue to believe that Epidiolex has a long commercial life ahead. With the addition of another patent last week, we now have 10 patents listed in the orange book, and we expect the addition of further LGS, DS and TSC patents this year. These patents expire in 2035 and provide real confidence in the durability of the brand. In addition to the use patents granted and under review, we continue to progress the composition patent application process. And while our clinical trials are on hold until the current restrictions are sufficiently eased, this is a temporary situation, and we continue to expect important pipeline progress in 2020. At the forefront of that list is nabiximols, an exciting late-stage program for GW in the U.S., for which we expect extended exclusivity. *We strongly believe that now is the ideal time for this product to emerge into the U.S. and believe that it can meet patient needs across multiple indications in the coming years. Indeed, we are now planning a virtual deep dive for investors and analysts on this product, so please look out for further details of this event in the coming weeks.* **I do believe that GW is as well positioned as any company to withstand the impact of the COVID-19 situation and to emerge from this crisis with real momentum for both Epidiolex and the pipeline.**

43.   And GW's Chief Medical Officer provided details regarding the Company's strong pipeline of products both in the near and long term:

Regarding our Epidiolex program, I am pleased to report that the FDA has accepted our sNDA for the use of Epidiolex to treat seizures associated with tuberous sclerosis complex. The FDA has granted priority review, which highlights the unmet need for new treatment options for patients with TSC, and the PDUFA date has been set for July 31, 2020. In Europe, we also submitted a type 2 variation application to the European Medicines Agency and recently received notice that this filing also has been accepted for their review. If approved, Epidiolex will be shown to be effective in treating seizures associated with Lennox-Gastaut syndrome, the Dravet syndrome and tuberous sclerosis complex, thus confirming the broad antiseizure effects of this medicine.

\*\*\*

As we emerge from COVID-19, I'm excited at the extensive clinical program planned for this year. Indeed, by the end of this year, we expect

FIRST AMENDED CLASS ACTION COMPLAINT

to be conducting 7 Phase II and 4 Phase III trials as well as 1 Phase IV study. We will also be conducting 6 Phase I trials on new pipeline products and formulations. Further trials are also in the planning for 2021.

As we look ahead in the next wave of cannabinoid products, it is clear that nabiximols is our top priority. Nabiximols offers a near-term route to market in the U.S. and is a product for which extensive safety and efficacy data already exist and which is already manufactured at commercial scale. It is truly a pipeline in the product with at least 3 target indications expected to be developed over the next few years. U.S. market research demonstrates that it has significant commercial potential in MS spasticity, spinal cord injury spasticity and the broader spasticity market. As a complex botanical product, we also believe that nabiximols may benefit from long exclusivity. Interactions with the FDA have been particularly productive. For MS spasticity, we are able to bridge from previously conducted positive Phase III trials in Europe by adding a new Phase III placebo-controlled trial with approximately 450 patients and a number of smaller mechanistic studies to the body of evidence.

44.     On June 30, 2020, GW provided the previously alluded to "deep-dive" (65 page) presentation announcing its strategy for bringing Sativex/nabiximols to the U.S. market, including its plans to commence a Phase 3 clinical program MS Spasticity Clinical program, Spinal Cord Injury spasticity program, Post Traumatic Stress Disorder program, and plans for broad spasticity indications, which would provide multiple opportunities for an NDA submission as early as 2021 in both the near-term and long-term. In the press release, Defendant Gover stated:

We are excited to present the details of our clinical program and regulatory strategy for nabiximols, which we believe support the potential for a *substantial near-term commercial opportunity* in the U.S. Following constructive meetings with the FDA, we are now commencing a Phase 3 clinical program that provides multiple opportunities for an NDA submission, including as early as 2021. *Beyond the initial target indication of MS spasticity, our Phase 3 clinical program is **designed to achieve a broad spasticity label over time.** This development strategy, together with the long-term exclusivity potential of nabiximols, provides GW with confidence that this product should represent a significant value driver for GW.*

45.     The presentation detailed both the near-term indications for the Phase III trials of Sativex/nabixmols already under way (and already approved in 25 countries around the world) and the long-term "blockbuster revenue potential" based on broader

FIRST AMENDED CLASS ACTION COMPLAINT

indications of Sativex/nabixmols—with some indications already performing successfully in FDA trials, and others well on their way in the developmental platform:



### Spinal Cord Injury may unlock broad spasticity indication



| Approximate Sample Size | Design | Endpoint | Target Start (FPI) | Target Data Readout |
|---|---|---|---|---|
| ~100 | Observational, 4-week clinical discovery study | Multiple spasticity endpoints | Q4 2020 | 2021 |
| ~100 | Part A: nabiximols run-in to identify responders<br>Part B: single dose, 3 way cross-over | Muscle Tone (LLMT-6) | Q2 2021 | 2022 |
| ~400 | Double-blind, placebo controlled, 12-week treatment period | Spasm frequency | H2 2021 | 2023 |

Spasticity in MS manifests mostly in the lower extremities and is related to spinal cord disease.

SCI is a logical next population to expand the nabiximols evidence base.

FDA has a precedent in approving drugs for spasticity irrespective of the underlying condition.

June 30, 2020    GW Pharmaceuticals Investor Presentation    11

### Nabiximols may address broad spasticity conditions, unlocking blockbuster revenue potential

*ILLUSTRATIVE*

MSS

Tomorrow    Future

MSS
Cerebral Palsy
NMSOD
Post-Stroke
ALS
Traumatic Brain Injury
Spinal Cord Injury

**Initial Nabiximols Indication**

*Core initial focus in **multiple sclerosis spasticity** (MSS)*

**Future Nabiximols Opportunity**

***Expansion** into adjacent spasticity populations could **drive commercial value** and **strengthen leadership position***

Source: Physician Interviews; Patient Interviews.

June 30, 2020    GW Pharmaceuticals Investor Presentation    2

FIRST AMENDED CLASS ACTION COMPLAINT

46.    Based on this presentation of "blockbuster" potential, *immediately after the presentation* on June 30, 2020, *Evercore raised its price target for GW from $250 per ADS to* ***$275 per ADS***.

47.    To account for this "blockbuster" revenue potential, GW management, **in its ordinary course of business,** prepared financial projections for the Company through 2035 (the "July Projections").

48.    On July 6, 2020, one week after the Sativex/nabixmols presentation, Jazz reached out to Defendant Gover and, on July 8, 2020, Jazz made an initial offer to purchase the Company for $172 per GW ADS—over $100 less per ADS than the Company's most recent price target.

49.    On July 16, 2020, the Board met and discussed the Jazz offer. At the meeting, Scott Giacobello, GW's Chief Financial Officer, presented background on Jazz based on public information, including information about its business and certain financial metrics. Mr. Giacobello then presented and reviewed with the GW Board the July Projections, which had been prepared by GW management ***prior*** to the receipt of Jazz's July 8, 2020 proposal.

50.    After these presentations, the GW Board expressed confidence in GW's standalone plan and prospects based on the July Projections and agreed to reject Jazz's offer because it fundamentally undervalued GW. However, the Board set an arbitrary benchmark of $200 for them to reconsider any proposal from Jazz, and provided Defendant Gover authority to reject future offers below this amount.

51.    It was during this same time period, July 2020, that GW decided to fire its existing independent compensation consultant and hired Radford to review GW's severance plans and programs (specifically including change in control scenarios) and provide recommendations for salaries, LTIP awards, performance plans, and bonus incentive awards for 2021. Radford's engagement—and especially the timing of its engagement—is important for several reasons. First, the fact that GW engaged

FIRST AMENDED CLASS ACTION COMPLAINT

Radford in July 2020 contradicts the version of events in the Proxy that Radford was not engaged until October 2020. Second, for years (perhaps decades), GW's regular practice for determining director and officer compensation and equity awards occurred in February or March of that year—as done in February 2020. The decision by Defendants to break from GW's normal course of business, accelerate the determination of executive compensation, and then lie to GW shareholders in the Proxy regarding the timing of this decision strongly indicates that this course of action was a direct result of the Jazz acquisition offer made at the beginning of the month. This further demonstrates that GW, and Defendant Guy, had already decided to sell the Company despite openly acknowledging the fundamental valuation shortcomings of the offer, and needed to (i) approve change in control and 2021 awards before they sold the Company and (ii) incentivize management with millions of reasons to go along with a sale, whether it represented fair value for GW shareholders or not.

52.     On July 31, 2020, GW continued the positive news and announced that the FDA approved a new indication Epidiolex oral solution to treat seizures associated with tuberous sclerosis complex (TSC) in patients one year of age and older.

53.     On August 6, 2020, the Company announced its strong Second Quarter 2020 financial results, reporting a 68% increase in total revenue and a decrease in costs of sales from 9% of net product sales to only 7% of net product sales. These record results, which again *exceeded* expectations, were driven by the substantial increase in Epidiolex net sales. In the press release, Defendant Gover stated:

> We were pleased with the strength of U.S. Epidiolex sales in the second quarter in spite of the COVID-19 pandemic. Further, the recent approval and imminent launch of Epidiolex for the treatment of seizures associated with TSC provides a meaningful new opportunity *to accelerate momentum through the second half of 2020 and beyond.* We also continue to be excited about the potential of our product pipeline, in particular nabiximols, for which we recently outlined our *accelerated US development strategy* in the treatment of spasticity in patients with MS and other conditions. We look forward to commencing the nabiximols Phase 3 program as well as multiple other pipeline clinical trials in the second half of the year.

-18-

FIRST AMENDED CLASS ACTION COMPLAINT

54. Defendant Gover elaborated during the Q2 earnings call later that evening on GW's historically great performance in the face of the pandemic and the strong potential of its products in the short, medium, and long term:

> Overall, *I'm extremely proud of how even in the face of the challenges of this unprecedented pandemic we have delivered quarter-on-quarter revenue growth* in the U.S. with Epidiolex net sales in the U.S. in Q2 reaching $111 million. I think this growth is a real testimony to the importance of Epidiolex in meeting a serious unmet need in patients with treatment resistant seizures, and to the commitment of our organization to these patients and their families.
>
> Within the last week, we were delighted to announce that Epidiolex was approved by the FDA for the treatment of seizures associated with tuberous sclerosis complex or TSC. This approval is a very significant milestone in the expansion of the market opportunity for Epidiolex, representing a near *doubling of the target patient population.*
>
> *We believe that the launch of this new indication this month will offer strong support to the commercial momentum of Epidiolex as we move through the second half of the year and beyond.*
>
> We view Epidiolex as the first of what we believe will be several novel cannabinoid medicines to emerge from our platform in the coming years. At the end of June, we hosted a webcast to announce details of the U.S. development and commercialization strategy for nabiximols, which we expect to be our next us commercial product. I hope that you have had the chance to review this webinar, if not, an archive is available on the GW website on the investor homepage.
>
> In summary, we have designed a clinical program that provides multiple accelerated pathways to an NDA submission, including as early as next year, and **believe in nabiximols very significant commercial potential over the short, medium and long term.**
>
> ***
>
> In closing, *we are very pleased with the performance of GW's business in the second quarter, **the strongest in our 20-year history***. In particular, we are seeing continued growth of Epidiolex U.S. revenue during the quarter. And with the TSC approval now in hand, our U.S. commercial team is poised for the launch of this important new indication, which should provide a solid tailwind for *Epidiolex growth through 2020 and beyond.*
>
> We are very excited about the impact of this expanded label and about the progress we are starting to see with U.S. payers in widening access. We also continue to make progress in further solidifying the exclusivity position of Epidiolex. ***

FIRST AMENDED CLASS ACTION COMPLAINT

Beyond Epidiolex, our new nabiximol program offers an exciting new horizon line for investors. We now have a clear path to an NDA with multiple shots on goal perhaps as soon as next year.

We also believe that nabiximol offers extended exclusivity due to the complex botanical composition of this medicine. *We strongly believe that now is the ideal time for this product to emerge in the United States and believe that it has the potential to become a broadly used medicine meeting patient needs across numerous indications in the coming years, providing another important growth driver for investors in GW well into the future.*

55.    During the call, Chief Medical Officer Volker Knappertz also expanded upon the June presentation regarding the Company's ramp up of Sativex/nabiximol:

Looking beyond Epidiolex. At our recent investor webinar, we discussed our accelerated U.S. development and regulatory strategy for nabiximols. Over the last 18 months, we've had multiple -- different collaborative meetings with the FDA regarding the path to an NDA for nabiximols. We've gained agreement to supplement and bridge the existing European pivotal data with data from one more trial with either muscle tone or muscle spasm as the primary endpoint.

At our webinar, we detailed the program of five MS spasticity trials, two of which are anticipated to commence this year and three in the first half of 2021. *We believe that positive results from any one of these trials will be sufficient for us to submit the NDA. All the other pieces of the NDA are either in place, or anticipated to be by the first half of 2021, thus enabling the NDA to be submitted as soon as we have data from one positive study.*

The first such opportunity should be mid next year. And there will be data readouts from the remaining four trials at regular intervals over the course of the remainder of 2021 and 2022. ***Our discussions with FDA also provide confidence in the ability for nabiximols to gain a broader specificity label over time.*** *The FDAs view is that spasticity is a neurological manifestation which is common to several conditions. And we believe that our program to study spinal cord injury spasticity may therefore not only allow for expansion to this patient population, but may lead to a broad spasticity indication.*

We have planned a program of three spinal cord injury studies, and beyond specificity, *we have selected Post Traumatic Stress Disorder as an additional target indication for nabiximols and expect the Phase 2/3 study to commence in the first half of 2021.*

56.    The next day, on August 7, 2020, Bank of America issued a price target of $234 per GW ADS and **Goldman Sachs** (*a week before officially being engaged as GW's financial advisor*) increased its price target from $171 to **$271 per GW ADS**.

FIRST AMENDED CLASS ACTION COMPLAINT

57.    On August 13, 2020, again one week after a positive announcement from GW, Jazz made a second offer to purchase GW for $187 per ADS. Although Defendant Gover later rejected this proposal as inadequate, privately, the Board was already sold and, shortly after the offer was mad, GW formally engaged the Financial Advisors, despite the offer's failure to even cross the arbitrary $200 threshold.

58.    On August 21, 2020, Defendant Gover officially rejected the offer, but this time he informed Jazz's CEO about the $200 threshold.

59.    On September 11, 2020, Jazz reached back out to indicate that it was willing to consider an increase in its proposal if GW would permit Jazz to conduct limited due diligence. The Board determined that there had been **no material changes to GW or its prospects** and again rejected the offer.

60.    On September 15, 2020, Defendant Gover participated in a Q&A session at the Morgan Stanley Global Healthcare Conference where he further explained the high likelihood of success for the Sativex/nabiximols clinical pipeline, its broad intended implications, and strong prospects in both the short and long term:

David Lebowitz

Now, I guess I'll take that -- this moment to jump from Epidiolex over to nabiximols. It's certainly a topic that has become more important to the conversation over the last few months. You held a deep dive on it this summer.

Could you tell us about nabiximols? I mean there is Sativex, which is on the market in Europe already. What exactly is nabiximols? And how does it -- I guess, bring us up to speed on what the MS spasticity market is?

Justin Gover

Yeah. Thanks for the opportunity. And you're right, I'm pleased to have noted the level -- the increased level of invested interest after our summer event. And rightly so, because I think nabiximols a product that is exciting in its own right. But I think more -- even more than that, *I think it has a **potentially transformative effect** on the investment proposition for GW as a whole, in that I think it provides -- could -- will provide, we hope, a validation of GW as a platform company, for which multiple cannabinoids can be developed and made available.*

FIRST AMENDED CLASS ACTION COMPLAINT

There's a long story, which I won't go into, but the very high level impression of this is nabiximols, as you said, is branded Sativex in Europe, and it was part of an early life of GW in the first decade. It got approved in Europe about a decade ago with some European clinical trials. And GW's efforts over the last five years really have focused on epilepsy and Epidiolex. And we didn't actually own the U.S. rights in nabiximols for most of the life of the company.

We recovered those rights about 18 months ago or so and have really since then shaped the program with FDA for nabiximols, which essentially evolves bridging from our older European studies to meeting modern FDA requirements. And that has enabled us to construct a program of several clinical trials within the field of MS spasticity, and *what we believe is now a derisked program* with multiple shots on goal, where we've got five studies that we are carrying out in the MS spasticity indication and believe that any one of those five would be sufficient to submit the NDA. The first readout, we expect around the middle of next year. Subsequent readouts for other studies will be coming in relatively quick succession after that.

*So it's really not that far away,* actually, potentially as our next drug. Darren's U.S. commercial team is busy prepping for the potential approval of nabiximols. And its market is -- potential, I think, is very exciting. Within MS, we see about a market estimate around peak sales of about $450 million in the U.S., but the MS indication is really just the beginning.

***Our FDA discussions have, I think, clarified for us that there is a pathway to a broad spasticity label*** *to include patients with spinal cord injury, traumatic brain injury, post-stroke and so on, and that broader indication can probably be achieved, we believe, with one additional form of spasticity in the form of spinal cord injury spasticity. And so if that works, that really does, again, significantly further boost the sales potential of the product.* So long answer, there are a lot to explain. But I think what we see here is a bit of a pipeline and a product opportunity, very late stage.

And finally, a product that we think has a lot of exclusivity duration to it. It's a highly-complex product. It falls within what the FDA term botanical guidance, which essentially means that the product can really can only be made from the plant from, which it's extracted. And I think, as I said, provides a really quite important new growth driver for the company.

61.    On November 3, 2020, the Company announced its Third Quarter 2020 financial results, again *exceeding* expectations, and reporting a sequential increase to record revenue (up 51%) and decrease to costs (down to 6% of net product sales). In the press release, Defendant Gover stated:

FIRST AMENDED CLASS ACTION COMPLAINT

We are pleased to report strong revenue growth in the 3rd quarter despite the challenges presented by COVID-19. Epidiolex meets a serious unmet need within the field of epilepsy and we expect the product to demonstrate continued strong growth in the months and years ahead. The recent expanded indication for the treatment of seizures associated with TSC has been very well received by patients, clinicians and payers. We have also now commenced the pivotal Phase 3 program for nabiximols in the treatment of multiple sclerosis spasticity, which provides multiple opportunities for an NDA submission, including as early as next year. Beyond nabiximols, we are advancing several clinical-stage pipeline candidates, including the recent start of a Phase 2 trial in schizophrenia.

62.    On the earnings call that followed, Defendant Gover elaborated:

*Overall, I'm very pleased to report a strong quarter* with total revenue in Q3 of $137 million, the sequential growth the 13% over the prior quarter and 51% over the prior year quarter. Year-to-date, total revenue is $379 million, representing 87% growth over the prior year.

While the pandemic makes for more challenging commercial backdrop, we are confident that Epidiolex has all the characteristics to continue to exhibit strong growth in the months and years to come.

In the close to two years since launch in the U.S., we estimate that Epidiolex has to-date achieve penetration of approximately 30% of LGS patients, 40% of Dravet patient, 10% of TSC patients and less than 10% of other refractory childhood onset epilepsies. While this level of penetration is significant, it is clear that there are tens of thousands of U.S. patients that remain potential candidates for Epidiolex.

In the second half of August, our U.S. sales organization started actively promoting the TSC indication. *Receptivity to-date has been very positive and we believe that this indication will offer strong support to the commercial momentum of Epidiolex as we move through the remainder of the year and into 2021.*

We have also seen important progress in recent months and expanding payer coverage, and overall, consider ourselves to be very well-positioned to deliver on the full potential of Epidiolex.

Outside the U.S., Epidiolex delivered a strong quarter, demonstrating a strong recovery from a COVID impacted Q2 and we continue to make important progress in pricing and reimbursement in key European market.

As we have stated on previous calls, we see Epidiolex as representing the beginning of a new era for cannabinoid science and we are committed to it advancing GW's cannabinoid pipeline to develop important new treatments for patients with a particular focus on the field of neurology and neuropsychiatry.

FIRST AMENDED CLASS ACTION COMPLAINT

In recent weeks, we have commenced a new Phase 3 program in MS, the start of a new Phase 2 program in schizophrenia and the first inhuman dosing in a Phase 1 trial of a new drug candidates targeted within neuropsychiatry.

Notably, we announced today that the nabiximols Phase 3 clinical program is now underway, where the first MS spasm study now recruiting patient. A second Phase 3 study on track to commence shortly and three other studies set to begin in 2021. As we have previously stated, any one of these studies could lead us to an NDA submission with FDA and data from the first study is expected in 2021.

\*\*\*

*In closing, we are very pleased with the performance of GWS overall business in Q3. The essential elements to support future Epidiolex revenue growth are in place*, in particular, an expanded indication and efficacy profile, broadening payer coverage and near universal adoption by key prescriber target. We fully expect Epidiolex to follow the same long-term growth path seen with previous highly successful anti-epilepsy drugs. We continue to enhance the exclusivity position of Epidiolex.

In addition to the 13 patents currently listed in the orange book, 12 of which expire in 2035, two further orange book listable patents are expected to be allowed or granted by Q1 2021 and additional applications beyond this are in prosecution. We also believe that the addition of the composition patent currently under review will provide an additional layer of protection.

*And beyond Epidiolex, as I mentioned in my opening remarks, we are committed to advancing GW's cannabinoid pipeline to develop important new treatments for patients.* GW is the unparalleled world leader in this field of science and our early mid- and late-stage pipeline taking shape.

This is most evident for nabiximols where we have multiple opportunities for our NDA submission as early as mid next year. The commercial potential and long-term exclusivity prospects for this product in the U.S. are truly exciting.

63.    On November 18, 2020, Defendant Gover participated in another Q&A session at the Stifel Virtual Healthcare Conference where he touted GW's recent successful quarters in the face of the pandemic and reiterated the path forward for Sativex/nabiximols with broad spasticity indications:

<u>Paul Matteis</u>

Yes. No, that's great. Thanks. Thanks so much, Justin. Yes. I mean, maybe I think *the question I'd love to kind of help clarify, as it relates to 3Q and of course, has implications for going forward is the sales*

-24-

FIRST AMENDED CLASS ACTION COMPLAINT

*increase you guys saw in 3Q was great. And it was a really nice quarter.* Do you -- how accurately over the past two to three quarters are the changes in sales sequentially tracking the change in patients on therapy?

Justin Grover

So we, I think there is the, although the stock price would have suggested a very different set of dynamics in Q2 and Q3, the reality actually was less sort of extreme. We've seen the world was a very different place in Q2, but equally, actually, we felt like we stood that pretty well. And Q3 was just building off that foundation. So, of course there are many things that go into growth of the product. We just got a new indication, of course, which is incredibly helpful. Payer coverage is a big dynamic and is one of the things we did on the course, talk specifically about the penetration we'd already achieved. And really, I think, hopefully giving investors a high level of comfort that there's a long runway here for this product albeit month-to-month in a pandemic and it is less easy to predict how each region and state and week or two is effective in this current environment. And I am sure investors get that.

\*\*\*

Paul Matteis

Yes. Makes sense. All right, great. Well, maybe do you want to just finish off by laying out the other pipeline catalysts to look forward to over say the next 12 to 18 months?

Justin Grover

Yes, just very briefly, right, *we've got nabiximols is not just limited to MS, of course. So this is we, we **believe based on FDA discussions that we can get a broader spasticity label,** which would be a **huge win** for the company.* And so we're going to do that through also adding in spinal cord spasticity as an indication. We have clinical programs in phase 2 running in autism, schizophrenia. And we have a new candidate that just went into phase one and more candidates that will go into the clinic next year or essentially focused on urology and neuro psychiatry. So as I mentioned in my -- in the outset, I think what you're going to see from GW over the next 18 months or so is commercial execution, the nabiximols sort of pivotal activity, phase 2 data and candidates kind of filling the early stage pipeline as well.

64.    On December 1, 2020, Jazz made a renewed offer for $205 per GW ADS.

65.    A week later, on December 8, 2020, the GW Board met with members of management, the Financial Advisors, and GW's legal advisors. At that meeting, with Jazz having crossed the arbitrary $200 barrier, and despite the fact that the Financial Advisors warning that Jazz would not have the financial ability to make any

FIRST AMENDED CLASS ACTION COMPLAINT

significantly higher offer,[4] the Board officially determined not to reach out to any other parties or perform any type of market check, because it didn't want to risk losing the deal if Jazz found out that GW was reaching out to other parties. However, after meeting with their Financial Advisors and considering Jazz's $205 per GW ADS offer (and their financial inability to meaningfully improve the offer), the Board realized that the deal price they were looking at would not represent fair value for GW shareholders. But instead of walking away from the deal or reaching out to other parties who could afford to pay fair value, the Board instructed Defendant Gover and his management team to prepare new, lower financial projections to make the offer price *appear* fair to GW shareholders.

66.    On December 13, 2020, the GW Board met again with members of management, the Financial Advisors, and GW's legal advisors. Armed with newly minted and drastically reduced financial projections (the "December Projections"), Goldman Sachs and Centerview presented financial analyses of GW based upon the December Projections, and discussion ensued regarding the analyses, the drivers and assumptions underlying them, and various sensitivities presented by each Financial Advisor. Even after reviewing these drastically lowered financial valuations of GW based on the downward manipulated December Projections, the Board was forced to concede that the arbitrary $200 threshold still fundamentally undervalued GW, and agreed to let Jazz perform due diligence to help increase its offer in light of Jazz's known budgetary limits.

67.    On December 23, 2020, after just a week of high-level due diligence, where GW did not provide and Jazz did not consider either the July Projections or the December Projections, Jazz increased its proposal to $220 per GW ADS, consisting of $200 in cash with the balance coming as a small fraction of Jazz ordinary shares.

---

[4] As a lender to Jazz under its existing credit agreement, Goldman Sachs had first hand knowledge regarding Jazz's limitations to raise additional debt to increase its offer.

FIRST AMENDED CLASS ACTION COMPLAINT

68.     On January 11, 2021, GW announced strong preliminary Fourth Quarter and Fiscal Year 2020 financial results and, once again, reported record revenue (up 70%) that *exceeded* expectations. In the press release, Defendant Gover stated:

> ***Epidiolex sales increased by over 70% in 2020 despite the challenges of COVID-19****, reflecting the positive impact this medicine has on patients as well as the performance of our commercial team.* We remain encouraged by our patients' experience on this product, as demonstrated by high persistence and refill rates. *This, combined with our expansion of payer coverage and the recently approved Tuberous Sclerosis Complex indication, leads us to expect continued strong growth in 2021 in both the US and Europe.* Our goals in 2021 include driving further Epidiolex growth and advancing multiple US pivotal trials for nabiximols in the treatment of MS spasticity, with the first data readout expected this year. In addition to our previously announced pipeline activities, we are leveraging our world leadership in cannabinoid science to design and synthesize novel cannabinoid molecules and expect our first novel product candidate to enter the clinic in 2021.

69.     By this point, with the Merger and derisory Merger Consideration *fait accompli*, the Company did not host an earnings call. However, on January 12, 2021, Defendant Gover did present at the Annual JPMorgan Virtual Healthcare Conference. At the conference, Defendant Gover talked at length about the immediate success of Epidiolex, its expanded indication, market penetration, payer acceptance, forthcoming global growth, and "blockbuster" potential. He then continued to reiterate GW's short and long term plans for Sativex/nabiximols growth, including indications for MS, broad spasticity, and PTSD:

> ***2020 was a year of achievement at GW across all aspects of our business in spite of all the challenges of COVID, and I think 2021 has the potential to be another transformative year for this company.*** *I look forward to sharing the success of 2020 with you today and to provide color on why we have much to look forward to in the year ahead.*
>
> ***
>
> *In 2020 we managed to achieve further success across all aspects of our business.* In particular we progressed on active R&D program and robust pipeline with multiple Phase 1 and 2 and 3 trials underway. We prepared nabiximols for U.S. Phase 3 development in anticipation in NDA submission developing a pathway forward with the FDA and commencing the pivotal trials program.

FIRST AMENDED CLASS ACTION COMPLAINT

*We expanded the indication and achieved commercial success for Epidiolex reporting revenue growth of over 70% compared to the prior year with total net product sales exceeding $500 million in just the second year of launch.* And we grew out global reach and established a European commercial market presence with GW teams and the major five European markets and progressing pricing and reimbursement across a wider European Union.

*Turning to slide 5, Epidiolex represented the beginning of a new era for cannabinoid science and we have expanded our pipeline to build on this success.* **With nabiximols we are moving forward with a robust Phase 3 program in MS spasticity followed by a program in spinal cord injury spasticity and PTSD.**

2021 could be a pivotal year for this product, and I will provide more detail on this important late stage asset later in the presentation. Beyond Epidiolex and nabiximols, we also have other candidates in phase 1 and 2 trials and are committed to advancing GW cannabinoid pipeline to develop important new treatments for patients with a particular focus on neurology and neuropsychiatry, including schizophrenia, autism, in NHIE and other targets.

*I am pleased to announce today for the first time that we are expanding beyond this pipeline with an exciting new additional research and discovery focus with GW Pharma.* On slide six, over the next over the last couple of years, we have been working on taking cannabinoid leadership to the next level. While our history has focused on plant derived medicines, and this remains a key part of our future. Today, I would like to talk to you about our plans to go beyond the plant to design next generation cannabinoid molecules.

\*\*\*

Since we began to commercialize the product approximately two years ago, we've had a highly successful launch. We are proud of the impact this medicine has had on thousands of patients and their families.

**As we announced yesterday, in 2020, <u>even in the context of COVID-19 in our second year of commercialization, we reported an increase in net sales of 70% to reach $510 million for the year</u>.**

\*\*\*

And we're not stopping there. There continues to be significant unmet need across treatment resistant epilepsy. You can see here the three indicated conditions for Epidiolex today, and we continue to consider ways in which we can expand the research that we conduct within the epilepsy field to meet the needs of additional patients. *We did announce recently that we will be pursuing a fourth indication for Epidiolex within the field of epilepsy and expect to start a trial later this year.* The unmet need remains very clear across the epilepsy community, with around a third of epilepsy patients being treatment resistant. *As such, we see there remains considerable potential for Epidiolex growth for many years to come.*

FIRST AMENDED CLASS ACTION COMPLAINT

Turning to slide 14, with our eye on reaching the most patients possible, *we have the expertise and team in place of* **building Epidiolex towards becoming a blockbuster medication.** In 2021 our priorities are to build on the positive patient and physician experiences to increase prescribing to accelerate adoption across a broader prescriber base, to continue to expand payer coverage to increase penetration in the long term care segment, and to continue to execute on a recent TFC label expansion, drive adoption in TSC.

\*\*\*

*We believe that nabiximols represents a near term U.S. product opportunity with significant commercial potential. Given that the product is already approved outside the United States, we already have a significant evidence base in terms of efficacy and safety.* Further, we also believe the product has strong durable exclusivity due to its complex botanical formulation. The graph on this slide shows the complex composition of this product, which we are required to standardize from batch to batch achieving this has required over a decade of work.

Turning to slide 18, our first indication is spasticity and MS, which we believe represents a potential U.S. sales opportunity of approximately $450 million. Despite current treatment, one third of MS spasticity patients live with uncontrolled spasticity. No new oral anti spasticity medicines have been approved in the last 20 years. And current disease modifying treatments show no evidence in relieving symptom.

Data gathered last year shows that 26% to 50% of MS patients in the United States are self-medicating with an unregulated cannabis product. And our recent market research shows there is significant interest among both physicians and patients in nabiximols and real enthusiasm for the arrival of this product to the United States.

Turning to slide 19, much of that enthusiasm is based on the demonstrated efficacy data from our three completed positive placebo controlled studies, all of which met their primary endpoints. These studies are all published in peer reviewed journals. And so on slide 20 over the last 18 months, we have had multiple informative and collaborative meetings with the FDA to agree the route to an NDA submission for nabiximols in MS.

In essence, we expect to bridge from the three positive trials carried out in Europe by supplementing the file with one additional trial with primary data and a more proximate spasticity endpoint, either addressing muscle tone or spasms. *Although we only expect to need data from one additional trial, we have decided to pursue a multiple shots on goal strategy with five trials planned. And I'm pleased to announce that the first two of these five trials are now underway. This multiple shots on goal strategy not only* **increases the probability of success,** *but we also see that the abundant clinical data generated will prove useful to physicians and patients as we bring this product to the United States. And beyond MS spasticity, we have also discussed with FDA the potential for expanding into other indications.*

FIRST AMENDED CLASS ACTION COMPLAINT

On slide 21, we provide more detail on the five MS spasticity trials. These include a range of study designs and sample sizes. Two of these five have started and three are scheduled to commence in the first half of this year. As soon as we obtain the results of one positive additional study demonstrating an effect on muscle tone or spasm we will be in a position to move forward with the NDA submission. We expect data from the first perhaps even the second of these trials during 2021.

And in parallel with these trials, our U.S. commercial team is starting to prepare for a future launch. On slide 22, *as we think about the life cycle beyond MS spasticity, we see real opportunities within the broader spasticity market.* There are as many as 3 million patients in the United States with spasticity associated with various conditions.

***In discussions with the FDA, we are confident that a broad spasticity label is achievable for this product.*** *And beyond MS, our next target was the spinal cord injury spasticity, which is similar in size to the commercial opportunity for multiple sclerosis. The addition of this indication may in fact be sufficient to achieve the broad spasticity label.*

***And beyond spasticity, we're also looking now at PTSD.*** *And there is great interest within the PTSD community around cannabis and the potential for an FDA approved option. We are currently preparing a phase 2 clinical trial in this indication.*

And finally, moving to our financials and outlook for 2021. On slide 24, you'll see that we reported our Q4 2020 results yesterday. I am proud to say that we reported net revenue of $148 million. And as you can see from this graph, the company has delivered strong revenue growth quarter-on-quarter over the last two years. Revenue in 2020 increased by over 70% over the prior year. Further, we are also in a solid financial position with $486 million in cash at year end. *Overall, our results last year reflect the continued dedication of the GW Organization and I'm proud of our team's commitment to the patients and physicians we serve while adapting to the challenges of the global COVID-19 pandemic.*

And moving to slide 25. And in closing, I'd like to review our key priorities for 2021. First, we expect to continue to deliver commercial success and revenue growth for Epidiolex. We have multiple growth drivers in the U.S. including the TSC indication and broadening payer coverage. Second, we expect to prepare nabiximols for approval and launch in the United States. We will have five pivotal trials in spasticity associated with MS running this year, and expect to submit the NDA upon the first positive readout data from at least one of these trials as expected this year. Third, we expect to advance a robust pipeline of clinical and research programs. We have multiple phase 2 clinical trials on going and new candidates moving into the clinic, including from our new discovery efforts focused on novel cannabinoid NCEs with increased potency.

And finally, we expect to continue to expand our global reach with the successful execution of additional launches of Epidiolex in the European Union and beyond. *I have every confidence that we will*

FIRST AMENDED CLASS ACTION COMPLAINT

*continue to deliver in 2021. And that the year ahead provides tremendous opportunity for value creation.*

70.    Having already determined to accept the unfair Merger Consideration, Defendants spent the final days extracting as much personal benefit for themselves as they could before exiting. Based on the recommendations of Radford (the advisor hired specifically to recommend change in control compensation), the Renumeration Committee authorized radical new compensation agreements, including GW entering into a new employment agreement with Defendant Gover—the individual ultimately in charge of GW's financial projections.

71.    On January 25, 2021, the Remuneration Committee identified the adoption of a company-wide severance program recommended by Radford, matters relating to GW's incentive programs and other employee benefits matters as relating to the transaction with Jazz, and authorized senior management to discuss and negotiate these matters with Jazz. From January 26 through February 2, Defendant Gover and others negotiated to further line their own pockets ahead of the sale, during which time they came to agreement with Jazz on incentive deals for members of GW management to remain with the combined company after the completion of the Merger, some on a transitional basis and some on a more long-term basis, with Defendant Gover remaining for a transitional period—***for a $7,600,00.00 fee***.

72.    On February 2, 2021, during the same meeting at which they approved the Merger Agreement, the Board approved the freshly inked change in control payments, bonuses, and compensation agreements, including Radford's and management's company-wide severance program, the accelerated timing of GW's 2021 long-term incentive grants, the treatment of incentive awards and other employee benefit programs in the Merger, and the outrageously lavish transition incentive bonus awards.

73.    The following day the parties executed the Merger Agreement.

FIRST AMENDED CLASS ACTION COMPLAINT

74.     Through the combination of these compensation agreements and the Merger, GW's officers and directors earned millions of dollars, not shared with GW shareholders. Moreover, in addition to the re-negotiated severance agreements, GW granted each executive officer a special transition incentive bonus: Defendant Gover—$7,600,000; U.S. Chief Commercial Officer Darren Cline—$2,300,000; CFO Giacobello—$2,550,000; Chief Legal Officer Douglas Snyder—$2,600,000; and CMO Knappertz—$2,600,000.[5] As a result of these incredibly lucrative arrangements made in the final days leading up to the Merger, Defendant Gover was classified as a "Tier 1" benefit recipient, entitling him to nearly $40 million in benefits—more than any other GW executive officer:

| Name | Cash ($) | Equity ($) | Perquisites / Benefits ($) | Total ($) |
|---|---|---|---|---|
| Geoffrey Guy | $ 1,215,113 | $14,667,437 | $ 6,210 | $15,888,760 |
| Justin Gover | $10,071,472 | $28,944,224 | $ 42,240 | $39,057,936 |
| Scott Giacobello | $ 3,637,101 | $ 8,621,346 | $ 46,680 | $12,305,127 |
| Volker Knappertz | $ 3,798,681 | $ 9,326,794 | $ 46,680 | $13,172,155 |
| Douglas Snyder | $ 3,742,806 | $ 8,953,618 | $ 46,680 | $12,743,104 |

## II.     The Defendants Authorized the Proxy to be Disseminated to GW's Shareholders, Which Provided a Misleading Picture of GW's Business Operations, Valuation, and Future Financial Prospects

75.     On March 15, 2021, Defendants filed the materially misleading Proxy with the SEC to solicit shareholder approval of the Merger.

76.     Each of the Individual Defendants reviewed the Proxy before it was disseminated to the Company's shareholders, as they each had a duty to review the Proxy and ensure it did not contain any materially false or misleading statements.

---

[5] GW's Chief Operating Officer Chris Tovey, an officer and initial member of the Board since the 2013 public offering, stayed on with the combined company and now serves as Jazz's Executive Vice President and Chief Operating Officer and Managing Director, Europe & International. The Proxy fails to disclose what compensation or equity rollover arrangements Mr. Tovey entered into with Jazz that allowed him to keep his full interest in the continued growth of GW.

FIRST AMENDED CLASS ACTION COMPLAINT

1    Defendants caused the materially false and misleading Proxy to be filed with the SEC

2    and disseminated to GW's shareholders. Indeed, the Proxy was signed "By the Order

3    of the Board," could not have been disseminated without Defendants' approval,

4    repeatedly discussed the actions and beliefs of the full GW Board, and stated that for

5    the reasons described in the Proxy the Board unanimously recommended that the

6    Company's shareholders vote in favor of the Merger. As set forth herein, the Proxy

7    contained materially false and misleading statements which influenced GW

8    shareholders' decision concerning how to vote their shares, in violation of Section

9    14(a) and SEC Rule 14a-9.

10       77.    In conjunction with approving the Merger, Defendants elected to obtain

11    a "fairness opinion" from their financial advisors, Goldman Sachs and Centerview.

12    Fairness opinions are not required by law, but are often obtained by boards of directors

13    anyway for two primary reasons. First, boards desire fairness opinions to act as a type

14    of liability shield for their judgment and decisions made as directors. Second, boards

15    obtain fairness opinions so that those opinions can be touted to shareholders as

16    evidence that the merger the Board approved is purportedly fair. As has been well

17    documented, fairness opinions are often "deeply flawed", as they "are frequently

18    prepared utilizing methodologies [and inputs] that simply do not jibe with best

19    practices. These defects are exacerbated by the recurring problem of investment banks

20    who are conflicted in their provision of fairness opinions." Steven M. Davidoff,

21    *Fairness Opinions*, 55 Am. U. L. Rev. 1557, 1573-78 (2006). As one scholar put it,

22    "obtaining a fairness opinion has become like the practice of buying indulgences prior

23    to the Protestant Reformation, but for sins that one is about to commit instead of for

24    past sins. The practice is very widespread but is not entirely legitimate." Jonathan R.

25    Macey, *The Regulator Effect In Financial Regulation*, 98 CORNELL L. REV. 591, 618-

26    19 (March, 2013).

27

28

FIRST AMENDED CLASS ACTION COMPLAINT

78.    For acting in their roles as financial advisors and providing fairness opinions to the board, each of the Financial Advisors was paid $36 million. However, those exorbitant fees were wholly contingent upon the execution/announcement of a merger agreement, with the 95.8% of the fees ($34.5 million each) only paid if GW shareholders approved the Merger and the Merger was consummated. In other words, since the GW Board would have almost certainly not executed the Merger agreement without a fairness opinion, the Financial Advisors had a combined 72 million reasons to bless the Merger as "fair" from a financial point of view to GW shareholders.

79.    As stated herein, the Financial Advisors would not have been able to provide, and the Defendants would not have been able to receive, their fairness opinions without the significantly lower December Projections.

*The Unjustifiably Manipulated Financial Projections*

80.    Prior to the receipt of Jazz's initial offer and in connection with GW's **ordinary strategic planning process**, Defendant Gover and his management team prepared the July Projections, which reflected the Company's anticipated future operations as a standalone entity. The July Projections included management projections for the following products and product candidates: (i) Epidiolex in Lennox-Gastaut Syndrome, Dravet Syndrome, Rett Syndrome (US only) and tuberous sclerosis complex, (ii) Nabiximols / Sativex in multiple sclerosis spasticity, spinal cord injury spasticity, PTSD, and additional broad spasticity indications, (iii) development organic products in schizophrenia, irritability in adult autism, agitation in dementia, canine epilepsy and epilepsy and (iv) potential cannabinoid science-based product candidates in development in unspecified indications.

81.    The July Projections were recognized by the Board at the time of their creation as accurately reflecting GW's standalone plan and prospects. The Board then re-affirmed their confidence in the July Projections at the end of the 2020 Third Quarter.

FIRST AMENDED CLASS ACTION COMPLAINT

82.    However, after deciding to sell the Company and coming to terms with Jazz's limitations to make a fair value offer, the Board realized that the July Projections would not allow Goldman Sachs and Centerview to provide the desired liability-shielding fairness opinions.

83.    Accordingly, in December 2020, the Board directed Defendant Gover and his management team to prepare the significantly lower December Projections[6] to provide to the Financial Advisors for use in their fairness opinions. The December Projections incorporated drastic slashes to both revenues and earnings projections for every single year from 2021-2035, averaging a 15% reduction per year for revenue and a 20% reduction per year for EBIT:

|  | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|
| Revenue | -4.6% | -2.5% | -5% | -4.9% | -4.8% | -10.2% | -12.6% | -13.1% |
| EBIT | -58.6% | -6.4% | -7% | -6% | -5.7% | -11% | -13.7% | -14.3% |

|  | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | **AVG** |
|---|---|---|---|---|---|---|---|---|
| Revenue | -14.1% | -15.2% | -22.6% | -23.6% | -25.9% | -35.2% | -38.1% | **-15.5%** |
| EBIT | -15.0% | -15.6% | -25.8% | -26.0% | -28.6% | -39.0% | -42.5% | **-21.0%** |

84.    The Defendants told Centerview that the December Projections were reasonably prepared on bases reflecting the best currently available estimates and judgments of the management of GW. The Defendants told Goldman Sachs that the December Projections were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of GW. Then, the GW Board and GW's management directed Centerview and Goldman Sachs to use and

---

[6] The December Forecasts included management projections for the following products and product candidates: (i) Epidiolex in Lennox-Gastaut Syndrome, Dravet Syndrome and tuberous sclerosis complex, (ii) nabiximols / Sativex in multiple sclerosis spasticity and spinal cord injury spasticity, (iii) development organic products in schizophrenia, irritability in adult autism, agitation in dementia, canine epilepsy and epilepsy and (iv) development platform in unspecified indications.

FIRST AMENDED CLASS ACTION COMPLAINT

rely on the December Projections in connection with their financial analyses and respective fairness opinions.

85.    However, as set forth herein, Defendants did not genuinely believe in the December Projections, knew that the numbers reflected therein were far below management's genuine expectations regarding the Company's future financial performance, and were contrary to GW's experienced growth between the creation of the July Projections and December Projections. Indeed, in August 2020, November 2020, and January 2021, the Company announced three consecutive quarters of record revenue that each *exceeded* expectations. The Defendants knew about the Company's positive financial performance during this time as reflected in Defendant Gover's comments during GW's Q3 2020 Earnings Call on November 3, 2020, just a month before the Company's projections were slashed:

> In closing, we are very pleased with the performance of GW's overall business in Q3. The essential elements to support future Epidiolex revenue growth are in place, in particular, an expanded indication and efficacy profile, broadening payer coverage and near universal adoption by key prescriber target. We fully expect Epidiolex to follow the same long-term growth path seen with previous highly successful anti-epilepsy drugs. We continue to enhance the exclusivity position of Epidiolex.
>
> ***
>
> And beyond Epidiolex, as I mentioned in my opening remarks, we are committed to advancing GW's cannabinoid pipeline to develop important new treatments for patients. GW is the unparalleled world leader in this field of science and our early mid- and late-stage pipeline taking shape.
>
> This is most evident for nabiximols where we have multiple opportunities for our NDA submission as early as mid next year. The commercial potential and long-term exclusivity prospects for this product in the U.S. are truly exciting.

86.    And Defendant Gover's comments on January 12, 2021, a month *after* the Company's projections were slashed, similarly contradicting the reductions:

> 2020 was a year of achievement at GW across all aspects of our business in spite of all the challenges of COVID, and I think 2021 has the potential to be another transformative year for this company. I look

FIRST AMENDED CLASS ACTION COMPLAINT

forward to sharing the success of 2020 with you today and to provide color on why we have much to look forward to in the year ahead.

\*\*\*

In 2020 we managed to achieve further success across all aspects of our business. In particular we progressed on active R&D program and robust pipeline with multiple Phase 1 and 2 and 3 trials underway. We prepared nabiximols for U.S. Phase 3 development in anticipation in NDA submission developing a pathway forward with the FDA and commencing the pivotal trials program.

87.    Moreover, the spurious, purported justifications provided in the Proxy for downgrading the financial metrics from the July Projections to the December Projections are contradicted by Defendant Gover's and the Company's statements regarding their genuine beliefs about the Company's future prospects.

88.    The Proxy states the reductions made to contrive the December Projections were based on the following false and misleading inputs and assumptions:[7]

- the removal of Rett Syndrome as a target indication for Epidiolex in light of the suspension of GW's ongoing Phase 3 clinical trial of Epidiolex in children with Rett Syndrome due to the impacts of the COVID-19 pandemic;

- the removal of PTSD as a target indication for nabiximols / Sativex given GW's decision after the July Forecasts had been prepared to delay the initiation of a planned study of nabiximols in PTSD and reassess the study in the second half of 2021;

- the removal of broad spasticity as a target indication for nabiximols / Sativex given that GW had already incorporated multiple sclerosis spasticity and spinal cord injury spasticity as target indications and a clinical program for broad spasticity had not yet been determined;

- the decrease in the POS assigned to development platform from 12% to 5%, reflecting GW management's assessment that the POS should be lower to reflect the risks associated with these assets, taking into account commonly used POSs in the industry for pipeline assets of this nature, given that the development platform assets were generally in research, pre-clinical or early clinical trial phases of development;

- the decrease in POS adjusted peak sales for the development platform from approximately $240 million to $50 million, reflecting the adjustment in the POS for the development

_____

[7] The remaining three stated differences in assumptions between the July and December Projections appear to be relatively minor adjustments.

FIRST AMENDED CLASS ACTION COMPLAINT

platform and GW management's assessment of the more likely market opportunity for these assets;

89.    As set forth below, each of these reasons are refuted from contemporaneous statements made by GW or their management.

90.    **First**, while it appears to be true that, due to the ultra-rare nature of Rett Syndrome, the pandemic impacted GW's ability to find participants for the Rett clinical trial, the Company's use of Epidiolex to help neurodevelopmental disorders was not abandoned. Rather GW used this as an opportunity to take stock of Epidiolex's potential and shifted focus to  much broader and more profitable indications, including autism and treatment resistant epilepsy. As stated in the November 3, 2020 Third Quarter Earnings Call (a time before the slash in projections), this switch to higher prevalence conditions provides a "much better path forward":

> *The pause in clinical trials caused by the pandemic has also caused us to review our lifecycle focus for Epidiolex.* Following the successful TSC label expansion, we have decided to commit to further expanding the Epidiolex label within the field of epilepsy and consequently expect to commence a Phase 3 trial in an additional orphan epilepsy syndrome in 2021.

> We also remain committed to more broadly understand the potential of cannabinoids in neurodevelopmental disorders. *Until now these efforts have been centered around the study of Epidiolex and Rett syndrome* and an investigator sponsored trial of CBDV in autism.

> The pandemic has caused meaningful feasibility challenges for the Rett study and we have therefore decided not to resume recruitment into this trial. ***Rather, we will further the understanding of the behavioral and cognitive effects of CBD in the broader autism population with a new study.***

> This new 160-patient placebo controlled trial is expected to commence in Q1 2021 and we'll address the core symptoms of autism with the CBD formulation.
>
>                              ***
>
> Neena Bitritto-Garg
>
> Hey, guys. Thanks for taking my question. I just wanted to ask about, Dravet syndrome study, I know you said that you face some challenges and you've decided not to -- continue to enroll patients in that study. But I guess, could you just elaborate a little bit more on what some of the complications you or the challenges that you've faced or given that I thought many of these assessments were essentially patient diaries and could be done remotely? And I guess, do you expect any of those

-38-

FIRST AMENDED CLASS ACTION COMPLAINT

challenges to translate into the CBD formulation studies that you're planning to start in autism? Thanks.

Justin Gover

Thanks, Neena. Volker?

Dr. Volker Knappertz

Yeah. So it was a difficult decision for us to stop Dravet study. As you may recall, *Rett is a rare, almost ultra-rare condition* that affects predominantly girls and women. I think the estimate for the United States today is about 60,000 total patients prevalent in the United States. And so it's a very different proposition to try to recruit a population that has -- that is so rare under these conditions.

So it was challenging to recruit Rett before the pandemic started and during the pandemic, I think, the concerns also about the patient safety and bringing patients to the sites for the assessments, despite our best efforts to try to do things by telemedicine within the constraints of the of the protocol and within the constraints of what is actually feasible with regards to the guidances that regulators and the FDA have issued on this. That have really shown to us that this is a study that we don't believe we can recruit in a reasonable timeframe.

*And our interest in Rett has always been that it's a monogenic disease that has a lot of features, while not itself an autism spectrum disorder has a lot of the features that are also seen in autism spectrum disorder. And after some very careful considerations, we believe, the much higher prevalence of autism spectrum disorder that will lend itself better to get these very important non-seizure neurodevelopmental outcomes for which we have a lot of anecdotal reports, especially in the syndromatic epilepsies for which we are already approved that these non-seizure neurodevelopmental features and the core features of autism can be addressed there.*

*So it's really a question of safety, a question of feasibility and it was a difficult decision to make, and* **we are confident that with regards to autism, we have a much better path forward there** *and get to some of the similar answers that we're looking for the effect of CBD.*

91.    And as stated by Defendant Gover in January at the JP Morgan Conference, after the slash in projections:

Turning to slide 13. And we're not stopping there. There continues to be significant unmet need across treatment resistant epilepsy. You can see here the three indicated conditions for Epidiolex today, and we continue to consider ways in which we can expand the research that we conduct within the epilepsy field to meet the needs of additional patients. We did announce recently that we will be pursuing a fourth indication for Epidiolex within the field of epilepsy and expect to start a trial later this year. The unmet need remains very clear across the epilepsy community, with around a third of epilepsy patients being

-39-

FIRST AMENDED CLASS ACTION COMPLAINT

treatment resistant. *As such, we see there remains considerable potential for Epidiolex growth for many years to come.*

## Significant Unmet Need Remains For Further Research



Turning to slide 14, *with our eye on reaching the most patients possible, we have the expertise and team in place of **building Epidiolex towards becoming a blockbuster medication.*** In 2021 our priorities are to build on the positive patient and physician experiences to increase prescribing to accelerate adoption across a broader prescriber base, to continue to expand payer coverage to increase penetration in the long term care segment, and to continue to execute on a recent TFC label expansion, drive adoption in TSC.

## Epidiolex 2021: Building a Blockbuster



FIRST AMENDED CLASS ACTION COMPLAINT

92.     Yet, neither the July Projections nor the December Projections reflect any input for autism or treatment resistant epilepsy as a target indication for Epidiolex, despite its known shift in November. Instead, the December Projections simply deleted a line of revenue to lower the July Projections without adding in its replacements. Given the stated optimism and confidence that these broader indications provide a "much better path forward" and that treatment resistant epilepsy would increase the addressable market of Epidiolex by 10x, creating "Blockbuster" potential, this unilateral deletion of revenue projections artificially decreased the value of the Company represented in the December Projections. Accordingly, this adjustment does not reflect the Company's actual value, the Company's contemporaneous public statements, or the Defendants' understanding of the Company's actual value.

93.     **Second**, the December Projections removed the revenue associated with both PTSD and broad spasticity as target indications for Sativex/nabiximols, despite the Company's entirely contradictory statements—made ***before and after*** the slashes to the Company's projections—declaring GW's intention, enthusiasm, and expected profitability for pursuing these indications.

94.     At the Stifel Conference on November 18, 2020, Defendant Gover plainly stated GW's persistence in pursuing broad spasticity as a target indication for Sativex/nabiximols:

**Paul Matteis**

Well, maybe do you want to just finish off by laying out the other pipeline catalysts to look forward to over say the next 12 to 18 months?

**Justin Grover**

Yes, just very briefly, right, we've got nabiximols is not just limited to MS, of course. So this is we, we believe based on FDA discussions that we can get a broader spasticity label, which would be a huge win for the company.

95.     At the JPMorgan Conference on January 12, 2021, Defendant Gover plainly stated GW's persistence in pursuing broad spasticity and PTSD as target

FIRST AMENDED CLASS ACTION COMPLAINT

indications for Sativex/nabiximols and expressed confidence in FDA approval for broad spasticity:

> Turning to slide 5, Epidiolex represented the beginning of a new era for cannabinoid science and we have expanded our pipeline to build on this success. *With nabiximols we are moving forward with a robust Phase 3 program in MS spasticity followed by a program in spinal cord injury spasticity **and PTSD**. 2021 could be a pivotal year for this product, and I will provide more detail on this important late stage asset later in the presentation.*



On slide 22, as we think about the life cycle beyond MS spasticity, ***we see real opportunities within the broader spasticity market.*** There are as many as 3 million patients in the United States with spasticity associated with various conditions.

***In discussions with the FDA, we are confident that a broad spasticity label is achievable for this product.*** And beyond MS, our next target was the spinal cord injury spasticity, which is similar in size to the commercial opportunity for multiple sclerosis. The addition of this indication may in fact be sufficient to achieve the broad spasticity label.

***And beyond spasticity, we're also looking now at PTSD.*** And there is great interest within the PTSD community around cannabis and the potential for an FDA approved option. We are currently preparing a phase 2 clinical trial in this indication.

FIRST AMENDED CLASS ACTION COMPLAINT

## Opportunity to Achieve Broad Spasticity Label As Well as Other Lifecycle Opportunities

○ Broader spasticity population
  ○ >3M U.S. patients including spinal cord injury, post-stroke, ALS, traumatic brain injury, cerebral palsy

○ Spasticity associated with Spinal Cord Injury (SCI)
  ○ Approx. 250K chronic SCI patients (~65%) suffer from spasticity
  ○ Likely single pivotal trial required
  ○ Sales potential ~$350M

○ Post Traumatic Stress Disorder (PTSD)
  ○ Impacting ~11.7M people with ~55% diagnosed
  ○ Anxiety is one of the top 3 reasons for self-medication with cannabis
  ○ Nabiximols offers potential to reduce sleep disturbance symptoms, anxiety and irritability

Sources: DiPiro. Spinal Cord. 2018; McGuire. Spasticity: Diagnosis and Management, 2011; Nicholson. Muscle Nerve. 2018; AANS Website; UpToDate; Physician Interviews; ClearView Analysis. Goldstein. Soc Psychiatry Psychiatr Epidemiol 2016; Kessler. Arch Gen Psychiatry. 2012; Kessler. Arch Gen Psychiatry. 2005; UpToDate; Physician Interviews; ClearView Analysis

22                                    J.P. Morgan Healthcare Conference | January 12, 2021                                    GW

96.    Further, Slides 13 and 15 from Jazz's February 2021 Investor Presentation announcing the Merger plainly indicate GW's persistence in pursuing broad spasticity and PTSD as target indications for Sativex/nabiximols:



## Nabiximols: Next U.S. Commercial Opportunity

- Derived from the whole cannabis plant containing a clinically proven, balanced dose of THC and CBD along with other cannabinoid and non-cannabinoid plant components
- **Approved in >25 countries** outside the U.S. as Sativex® for the treatment of spasticity due to multiple sclerosis (MS); sold via marketing partners
- **Near-term opportunity** in MS Spasticity
  - Positive efficacy, safety and abuse/diversion data
  - US pivotal clinical program now recruiting
  - **Broad potential** in spasticity beyond MS
- Complex botanical formula strengthens exclusivity
- **In Phase 3 development in the US** and aiming to submit a NDA to the FDA in the next 1-2 years

Jazz Pharmaceuticals                                                                                    13 | February 2021

-43-

FIRST AMENDED CLASS ACTION COMPLAINT



97.    Finally, GW's 10-K for FY 2020, filed on February 6, 2021, plainly states the Company's intentions to continue with broad spasticity and PTSD indications for Sativex/nabiximols:

> Our nearest term pipeline opportunity in the U.S. is nabiximols. Following meetings with the FDA, we initiated two out of five pivotal clinical trials in 2020 for nabiximols in the treatment of spasticity due to multiple sclerosis, with the remaining three trials planned to begin in the first half of 2021. ***We believe that nabiximols has the potential to be developed in several additional indications and are planning clinical programs in spasticity due to spinal cord injury and PTSD.***
>
> ***
>
> *With respect to the lifecycle for nabiximols beyond MS spasticity,* ***we see potential opportunities within the broader spasticity markets*** *as there are around three million patients in the United States with spasticity associated with various conditions. We are, in parallel, planning clinical programs in two further indications, spasticity due to spinal cord injury* ***and PTSD****. We commenced the MS spasticity clinical program in the second half of 2020 to address these broader markets with a view to achieving a series of approved indications for nabiximols over the coming years.*

-44-

FIRST AMENDED CLASS ACTION COMPLAINT

98.    Therefore, eliminating billions of dollars of revenue from July Projections associated with broad spasticity and PTSD indications for Sativex/nabiximols all the way through year 2035 does not reflect the Company's actual value, the Company's contemporaneous public statements, or the Individual Defendants' understanding of the Company's actual value.

99.    **Third**, the dramatic reduction in the probability of success ("POS") from 12% in the July Projections to 5% in the December Projections represents an unwarranted slashing to the future value of the Company. Based on contemporaneous statements from the Company, GW's probability of success improved—not deteriorated—in both their clinical and developmental assets.

100.    For example, the following comments from Defendant Gover's presentation at the JPMorgan Conference, on January 12, 2021, discussing GW's growing development pipeline and *increased* probability of success for its clinical trials contradict these reductions:

> In 2020 we managed to achieve further success across all aspects of our business. In particular we progressed on active R&D program and robust pipeline with multiple Phase 1 and 2 and 3 trials underway.
>
> . . .
>
> Beyond Epidiolex and nabiximols, we also have other candidates in phase 1 and 2 trials and are committed to advancing GW cannabinoid pipeline to develop important new treatments for patients with a particular focus on neurology and neuropsychiatry, including schizophrenia, autism, in NHIE and other targets.
>
> I am pleased to announce today for the first time that we are expanding beyond this pipeline with an exciting new additional research and discovery focus with GW Pharma.
>
> . . .
>
> In essence, we expect to bridge from the three positive trials carried out in Europe by supplementing the file with one additional trial with primary data and a more proximate spasticity endpoint, either addressing muscle tone or spasms. Although we only expect to need data from one additional trial, we have decided to pursue a multiple shots on goal strategy with five trials planned. And I'm pleased to announce that the first two of these five trials are now underway. *This multiple shots on goal strategy not only **increases the probability of success**, but we also see that the abundant clinical data generated will prove useful to physicians and patients as we bring this product to the

FIRST AMENDED CLASS ACTION COMPLAINT

United States. And beyond MS spasticity, we have also discussed with FDA the potential for expanding into other indications.

. . .

And in closing, I'd like to review our key priorities for 2021. First, we expect to continue to deliver commercial success and revenue growth for Epidiolex. We have multiple growth drivers in the U.S. including the TSC indication and broadening payer coverage. Second, we expect to prepare nabiximols for approval and launch in the United States. We will have five pivotal trials in spasticity associated with MS running this year, and expect to submit the NDA upon the first positive readout data from at least one of these trials as expected this year. Third, we expect to advance a robust pipeline of clinical and research programs. We have multiple phase 2 clinical trials on going and new candidates moving into the clinic, including from our new discovery efforts focused on novel cannabinoid NCEs with increased potency.

101.    And statements from Volker Knappertz, the Company's Chief Medical Officer, made in the November 3, 2020 Q3 Earnings Call indicate that the Company was moving strongly forward with its developmental pipeline:

Regarding CBDV, an autism spectrum disorder, recruitment has resumed in the investigator led 100 patient placebo controlled trial.

During September we were pleased to initiate a Phase 2b study in schizophrenia. This randomized double-blind placebo controlled trial will investigate the safety and efficacy of GWP42003 versus placebo as adjunctive therapy in participants with schizophrenia experiencing inadequate response to ongoing anti-psychotic treatments. Additionally, a study of an intravenous form of cannabidiol to treat neonatal hypoxic ischemic encephalopathy or NHIE continues to recruit.

Finally, I'm excited to introduce a new botanical cannabinoid product candidate, GW541. GW541 is a complex botanical formulation that contains many known constituents of the cannabis sativa plant, but differs in cannabinoid composition from nabiximols.

The relative amounts of the target cannabinoids have been optimized to treat conditions within the field of neuropsychiatry. The Phase 1 study to assess the safety, tolerability and pharmacokinetics of GW541 in healthy and elderly volunteers has recently commenced. *This is one of several new candidates that our discovery team has been evolving and we expect additional new cannabinoid products to enter the clinic in 2021.*

102.    Simply put, there was no suggestion that the Company's developmental platform was downgraded or that any intervening event would have caused the Company's probability of success to drop drastically from July to December. An event

FIRST AMENDED CLASS ACTION COMPLAINT

causing GW to drastically reduce its probability of success would certainly have been material information and would have been disclosed to shareholders. Contrarily, Defendants made numerous statements boasting increased optimism in GW's developmental platform and the probability of success of its product pipeline. Accordingly, the drastic reduction to POS does not reflect the Company's actual value, the Company's contemporaneous public statements, or the Individual Defendants' understanding of the Company's actual value.

103.   In sum, from July through December of 2020, GW's business was thriving; repeatedly posting record revenues that exceeded expectations and making numerous positive announcements regarding the development and approval of its current products and drug candidates. However, after it had been decided that GW would be sold, and at the same meeting that Defendants decided to only sell to Jazz— a Company with a limited spending budget—Defendants ordered Company management to lower their financial projections. The pretextual justifications for the removal of nearly *$6 Billion of revenue* from the July Projections were contradicted by statements made by the Company and its management before, during, and after the downward revisions to the projections. The illegitimate December Projections were not provided to Jazz and were not relied upon in operating the Company—nor could they be since GW was being sold. The December Projections were drastically slashed for one reason: to justify the unjustifiable Merger.

*The Challenged Misleading Statements*

104.   Plaintiffs identify the following statements as false and/or misleading.

105.   **First**, the changes in assumptions identified in the Proxy on pages 83-84 for drastically lowering the July Projections to create the December Projections were false and misleading. As discussed at length above, these assumptions are contradicted by the contemporaneous Company statements and misled shareholders to conclude that these spurious changes were legitimate, reasonable, and accurately reflected

FIRST AMENDED CLASS ACTION COMPLAINT

actual changes in the Company's operations and value. In reality, they were pretextual and objectively unreasonable justifications offered to deceive shareholders into thinking the drastic cut to the projections were warranted when Defendants knew they were not.

106. **Second**, the statements in the Proxy conveying that the December Projections and their underlying assumptions were "reasonably prepared" and reflected the Company's "best currently available estimates" ((i) Proxy at 68: "that the Internal Data (including, without limitation, the December Forecasts) were reasonably prepared on bases reflecting the best currently available estimates and judgments of the management of GW;" and (ii) Proxy at 75: "that the December Forecasts and the NOL Forecasts were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of GW.") were materially false and misleading because, as set forth herein, Defendants did not genuinely believe that the December Projections and the assumptions upon which they were generated were reasonable or reflected management's best available estimates.

107. Defendants did not actually believe in the December Projections, and knew they were false and misleading because they: (i) were predicated upon unreasonable assumptions that contradicted the July Projections that Defendants knew were prepared in the ordinary course of business and approved as reflecting the Company's actual expected financial outlook; (ii) were predicated upon unreasonable assumptions that contradicted the Company's and its officers' (including Defendant Gover's) statements made during the months after the July Projections and up through the announcement of the Merger; (iii) were incongruous with the Company's and Defendant Gover's positive statements made during the months after the July Projections and up through the announcement of the Merger regarding the Company's positive financial trends and strong growth prospects; and (iv) were not used during the Company's negotiation with Jazz and were created solely for use by the Financial

FIRST AMENDED CLASS ACTION COMPLAINT

Advisors to provide their fairness opinions. Therefore, the statements supporting the December Projections as reasonably prepared and reflecting the Company's best available estimates were false and misled GW shareholders regarding GW's business operations, the reliability of GW's future prospects, and GW's value.

108.    **Third**, the ADS present value ranges ("Present Value Ranges") included in the Proxy (pages 70-73, 76-79) were calculated by the Financial Advisors using the unreasonably reduced December Projections that dramatically impacted the financial valuation of GW, and, therefore, dramatically misled shareholders regarding the fair *present* value of GW. Defendants were only able to portray the Merger Consideration as "fair" to GW shareholders by creating the downward revised December Projections and approving their use by the Financial Advisors in their valuation analyses. In other words, the December Projections were engineered to present the unfair Merger Consideration as "fair," not to reflect management's legitimately held views. Therefore, the Present Value Ranges calculated by the Financial Advisors using the December Projections and included in the Proxy to show the Merger Consideration to be within an artificial range of fairness materially misled GW shareholders. The Present Value Ranges misled GW shareholders as to what they were actually giving up in exchange for the Merger Consideration. The mythical business that was presented in the Proxy and valued using the December Projections resulted in Present Value Ranges for GW that were false and misleading in that they led GW shareholders to believe the Merger Consideration was "fair."

**III.    Defendant Guy and Defendant Gover Faced Disabling Conflicts of Interest That Motivated Them to Sell the Company for Less Than Fair Value and the Purportedly Independent Board Members Were At Least Negligent for Allowing the Misleading Statements to be Included in the Proxy**

109.    Defendant Guy, GW's founder, Executive Chairman, and Chairman of the Board, wanted out from the responsibility of running a publicly traded Company.

FIRST AMENDED CLASS ACTION COMPLAINT

Defendant Guy was 68 years old and going on 30+ consecutive years of highly stressful work. He sought to reduce his stress, lower his blood pressure, spend more time at home, and more time with his family. But perhaps above all, he sought the time and money to pursue his next interest, quantum biology, which he recognized could only be achieved through funding.

110.    Since the Merger, Defendant Guy has admitted that he was ready to take a step back. He had succeeded in his goals of bringing both Sativex and Epidiolex to market and grew GW to a large company poised for success. But he didn't have any desire to continue running a public company. Interestingly, he described his greatest feeling after the Merger as relief.

111.    Defendant Gover, GW's Chief Executive Officer and director, had a thirty-year relationship with and was beholden to Defendant Guy. As soon as Jazz made their initial offer, and the decision to sell the Company was made, GW fired its existing independent outside consultant and brought in Radford to make irregular adjustments to the change in control payments that GW's officers and directors would receive when GW was sold. In other words, the Board, including Defendants Guy and Gover, paid off management and themselves to ensure a sale of the Company. GW management then spent the final days leading up to the Merger negotiating millions of dollars in additional compensation on their way out the door. As a result of these self-interested money grabs, Defendant Gover, along with the other members of GW management, was paid millions of dollars to ensure that the Merger went through.

112.    Each of the Individual Defendants, as directors and/or officers of the Company, had a duty to carefully review the Proxy before they authorized its dissemination to ensure it did not contain any materially false or misleading statements. The Individual Defendants failed to fulfill their duty by allowing the Proxy to contain the materially false and misleading statements referenced above. As a result, GW shareholders were misled to voting in favor of the Merger, thereby causing them

FIRST AMENDED CLASS ACTION COMPLAINT

to receive less than full value for their GW ADSs and lose out on millions of dollars of value in the Company.

113.    Each Individual Defendant was at least negligent because, as directors of the Company, they were responsible for and significantly involved in the preparation and dissemination of the Proxy. Furthermore, as directors of the Company, each of the Individual Defendants was aware of both the July Projections and management's comments and views regarding the Company's financial condition and prospects that were conveyed during the Company's press releases, earnings calls, conferences, and presentations before, during, and after the creation of both sets of projections. Defendants Guy and Gover knew and each of the non-executive director Defendants knew or should have known that the December Projections significantly slashed the Company's revenue and earnings projections as set forth in the July Projections, despite the fact that such a significant slash was in no way warranted or justified by the Company's and management's outlook or any negative changes to the Company's long-term business prospects.

114.    Each Individual Defendant also reviewed the financial analyses and fairness opinions with Goldman Sachs and Centerview and knew that their financial analyses were predicated on the unreasonably low December Projections that the Board ordered to be created just days earlier. Defendants Guy and Gover knew and each of the non-executive director Defendants knew or should have known that the sole purpose for the creation of the unreasonable December Projections was for the Financial Advisors to generate fairness opinions and allow the Board to approve the unfair Merger. Nevertheless, Defendants at least negligently approved, signed, and authorized the dissemination of the Proxy, which contained the unreasonably low December Projections and related false and misleading statements set forth above.

115.    Instead of acknowledging that the December Projections were inappropriate for use in valuing the Company because they were predicated on

FIRST AMENDED CLASS ACTION COMPLAINT

unsound and unreasonable assumptions and inputs, the Individual Defendants authorized Goldman Sachs and Centerview to utilize the December Projections for purposes of their valuations, and at least negligently allowed the resulting materially false and misleading valuations to get disseminated to shareholders in the Proxy.

## IV.   The False and Misleading Proxy Statement Caused GW Shareholders Economic Harm

116.   The Merger Consideration received by GW shareholders represented just a fraction of the true value of their holdings. However, the Proxy misled GW shareholders regarding the true value of their GW ADSs, thereby causing GW shareholders to approve the unfair Merger. Since the Merger could not have occurred without the approval of GW shareholders, the Proxy was an essential link in the accomplishment of the Merger and the misleading statements were the cause of the Class's (defined below) economic loss.

117.   The causal connection here is straightforward. If GW shareholders had been informed that ADSs of GW were worth $270 at the time of the Merger, and the Board would have been unable to obtain fairness opinions from the Financial Advisors, then GW shareholders would not have voted to approve the Merger purporting to offer them $220 per ADS. Accordingly, GW shareholders are entitled to damages in the amount of the difference between the price received in the Merger and the fair value of their GW ADSs as calculated in accordance with recognized methods of valuation.

118.   Multiple sources indicate that the fair value of GW stock was more than $270 per ADS, far in excess of the $220 Merger Consideration.

119.   Indeed, had the valuations performed by the Financial Advisors been calculated utilizing the legitimate July Projections, GW's valuation would have entirely exceeded the value of the Merger Consideration. In other words, the Merger Consideration would have fallen outside the range of fairness and the Financial

FIRST AMENDED CLASS ACTION COMPLAINT

Advisors would **not** have been able to issue their fairness opinions touting the Merger Consideration as fair to GW shareholders.

120.    GW's revenue for years 2021-2035 was slashed by an average of 15% from the July Projections to the December Projections. GW's EBIT for years 2021-2035 was slashed by an average of 20% from the July Projections to the December Projections.

121.    Centerview's Discounted Cash Flow Analysis ("DCF")[8] resulted in a range of present values per GW ADS of $200.20 to $247.95.

122.    Goldman Sachs' DCF resulted in a range of present values per GW ADS of $199 to $244.

123.    Typically, reductions to top line revenue are amplified on down the line numbers as costs, both fixed and variable, take their toll on the metrics. Stated simply, a 15% cut in revenue will have a greater than 15% impact on earnings and free cash flows (the necessary metric to perform a DCF). This point is illustrated here by the difference in changes between revenue and EBIT metrics from the July Projections to the December Projections. For years 2021-2035, revenue metrics decreased by an average of **15%,** causing EBIT projections to be decreased by **20%**. Accordingly, free cash flows would have been decreased even further than 20%. Moreover, this point can easily be observed in the December Projections, which show the cash flow projections to be significantly less than the EBIT projections.

---

[8] "Discounted cash flow (DCF) forms the core of finance…. Though professionals may employ other methods of valuation, such as relative valuation and the contingent claims approach, DCF forms the basis for all other valuations. Underscoring the importance of DCF valuation is the fact that it provides a linchpin to link various fields of finance." The Valuation Handbook: Valuation Techniques from Today's Top Practitioners. Ed. Rawley Thomas and Benton E. Gup. Hoboken: John Wiley & Sons, 2010.

FIRST AMENDED CLASS ACTION COMPLAINT

124.    However, even utilizing the conservative 15% and 20% figures, it is clear that the results of both Financial Advisors' DCF analyses would have shown the value to the Company to entirely exceed the value of the $220 Merger Consideration:

|  | Centerview | | Goldman | | Average |
|---|---|---|---|---|---|
|  | Low | High | Low | High | Midpoint |
| Results from Proxy | $ 200.20 | $ 247.95 | $ 199.00 | $ 244.00 | **$222.79** |
| Reflecting 15% Change | $ 235.53 | $ 291.71 | $ 234.12 | $ 287.06 | **$262.10** |
| Reflecting 20% Change | $ 250.25 | $ 309.94 | $ 248.75 | $ 305.00 | **$278.48** |

125.    Moreover—and supporting the $270.09 average of these higher valuations—expert Wall Street analysts (including Goldman Sachs before it was paid $36 million to provide a fairness opinion) maintained price targets for GW of up to $271 and $275. This further indicates that shareholders suffered economic loss as a result of the materially false and misleading Proxy that was utilized to procure approval of the unfair Merger.

126.    In sum, the Merger, which could not have been accomplished without the materially false and misleading statements in the Proxy, caused GW shareholders to forfeit their holdings at a substantial discount to their fair value. Accordingly, Plaintiffs, on behalf of the Class, seek to hold Defendants accountable for the financial loss and damages they suffered, which were caused by Defendants' violations of the Exchange Act.

## CLASS ACTION ALLEGATIONS

127.    Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and all other GW shareholders (the "Class"). Excluded from the Class are Defendants and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

128.    This action is properly maintainable as a class action because:

a.    The Class is so numerous that joinder of all members is impracticable. As of April 23, 2021, 378,535,952 ordinary shares were

outstanding, including 368,966,160 ordinary shares held as GW ADSs, each representing twelve ordinary shares, collectively held by hundreds to thousands of individuals and entities scattered throughout the country. The actual number of GW shareholders will be ascertained through discovery;

b.    There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)    whether Defendants misrepresented material information in the Proxy, in violation of Section 14(a) of the Exchange Act;

ii)    whether the Individual Defendants violated Section 20(a) of the Exchange Act; and

iii)    whether Plaintiffs and the Class were harmed by the misleading Proxy;

c.    Plaintiffs are adequate representatives of the Class, have retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.    Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs do not have any interests adverse to the Class;

e.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.    A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

FIRST AMENDED CLASS ACTION COMPLAINT

## COUNT I

### Against Defendants for Violations of Section 14(a) of the Exchange Act

129.    Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

130.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

131.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

132.    Defendants issued the Proxy and/or permitted the use of their names in the Proxy with the intention of soliciting GW shareholders' support for the Merger. Each of the Individual Defendants reviewed, signed, and/or authorized the dissemination of the Proxy, which misrepresented the above-identified material information and rendered the above-identified sections of the Proxy materially false and misleading because such sections provided a false and misleading picture of GW's business operations, valuation, and future financial prospects.

133.    Each of the Individual Defendants, by virtue of their roles as officers and/or directors of GW, were aware of the GW's business, its financial projections,

and its valuation information but failed to ensure such information was disclosed in the Proxy in a non-misleading fashion, in violation of Section 14(a) and Rule 14a-9. Defendants Guy and Gover knew and each of the non-executive director Defendants knew or should have known that the Proxy was materially false and misleading in regard to the above-referenced material information. The Individual Defendants reviewed and relied upon the material information identified above in connection with their decision to approve and recommend the Merger; indeed, the Proxy states that the Company management reviewed and discussed the Company's financial projections with the Board and the Financial Advisors reviewed and discussed their financial analyses with the Board, and further states that the Board considered both the financial analyses provided by the Financial Advisors as well as their fairness opinions and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the true facts concerning the process involved in selling GW and GW's true value, which was far greater than the value of the Merger Consideration GW shareholders received.

134.    Defendants Guy and Gover knew and each of the non-executive director Defendants knew or should have known that the material information identified above had been misrepresented in the Proxy, rendering the sections of the Proxy identified above to be materially false, misleading, and/or incomplete. Indeed, the Individual Defendants were required to review the Financial Advisors' valuation analyses, question the Financial Advisors as to their derivation of fairness, and to be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there were no material misstatements or omissions. After reviewing both the underlying materials and the Proxy, the Individual Defendants failed to provide a non-misleading proxy solicitation.

135.    GW is liable for violations of the Exchange Act as the issuing entity of the Proxy and based on the Individual Defendants' violation of the Exchange Act.

FIRST AMENDED CLASS ACTION COMPLAINT

136.   The above-referenced information that was mispresented in the Proxy was material to Plaintiffs and the Class, who were deprived of their right to cast an informed vote because such misrepresentations and omissions were not corrected prior to the vote on the Merger and rendered the above-refenced sections of the Proxy materially false and misleading.

137.   As a direct and proximate result of the dissemination of the materially false and misleading Proxy that Defendants used to obtain shareholder approval of the Merger, Plaintiffs and the Class have suffered damages and actual economic losses (i.e., the difference between the value they received as a result of the Merger and the true value of their GW ADSs at the time of the Merger) in an amount to be determined at trial. By reason of the misconduct detailed herein, Defendants are liable pursuant to Section 14(a) of the Exchange Act and SEC Rule 14a-9.

## COUNT II

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

138.   Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

139.   The Individual Defendants acted as controlling persons of GW within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of GW, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements contained in the Proxy filed with the SEC, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are materially false and misleading.

140.   Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiffs to be

FIRST AMENDED CLASS ACTION COMPLAINT

misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

141. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the members of the Board to approve the Merger and was signed "By Order of the Board." They were thus directly involved in preparing this document and responsible for its contents.

142. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in (i) negotiating, reviewing, and/or approving the Merger; and (ii) preparing, reviewing, and/or approving the December Projections. The Proxy describes the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

143. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

144. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiffs and the Class have suffered damages and actual economic losses (*i.e.*, the difference between the value they received as a result of the Merger and the true value of their GW ADSs at the time of the Merger) in an amount to be determined at trial.

FIRST AMENDED CLASS ACTION COMPLAINT

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs demand relief in their favor and against the Defendants jointly and severally, as follows:

A. Declaring that this action is properly maintainable as a Class Action and certifying Plaintiffs as Class Representatives and their counsel as Class Counsel;

B. Awarding Plaintiffs and the Class damages sustained as a result of Defendants' wrongdoing, including but not limited to compensatory damages, rescissory damages, and quasi-appraisal damages, plus pre-judgment and post-judgment interest;

C. Awarding Plaintiffs and the Class the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

D. Awarding extraordinary and/or equitable relief as permitted by law, equity, and the federal statutory provisions sued hereunder; and

E. Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury.

FIRST AMENDED CLASS ACTION COMPLAINT

1   DATED: March 28, 2022                    Respectfully submitted,

2
    **OF COUNSEL**                            */s/ David E. Bower*

3                                            David E. Bower

4   **MONTEVERDE & ASSOCIATES PC**
5   Juan E. Monteverde                       David E. Bower SBN 119546
    John W. Baylet                           **MONTEVERDE & ASSOCIATES PC**
6   The Empire State Building                600 Corporate Pointe, Suite 1170
    350 Fifth Avenue, Suite 4405             Culver City, CA 90230
7   New York, New York 10118                 Tel: (213) 446-6652
8   Tel: (212) 971-1341                      Fax: (212) 202-7880
    Fax: (212) 202-7880                      dbower@monteverdelaw.com
9   jmonteverde@monteverdelaw.com
10  jbaylet@monteverdelaw.com                *Lead Counsel for Lead Plaintiffs and the
                                             Putative Class*
11  **KAHN SWICK & FOTI, LLC**
12  Michael Palestina
    1100 Poydras Street, Suite 3200
13  New Orleans, LA 70163
14  Tel: (504) 455-1400
    Fax: (504) 455-1498
15  michael.palestina@ksfcounsel.com

16
    *Lead Counsel for Lead Plaintiffs and the
17  Putative Class*

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT