NOAH A. KATSELL (Bar No. 217090)
noah.katsell@dlapiper.com
**DLA PIPER LLP (US)**
401 B Street, Suite 1700
San Diego, CA 92101-4297
Tel:   619.699.2700
Fax:   619.699.2701

RACHELLE SILVERBERG (*pro hac vice*, NY 2614063)
rsilverberg@wlrk.com
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52nd Street
New York, NY 10019
Tel:  212.403.1000

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KURT ZIEGLER and DANIEL BRADY, on Behalf of Themselves and All Others Similarly Situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>GW PHARMACEUTICALS, PLC, JUSTIN GOVER, GEOFFREY GUY, CABOT BROWN, DAVID GRYSKA, CATHERINE MACKEY, JAMES NOBLE, ALICIA SECOR, and LORD WILLIAM WALDEGRAVE,<br><br>    Defendants. | Case No.:  3:21-CV-01019-BAS-MSB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>Special Briefing Schedule Ordered<br>Hearing Date: September 12, 2022<br><br>NO ORAL ARGUMENT UNLESS ORDERED BY THE COURT<br><br>Judge:   Hon. Cynthia A. Bashant<br><br>Complaint Filed:  May 27, 2021 |

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................1

STATEMENT OF FACTS .....................................................................................2

      A.    The parties...............................................................................2

      B.    GW's business and products .................................................2

      C.    The July Projections .............................................................3

      D.    Jazz offers to acquire GW and is repeatedly rebuffed ........4

      E.    GW scales back various projects due to Covid and updates its projections to reflect its updated business plans .................5

      F.    The Merger and the fairness opinions...................................6

      G.    The Merger Proxy .................................................................7

      H.    Plaintiffs' allegations ..........................................................8

LEGAL STANDARD ............................................................................................9

ARGUMENT ........................................................................................................10

I.     PLAINTIFFS FAIL TO STATE A CLAIM FOR RELIEF UNDER SECTION 14(a) OF THE EXCHANGE ACT ...........................................10

      A.    Plaintiffs fail to plead any actionable misstatement in the five Projection Assumptions. .....................................................10

           1.    The Projection Assumptions are forward-looking statements accompanied by cautionary language...................10

               a.    The Projection Assumptions are forward-looking. .......10

               b.    The Projection Assumptions are accompanied by cautionary language......................................................11

           2.    Plaintiffs have not alleged a false factual assertion in the Projection Assumptions. .........................................................13

      B.    Plaintiffs fail to plead any actionable misstatement in the Advisor Assumptions. .............................................................17

           1.    Plaintiffs misrepresent the Proxy's disclosure of the Advisor Assumptions.................................................................17

           2.    The Advisor Assumptions are forward-looking statements accompanied by cautionary language.......................................18

                a.    The Advisor Assumptions are forward-looking............18

               b.    The Advisor Assumptions are accompanied by cautionary language......................................................19

      C.    Plaintiffs fail to plead any actionable misstatement in the Present Value Ranges. ..............................................................19

1.  The Present Value Ranges are forward-looking statements accompanied by cautionary language.....................................19

a.  The Present Value Ranges are forward-looking. ..........19

b.  The Present Value Ranges are accompanied by cautionary language.......................................................21

2.  The Proxy contained no material misstatements regarding the Present Value Ranges. .........................................................21

D.  Plaintiffs fail to allege loss causation.................................................22

II.  THE "CONTROL PERSON" CLAIM MUST BE DISMISSED................25

CONCLUSION.........................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009) ........................................................................... 9

*Atlas* v. *Accredited Home Lenders Holding Co.*,
  556 F. Supp. 2d 1142 (S.D. Cal. 2008) ............................................ 16

*Bell Atlantic Corp.* v. *Twombly*,
  550 U.S. 544 (2007) ........................................................................... 9

*City of Hialeah Employees' Retirement System* v. *FEI Co.*,
  289 F. Supp. 3d 1162 (D. Or. 2018) ................................................. 13

*Golub* v. *Gigamon Inc.*,
  372 F. Supp. 3d 1033 (N.D. Cal. 2019),
  *aff'd*, 847 F. App'x 368 (2021) ..............................12, 13, 18, 19, 25

*Gray* v. *Wesco Aircraft Holdings, Inc.*,
  454 F. Supp. 3d 366 (S.D.N.Y. 2020),
  *aff'd*, 847 F. App'x 35 (2d Cir. 2021) ......................................... 18, 19

*Gray* v. *Wesco Aircraft Holdings, Inc.*,
  847 F. App'x 35 (2d Cir. 2021) ..................................... 18, 23 n.10, 24

*In re Alloy, Inc. Shareholder Litigation*,
  2011 WL 4863716 (Del. Ch. Oct. 13, 2011) ............................... 7 n.7

*In re Analogic Corp. Shareholder Litigation*,
  2019 WL 4804800 (D. Mass. Sept. 30, 2019) .............................. 18, 19

*In re Bemis Co. Securities Litigation*,
  512 F. Supp. 3d 518 (S.D.N.Y. 2021) ............................................. 19

*In re Keryx Biopharmaceuticals, Inc.*,
  454 F. Supp. 3d 407 (D. Del. 2020) ................................................. 18

*In re Ocera Therapeutics, Inc. Securities Litigation*,
  806 F. App'x 603 (9th Cir. 2020) .........................................2, 22, 23, 24

*J. K. J.* v. *City of San Diego*,
  17 F.4th 1247 (9th Cir. 2021) ............................................................. 9

*Kuebler* v. *Vectren Corp.*,
  13 F.4th 631 (7th Cir. 2021) ...................................................... 23 n.10

*Laborers' Local #231 Pension Fund* v. *PharMerica Corp.*,
  2019 WL 4645583 (W.D. Ky. Sept. 24, 2019) ................................. 18

*Laborers' Local No. 231 Pension Fund* v. *Cowan*,
  837 F. App'x 886 (3d Cir. 2020) ........................................................ 13

*Mack* v. *Resolute Energy Corp.*,
  2020 WL 1286175 (D. Del. Mar. 18, 2020),
  *aff'd sub nom. In re Resolute Energy Corp. Securities Litigation*,
  2022 WL 260059 (3d Cir. Jan. 27, 2022) ...................................... 24, 25

*Metzler Inv. GMBH* v. *Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) .............................................................. 23

*Montanio* v. *Keurig Green Mountain, Inc.*,
  237 F. Supp. 3d 163 (D. Vt. 2017) .................................................. 15, 16

*New York City Employees' Retirement System* v. *Jobs*,
  593 F.3d 1018 (9th Cir. 2010),
  *overruled on other grounds*, *Lacey* v. *Maricopa Cty.*,
  693 F.3d 896 (9th Cir. 2012) ............................................................ 9, 22

*No. 84 Employer-Teamster Joint Council Pension Trust Fund*
  v. *America West Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) .......................................................... 10, 20

*Paradise Wire & Cable Defined Pension Plan* v. *Weil*,
  918 F.3d 312 (4th Cir. 2019) ................................................................ 13

*Trahan* v. *Interactive Intelligence Group, Inc.*,
  308 F. Supp. 3d 977 (S.D. Ind. 2018) ....................... 15, 16, 20, 21, 25

*Tritz* v. *U.S. Postal Service*,
  721 F.3d 1133 (9th Cir. 2013) ................................................................ 9

*Wochos* v. *Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) ............................... 2, 10, 11, 13, 20

**Statutes and Rules**

15 U.S.C. § 78u-4(b)(1) ............................................................................ 16

15 U.S.C. § 78u-4(b)(4) ............................................................................ 22

15 U.S.C. § 78u-5(i) ..................................................................... 1, 10, 20

Fed. R. Civ. P. 12(b)(6) .............................................................................. 9

**Other Authorities**

JONATHAN BERK & PETER DEMARZO, CORPORATE FINANCE (4th ed.
  2017) ........................................................................................................ 20

1

## INTRODUCTION

2    This case arises from the $7.2 billion acquisition of GW Pharmaceuticals plc

3    ("GW") by Jazz Pharmaceuticals plc ("Jazz"). Jazz paid the GW shareholders $220

4    per American Depositary Share ("ADS"), a premium of 53% over the pre-

5    announcement market price of $144.08/ADS.

6    The merger was conditioned on approval of GW's shareholders. Before the

7    shareholder vote, GW sent its shareholders a Proxy Statement ("Proxy") with

8    extensive disclosures about the merger. The Proxy disclosed among other things

9    (1) a set of 15-year projections (the "December Projections") reflecting certain

10   assumptions about GW's business; (2) that GW's financial advisors "assumed" those

11   projections were the "best currently available estimates" and "reasonably prepared";

12   and (3) the "present value ranges" of GW shares calculated by the financial advisors.

13   Plaintiffs' sole challenge to the merger relates to these Proxy disclosures.

14   Plaintiffs challenge (1) five assumptions underlying the December Projections; (2) the

15   statement that the financial advisors "assumed" those projections were the "best

16   currently available estimates" and "reasonably prepared"; and (3) certain of the

17   implied "present value ranges" calculated by the financial advisors. In each case,

18   plaintiffs allege that the challenged statements were materially false and misleading,

19   in violation of Section 14(a) of the Securities Exchange Act of 1934.

20   The complaint fails to state a claim as a matter of law. *First*, The Private

21   Securities Litigation Reform Act ("PSLRA") contains a "safe harbor" for forward-

22   looking statements accompanied by cautionary language. Under the plain language

23   of the statute, "forward-looking" statements include statements regarding

24   "projection[s]," "plans and objectives . . . for future operations," "future economic

25   performance," and "assumptions underlying or relating to any" of these. 15 U.S.C.

26   § 78u-5(i). Each of the challenged statements falls squarely within this definition and

27   is accompanied by cautionary language.

28

*Second*, under controlling Ninth Circuit law, plaintiffs alleging that a statement is not forward-looking must allege a "concrete factual assertion about a specific present or past circumstance" in the statement that is false. *Wochos* v. *Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021). Plaintiffs fail to do this.

*Third*, plaintiffs have not alleged loss causation. Under the PSLRA, plaintiffs must allege—and not just speculate—that the challenged disclosures caused the shareholders "actual economic harm." Here, plaintiffs allege that GW's stock, which had never traded anywhere near $220/ADS, was really worth over $270/ADS. But the only alleged bases for that claim are two cherry-picked analyst reports and a set of earlier, outdated projections. The Ninth Circuit recently rejected virtually identical allegations in a similar lawsuit as "speculative in the extreme" and affirmed the dismissal for failure to allege loss caution. *In re Ocera Therapeutics, Inc. Sec. Litig.*, 806 F. App'x 603, 605 (9th Cir. 2020).

## STATEMENT OF FACTS[1]

### A.    The parties

Defendant GW was a publicly-traded pharmaceutical company incorporated in the United Kingdom and headquartered in California. Compl. ¶ 15. Prior to the merger with Jazz (the "Merger"), its ADSs traded on the Nasdaq stock exchange. *Id.* The individual defendants constituted GW's board of directors ("Board"). *Id.* ¶ 24.

### B.    GW's business and products

At the time of the Merger, GW had only two products—Epidiolex and nabiximols/Sativex. *Id.* ¶ 34. Epidiolex was launched in the U.S. in 2018, and was approved only for the treatment of seizures associated with three rare diseases: Lennox-Gastaut syndrome, Dravet Syndrome, and Tuberous Sclerosis Complex. *Id.* ¶ 35. Nabiximols was not approved for any use in the U.S. It was approved in some

---

[1] The Statement of Facts is drawn from the well-pleaded factual allegations in the Amended Complaint ("Compl."), documents that are incorporated by reference into the Amended Complaint, and documents subject to judicial notice.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS
CASE NO.  3:21-CV-01019-BAS-MSB

foreign countries for the treatment of MS spasticity, but was still in Phase 3 trials in the U.S. for that indication. *Id.* ¶¶ 36, 37. Though plaintiffs allege that GW "had plans" both "short and long term" to "unlock" nabiximols's alleged "blockbuster" potential for various other indications, the pleaded facts show that GW was nowhere near approval for any of those other indications. *Id.* ¶¶ 37-38, 96. Plaintiffs do not allege otherwise.

Given its limited products and extensive costs (including research and development), GW was losing millions of dollars each quarter.[2] Exs. B at 53, C at 58, D at 63.

**C.    The July Projections**

In July 2020, GW management prepared a set of 16-year projections (the "July Projections"), forecasting the company's annual financial performance for the years 2020-2035. The July Projections included the following products and product candidates:

- Epidiolex in the three approved indications and Rett Syndrome (U.S.), *even though Epidiolex was not yet approved for Rett*;

- Nabiximols in multiple sclerosis spasticity, spinal cord injury spasticity, PTSD (post-traumatic stress disorder), and additional broad spasticity indications, *even though Nabiximols was not approved in the U.S. for any of those indications*;

- Development organic products for various indications, *even though they were still in the research and development stage*; and

- Potential cannabinoid science-based *product candidates in development in unspecified indications*.

Compl. ¶ 80. The projections were necessarily speculative as they were built on

---

[2] Citations to "Ex. _" refer to exhibits to the Declaration of Noah A. Katsell. Page citations to the exhibits (including Exhibit A, the Proxy), refer to the Bates numbers added to the exhibits rather than the page numbers of the original documents.

estimates and assumptions going out more than 15 years for products in various stages of clinical trials and in many cases still in the development stage.

### D.    Jazz offers to acquire GW and is repeatedly rebuffed

On July 8, 2020, Jazz made an initial offer to acquire GW for $172/ADS, a 33% premium to the then-current stock price of $129/ADS. Compl. ¶ 48; Ex. H. GW rejected the offer out of hand.[3] Compl. ¶ 50. In August, Jazz offered $187/ADS, which GW also rejected. *Id.* ¶ 57. This time, GW conveyed that it would reject any proposal at $200/ADS or less—a message that served to entice a more significant move by Jazz, while signaling that Jazz should not waste its and GW's time if it could not pass that threshold.[4] *Id.* ¶ 58.

On September 11, 2020, Jazz reiterated its offer of $187/ADS, adding that it might go higher if it could conduct limited due diligence. Compl. ¶ 59; Proxy (Ex. A) at 12. Once again, it was rebuffed. Compl. ¶ 59. Though plaintiffs allege that "the decision to sell the Company was made" "[a]s soon as Jazz made their initial offer" (Compl. ¶ 111), GW's consistent refusal to engage with Jazz rebuts plaintiffs' conclusory allegation.[5]

---

[3] Though plaintiffs allege that the Jazz offer was "over $100 less per ADS than the Company's most recent price target" (Compl. ¶ 48), their allegation is based on an outlier analyst report that is not representative of analysts' sentiment more generally. *See infra* pp. 23-24. The Jazz offers were consistently at a significant premium to GW's market price. *See* Exs. H, M.

[4] Plaintiffs repeatedly label the $200 threshold as "arbitrary," Compl. ¶¶ 50, 57, 65, 66, but this second-guessing of negotiating tactics is completely irrelevant to whether the Proxy was accurate. Plaintiffs did not assert any claim for breach of fiduciary or other duty in connection with the Merger or its negotiation.

[5] Plaintiffs allege that GW replaced its existing compensation consultant in July 2020 and purportedly asked the new consultant (Radford) to review "severance plans," "change in control scenarios," "salaries, LTIP awards, performance plans," and other benefits. Compl. ¶ 51. But nothing about switching from one consultant to another suggests that a decision had been made to sell the company. Moreover, as the document plaintiffs rely upon shows, Radford was engaged in July to perform general compensation work, and was not engaged until the fall to consider change in control benefits. Ex. K at 143, 145.

**E.    GW scales back various projects due to Covid and updates its projections to reflect its updated business plans**

As 2020 progressed, the continuing impact of Covid led GW to scale back various planned clinical trials and other activities.  In its November 2020 earnings call, GW announced that it would suspend its study for using Epidiolex to treat Rett Syndrome, as "[t]he pandemic has caused meaningful feasibility challenges for the Rett study," and GW had "decided not to resume recruitment into this trial."  Ex. E at 76.  GW also announced that it "push[ed] back" the timeline for other trials, expressly including the "planned posttraumatic stress syndrome [PTSD] study," the timing of which GW planned to review "in the second half of 2021."  *Id.*  Finally, GW disclosed that it had a net loss of $12.2 million that quarter.  *Id.* at 77.

Though the Complaint touts several positive developments discussed on the November earnings call (Compl. ¶ 62), it conspicuously ignores the negative developments discussed on that same call regarding canceled and delayed clinical trials and other Covid-related impacts.  Ex. E at 76.

On December 1, 2020, Jazz again offered to buy GW, this time at $205/ADS—thus exceeding the $200 threshold the Board had set in August.  Compl. ¶ 64.  The GW Board met with management and its two financial advisors (Centerview and Goldman Sachs ("GS")) to discuss the offer.  *Id.* ¶ 65.  The Board also asked management to update the July Projections, allowing the Board to consider the Jazz proposal with the benefit of GW's most up-to-date business prospects.  *Id.*

Management prepared updated projections (the "December Projections") reflecting GW's updated business plans, including the cancellations and delays in certain clinical trials announced in November.  *Id.* ¶¶ 66, 88.  The Proxy disclosed the following five "key differences in the assumptions underlying the December Forecasts relative to the July Forecasts":

(1) "the removal of Rett Syndrome as a target indication for Epidiolex in light of the suspension of GW's ongoing Phase 3 clinical trial" due to Covid;

(2) "the removal of PTSD as a target indication for nabiximols / Sativex given GW's decision after the July Forecasts had been prepared to delay the initiation of a planned study of nabiximols in PTSD and reassess the study in the second half of 2021";

(3) "the removal of broad spasticity as a target indication for nabiximols / Sativex given that GW had already incorporated multiple sclerosis spasticity and spinal cord injury spasticity as target indications and a clinical program for broad spasticity had not yet been determined";

(4) "the decrease in the POS [probability of success] assigned to development platform from 12% to 5%, reflecting GW management's assessment that the POS should be lower to reflect the risks associated with these assets, taking into account commonly used POSs in the industry for pipeline assets of this nature, given that the development platform assets were generally in research, pre-clinical or early clinical trial phases of development"; and

(5) "the decrease in POS adjusted peak sales for the development platform from approximately $240 million to $50 million, reflecting the adjustment in the POS for the development platform and GW management's assessment of the more likely market opportunity for these assets."

Compl. ¶ 88; Proxy at 41-42. These five updated assumptions are collectively called the "Projection Assumptions."[6]

### F.    The Merger and the fairness opinions

The GW Board met with its financial advisors on December 13 to consider Jazz's pending offer. Compl. ¶ 66. They discussed, among other things, the July and December Projections and the assumptions underlying them. *Id.* The Board again rejected Jazz's offer. *Id.*

Jazz ultimately increased its offer to $220/ADS, consisting of $200 in cash and $20 in Jazz stock, for a total of $7.2 billion. Compl. ¶ 67; Ex. F at 105.

The GW Board met to discuss the offer on February 2, 2021. Compl. ¶ 72. They heard from their financial advisors, Centerview and GS, both of which opined that the Merger price was fair to the GW ADS holders. *Id.* ¶ 77. The opinions were based on several industry-standard valuation methodologies, including discounted

---

[6] The December Projections included three other updated assumptions not challenged by plaintiffs. Compl. ¶ 88 n.7; Proxy at 42.

cash flow ("DCF") analyses using the December Projections, and other analyses *not dependent on the December Projections.* Proxy at 25-38. *The Merger price was comfortably within the fairness range in every one of these analyses. Id.*[7]

Following discussion, the GW board unanimously voted to approve the Merger, subject to a shareholder vote. Compl. ¶¶ 3, 72, 76. The $220/ADS Merger price was a 53% premium to the closing price of $144.08/ADS prior to the Board's approval. Proxy at 21.

### G.    The Merger Proxy

On March 15, 2021, GW filed the Proxy with the SEC to solicit shareholder approval. Compl. ¶ 3. The Proxy was supplemented by a Form 8-K filing on April 14, 2021. Ex. G. The Proxy included detailed descriptions of the Background of the Transaction; GW's Reasons for the Transaction; and a summary of the "Opinions of Financial Advisors of GW."[8] *See* Exhibit A at 11, 20, 25.

In a section titled "Certain GW Forecasts" (*id.* at 39-42) the Proxy disclosed both the July and the December Projections and described each of the Projection Assumptions. The Proxy then expressly cautioned:

> [the projections] should not be construed as financial guidance nor relied on as such. The [projections] are not included in this proxy statement in order to induce any GW shareholder to vote in favor of the Proposals or to influence any GW shareholder or any other person to make any investment decision with respect to the Transaction.

*Id.* at 40-41. The Proxy further explained that the projections were included "solely to give GW shareholders access to the information that was made available to the GW Board, Jazz and their respective financial advisors." *Id.* at 39.

---

[7] Though the financial advisors' fee was partially contingent on the closing of a deal, Compl. ¶ 78, courts routinely recognize that such "contingent fees are undoubtedly routine" and "common practice." *In re Alloy, Inc. S'holder Litig*, 2011 WL 4863716, at *11 (Del. Ch. Oct. 13, 2011) (fee "contingent upon consummation of the Merger does not support an inference that [the advisor] intentionally undervalued" a company).

[8] The Proxy also disclosed the interests of GW's directors and officers in the Merger, including equity awards, bonuses, severance, and benefits. Proxy at 45-51.

7

1    The GW shareholders approved the Merger, which closed on May 5, 2021.

2    Compl. ¶ 8.

3    Plaintiffs allege that "[s]ince the merger," GW's founder and Executive

4    Chairman Geoffrey Guy "has admitted that he was ready to take a step back" from

5    GW and "didn't have any desire to continue running a public company."  Compl.

6    ¶¶ 109-110.  According to plaintiffs, Dr. Guy "wanted out," as he "sought to reduce

7    his stress," "lower his blood pressure," and have more "time and money to pursue his

8    next interest."  *Id.*  Plaintiffs' overarching theory of the case is that Dr. Guy "sought

9    an exit" from GW and that the other directors bowed to his wishes.  *Id.* ¶ 2; *see also*

10   *id.* ¶¶ 16, 109-11.

11   Plaintiffs' allegations bear no relation to Dr. Guy's actual statements.  The

12   alleged "admissions" mischaracterize Dr. Guy's comments in a book he wrote after

13   the merger.  *See* Ex. L.  Dr. Guy acknowledged that "[n]ow the deal is done," he has

14   "mixed feelings" about selling the company that "was like a baby to me," but that

15   "[o]ne beneficial side effect" of the sale has been that his "blood pressure has dropped

16   enormously."  *Id.* at 155-156.  Nothing in the relevant chapter of the book remotely

17   suggests that Dr. Guy was looking for an exit, or otherwise supports plaintiffs'

18   allegations or theory of the case.

19   **H.    Plaintiffs' allegations**

20   Plaintiffs' Amended Complaint alleges that GW made false and misleading

21   statements in the Proxy in violation of Sections 14(a) and 20(a) of the Securities

22   Exchange Act of 1934.  All of the challenged statements relate to the December

23   Projections, which plaintiffs allege were insufficiently optimistic and undervalued the

24   company.  Compl. ¶¶ 5, 103.  Plaintiffs challenge the following statements (*id.*

25   ¶¶ 105-08):

26       • Each of the five Projection Assumptions, quoted *supra* pp. 5-6.

27       • Statements that the financial advisors "assumed," for purposes of their

28         DCF analyses, that the December Projections were "reasonably prepared

8

1      on bases reflecting the best currently available estimates and judgments

2      of the management of GW" (the "Advisor Assumptions") (Proxy at 26,

3      33);

4   •   The "present value" of the December Projections derived from the

5      financial advisors' discounted cash flow analyses (the "Present Value

6      Ranges") (Proxy at 30, 34).

7      Plaintiffs allege that (1) absent these disclosures, GW shareholders would have

8   rejected Jazz's $220/ADS offer (and the 53% premium it represented), and (2) the

9   value of the GW ADSs would have been *in excess of $220/ADS* rather than at or near

10  the pre-Merger announcement price of $144.08.   Compl. ¶¶ 117-18.   Plaintiffs'

11  complaint fails as a matter of law and should be dismissed.

12                          **LEGAL STANDARD**

13     "To survive a motion to dismiss, a complaint must contain sufficient factual

14  matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*

15  v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544,

16  570 (2007)); *see also* Fed. R. Civ. P. 12(b)(6).  "[F]acts that are 'merely consistent with'

17  a defendant's liability" fall short of a plausible entitlement to relief.  *Iqbal*, 556 U.S. at

18  678 (quoting *Twombly*, 550 U.S. at 557).  In addition, "[w]here the complaint makes

19  'conclusory allegations that are contradicted by documents referred to [or incorporated]

20  in the complaint,' a court may decline to accept such conclusory allegations as true."

21  *J. K. J.* v. *City of San Diego*, 17 F.4th 1247, 1254 (9th Cir. 2021) (quoting *Tritz* v. *U.S.*

22  *Postal Serv.*, 721 F.3d 1133, 1135 n.1 (9th Cir. 2013)).

23     To state a claim under Section 14(a) and Rule 14a-9, a plaintiff must establish

24  that "(1) a proxy statement contained a material misrepresentation or omission which

25  (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the

26  particular defect in the solicitation materials, was an essential link in the

27  accomplishment of the transaction."  *N.Y.C. Emps.' Ret. Sys.* v. *Jobs*, 593 F.3d 1018,

28  1022 (9th Cir. 2010), *overruled in part on other grounds*, *Lacey* v. *Maricopa Cty.*, 693

1 F.3d 896 (9th Cir. 2012).

2 **ARGUMENT**

3 **I.    PLAINTIFFS FAIL TO STATE A CLAIM FOR RELIEF UNDER SECTION 14(a) OF THE EXCHANGE ACT.**

4
5 **A.    Plaintiffs fail to plead any actionable misstatement in the five Projection Assumptions.**

6 Plaintiffs' principal claim attacks as false the five Projection Assumptions in

7 the December Projections.  These statements are non-actionable because (1) they are

8 forward-looking statements protected by the PSLRA's safe harbor and (2) they

9 contain no material misstatements.

10 **1.    The Projection Assumptions are forward-looking statements accompanied by cautionary language.**

11 The PSLRA creates a "safe harbor" that exempts "forward-looking" statements

12 from liability under Section 14(a) where the statements are identified as such and

13 "accompanied by cautionary language."  *Wochos*, 985 F.3d at 1189-90 (citation

14 omitted).  A "forward-looking statement" is defined as "any statement regarding

15 (1) financial projections, (2) plans and objectives of management for future

16 operations, (3) future economic performance, or (4) the assumptions 'underlying or

17 relat[ing] to' any of these."  *No. 84 Employer-Teamster Joint Council Pension Tr.*

18 *Fund* v. *Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (quoting 15 U.S.C.

19 § 78u-5(i)).

20 **a.    The Projection Assumptions are forward-looking.**

21 The Projection Assumptions were identified as "forward-looking" statements[9]

22 and fall squarely within the definition quoted above as they are statements regarding

23 "assumptions underlying or relating to" (1) "projection[s]," (2) "future economic

24 performance," and/or (3) "plans and objectives of management for future operations."

25
26 [9] *See* Proxy at 9-10, defining "forward-looking statements" as including the
27 "expectations and beliefs" of the GW Board and management; "other statements that are not historical facts"; and statements using terminology such as "estimate," "plan," "potential," "project," "should," "will," or "comparable terminology." This definition
28 covers all of the statements challenged by plaintiffs.

10

15 U.S.C. § 78u-5(i)(1).  Plaintiffs allege that:

> ➤ the removal of Rett as an indication for Epidiolex "simply deleted a line of revenue to lower the July Projections without adding in its replacements. . . . Accordingly, this adjustment does not reflect the Company's actual value." Compl. ¶ 92.

> ➤ the removal of PTSD and broad spasticity as target indications for nabiximols "does not reflect the Company's actual value," because of the company's "intention, enthusiasm, and expected profitability for pursuing these indications." *Id.* ¶¶ 93, 98.

> ➤ the changes to the development platform's POS "represent[] an unwarranted slashing to the *future* value of the Company" because "Defendants made numerous statements boasting increased *optimism* in GW's developmental platform." *Id.* ¶¶ 99, 102 (emphases added).

In each case, plaintiffs' complaint is that the Board's assumption about future plans, operations and/or performance was wrong.  Such claims are not actionable.

Under controlling Ninth Circuit law, plaintiffs who challenge statements of "plans and objectives for future operations" must allege a "concrete factual assertion about a specific present or past circumstance" in the statement that is false.  *Wochos*, 985 F.3d at 1191-92 (holding that assumptions about future performance are "forward-looking" absent a "representation of current or past fact").  But as set forth below (*see infra* pp. 13-17), plaintiffs do not identify a single concrete factual assertion in any of the five Projection Assumptions that is false.

Plaintiffs' complaint is thus exactly what the PSLRA was intended to preclude: shareholder claims challenging projections and related assumptions about future plans, objectives, and economic performance.

### b.    The Projection Assumptions are accompanied by cautionary language.

Forward-looking statements are non-actionable when accompanied by

11

1    meaningful cautionary language. *Wochos*, 985 F.3d at 1190.  The Proxy's discussion

2    of the December Projections, and the Projection Assumptions underlying them, is

3    immediately preceded by over two pages containing cautionary language, warning

4    among other things:

- "GW does not as a matter of course publicly disclose financial forecasts or projections as to future revenues or other results of its operations due to, among other reasons, the uncertainty, unpredictability and subjectivity of the underlying assumptions and estimates";
- The projections "are subjective in many respects" and "reflect numerous estimates and assumptions made by GW's management . . . that are difficult to predict and that are beyond GW's control and are subject to change" due to "a wide variety of significant . . . risks and uncertainties";
- Those risks included "risks and uncertainties relating to the commercialization of Epidiolex / Epidyolex, obtaining marketing approvals for Epidiolex / Epidyolex in additional indications or in additional jurisdictions, . . . and the research, development, regulatory review and potential future commercialization of nabiximols / Sativex and GW's other product candidates";
- "Modeling and forecasting the future commercialization of clinical, pre-clinical and research stage product candidates is a highly speculative endeavor";
- "[T]he [projections] cover a number of years into the future and such information by its nature becomes less predictive with each successive year"; and
- "[T]he inclusion of the [projections] in this proxy statement should not be regarded as a representation by any person that the results contained in the [projections] will be achieved or that the results achieved will not exceed those reflected in the [projections]."

19    Proxy at 39-40; *see also* Proxy at 9-10 (containing additional cautionary language).

20    The section concludes with the following express warning:

By including the [projections] in this proxy statement, neither GW nor Jazz . . . makes any representation to any person regarding the ultimate performance of GW compared to the information contained in the [projections].  Accordingly, the [projections] should not be construed as financial guidance, nor relied on as such.  ***The [projections] are not included in this proxy statement in order to induce any GW shareholder to vote in favor of the Proposals or to influence any GW shareholder or any other person to make any investment decision with respect to the Transaction or otherwise. . . .***

26    Proxy at 40-41 (emphasis added).

27    This cautionary language far exceeds the legal threshold for adequacy.  *Golub*

28    v. *Gigamon Inc.*, 372 F. Supp. 3d 1033, 1050 (N.D. Cal. 2019) (quoting nearly

12

1   identical language and noting "other courts have found less complete cautionary

2   statements to be sufficient"), *aff'd*, 847 F. App'x 368 (2021); *see also Paradise Wire*

3   *& Cable Defined Pension Plan* v. *Weil*, 918 F.3d 312, 322-23 (4th Cir. 2019)

4   (statement that projection "is not being included in this" proxy statement to influence

5   shareholder's vote constitutes a specific and tailored cautionary language.); *Laborers'*

6   *Loc. No. 231 Pension Fund* v. *Cowan*, 837 F. App'x 886, 891 (3d Cir. 2020) (same);

7   *City of Hialeah Emps.' Ret. Sys.* v. *FEI Co.*, 289 F. Supp. 3d 1162, 1174 (D. Or. 2018)

8   (holding that statement that "shareholders are cautioned not to place undue, if any,

9   reliance on the projections included in this proxy statement" was sufficiently

10  cautionary and noting that "[t]he Ninth Circuit has found far less to be sufficient").

11      Because the Projection Assumptions are forward-looking statements

12  accompanied by cautionary language, they are subject to the PSLRA safe harbor and

13  are not actionable.

14              **2.    Plaintiffs have not alleged a false factual assertion in the**

15                     **Projection Assumptions.**

16      Plaintiffs' challenge to the Projection Assumptions also fails because plaintiffs

17  have not alleged that they contain any "concrete factual assertion about a specific

18  present or past circumstance" that is false.  *Wochos*, 985 F.3d at 1191-92.  Though

19  plaintiffs allege that the Projection Assumptions are inconsistent with other GW

20  disclosures, plaintiffs do not identify any public disclosures inconsistent *with a factual*

21  *assertion* in the Projection Assumptions.  The only alleged inconsistency is plaintiffs'

22  view that the December Projections are insufficiently optimistic:

23      **Rett**.   The Proxy discloses that Rett Syndrome was removed as a target

24  indication for Epidiolex "in light of the suspension of GW's ongoing Phase 3 clinical

25  trial . . . due to the impacts of the COVID-19 pandemic."  Compl. ¶ 88; Proxy at 41.

26  Plaintiffs concede it is "true" that the trial was suspended, which should end any

27  challenge to that statement.  Compl. ¶ 90.

28      Plaintiffs nonetheless allege that the trial suspension was seen "as an

13

opportunity to take stock of Epidiolex's potential and shift[] focus to much broader and more profitable indications," including autism and epilepsy, and that the December Projections failed to "reflect any input" for these additional indications. *Id.* ¶¶ 90, 92. But nothing about GW's plans for *other* indications suggests that the statement about Rett was false or misleading. Plaintiffs' complaint reduces to a general challenge to the level of optimism built into the projections, which does not state a claim.

**PTSD**. The Proxy disclosed that PTSD was removed as a target indication for nabiximols given GW's decision to delay the initiation of a planned PTSD study. *Id.* ¶ 88; Proxy at 41. That statement is not inconsistent with any prior disclosures.

The November earnings call quoted at length in plaintiffs' complaint expressly disclosed that GW decided to "push back the time line" for certain trials, specifically including the "planned posttraumatic stress syndrome study." Ex. E at 76. Reflecting this changed status, the accompanying earnings release omitted the planned PTSD study from the company's "operational highlights," Ex. D at 63-64, where it had been included in the prior two quarters. Ex. B at 53-54; Ex. C at 58-59.

Against all this, plaintiffs point only to a February 2021 slide presentation identifying PTSD (among other indications), as having "planned" studies. Compl. ¶ 96. That slide does not contradict anything. GW *did* have a planned study—as disclosed throughout 2020—but that planned study was delayed.

**Broad spasticity**. The Proxy disclosed that broad spasticity was removed as a target indication for nabiximols because "a clinical program for broad spasticity had not yet been determined." *Id.* ¶ 88; Proxy at 41. Plaintiffs do not allege any disclosures inconsistent with that statement. Instead, they point to generalized disclosures that the company "believe[s]" it can ultimately "get a broader spasticity label"; that GW "see[s] real opportunities within the broader spasticity market"; and that "we are confident that a broad spasticity label is achievable for this product." Compl. ¶¶ 94-95. None of those disclosures contradict the statement that "a clinical

14

program for broad spasticity had not yet been determined." *Id.* ¶ 88.  If anything, the January 2021 presentation quoted by plaintiffs makes clear that GW was then pursuing an indication for MS spasticity, to be "followed by a program in spinal cord injury spasticity." *Id.* ¶ 69.  Broad spasticity would follow down the road.

Plaintiffs' claims ultimately reduce to the argument that the Proxy's disclosures were false and misleading because GW had previously declared its "intention, enthusiasm, and expected profitability" from the broad spasticity (and PTSD) indications.  Compl. ¶ 93.  But a company's "expressions of optimism" and "public puffing" about potential new products are not objective statements of fact, and cannot render the Projection Assumptions actionable.  *See Trahan* v. *Interactive Intel. Grp., Inc.*, 308 F. Supp. 3d 977, 988 (S.D. Ind. 2018).

*Montanio* v. *Keurig Green Mountain, Inc.* is instructive.  There, the court rejected an argument that a 50% probability weighting for a new product was false because it allegedly conflicted with earlier statements that the company "was optimistic about the 'opportunity' that [the product's] introduction presented."  237 F. Supp. 3d 163, 173 (D. Vt. 2017).  The court found that "these general statements are not 'provable facts' that could demonstrate that the endorsement of the [50%] probability weighting was objectively false." *Id.*  The same result is warranted here.

**POS for the development platform**.  The Proxy disclosed that GW decreased the probability of success assigned to the development platform (*i.e.*, products still in the research and development stage) from 12% to 5%, to account for these products' risks, industry standards, and the fact that the products were in early, uncertain stages of development.  Compl. ¶ 88; Proxy at 41.  Plaintiffs do not dispute that the adjustment occurred, but allege that the explanation for it was contradicted by other GW statements purportedly describing an *increased* probability of success for GW.  Compl. ¶ 99.  Plaintiffs' own allegations do not support that claimed contradiction.

Plaintiffs' argument relies on two GW disclosures.  The first is a January 12, 2021 statement about the probability of success for an ***MS spasticity indication*** for

15

nabiximols:

> we have had multiple . . . meetings with the FDA to agree the route to **an NDA submission for Nabiximols in MS** . . . Although we only expect to need data from one additional trial, we have decided to pursue a multiple shots on goal strategy with five trials . . . This multiple shots on goal strategy . . . **increases the probability of success**.

Compl. ¶¶ 69, 100 (first emphasis added). This statement is limited to MS spasticity—which was already included in the December Projections as a target indication for nabiximols (Compl. ¶ 83 n.6)—and says nothing about the probability of success of GW's *overall development platform*—which was an entirely different line item.

The second disclosure is GW's November 3, 2020 earnings call disclosing that GW was initiating a Phase 2b trial for schizophrenia; that it was introducing a new botanical cannabinoid product candidate; and that it expected "additional new cannabinoid products to enter the clinic in 2021." Compl. ¶ 101. Those disclosures say nothing about predicted probability of success for those products or for the overall development platform more generally, and do not render the revised POS assumption materially false or misleading. *Cf. Keurig*, 237 F. Supp. 3d at 173; *Trahan*, 308 F. Supp. 3d at 988.

**POS adjusted peak sales for the development platform**. Finally, the Proxy disclosed a reduction of POS adjusted peak sales for the development platform from approximately $240 million to $50 million. Compl. ¶ 88; Proxy at 42. Plaintiffs label this adjustment as misleading, but they make no particularized allegations regarding it. *See* Compl. ¶¶ 89-103 (discussing the other revised assumptions, but not this one). For this reason alone, plaintiffs' Section 14(a) claim pertaining to this statement should be dismissed. *Atlas* v. *Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1153 (S.D. Cal. 2008) (under the PSLRA, a "securities complaint must 'specify . . . reasons why [each] statement is misleading'") (quoting 15 U.S.C. § 78u-4(b)(1)). In any event, plaintiffs' challenge to this statement fails because there is no allegation of any contradictory statements by GW regarding the overall probability of

16

1    success for GW's developmental platform.

2                              *      *      *

3         The Projection Assumptions are forward-looking statements accompanied by

4    cautionary language, and plaintiffs have not pleaded any concrete factual assertions

5    about specific present or past circumstances in those statements that are false.  The

6    claims based on these statements should therefore be dismissed.  Because plaintiffs'

7    challenges to the Advisor Assumptions and Present Value Ranges are entirely

8    derivative of the challenges to the Projection Assumptions, those claims should be

9    dismissed as well.

10        **B.    Plaintiffs fail to plead any actionable misstatement in the Advisor Assumptions.**

11        The Proxy also contained a section titled "Opinion of Financial Advisors,"

12   which summarized the analyses performed by the financial advisors.  The Proxy

13   further disclosed that, for certain analyses, the financial advisors relied on the

14   December Projections:

15   •    Centerview "assumed, at GW's direction, that the [December
16        Projections] were reasonably prepared on bases reflecting the best
         currently available estimates and judgments of the management of GW
17        as to the matters covered thereby," Proxy at 26; and

18   •    GS "assumed with GW's consent that the [December Projections] . . .
19        were reasonably prepared on a basis reflecting the best currently
         available estimates and judgments of the management of GW."  *Id.* at
20        33.

21        Plaintiffs allege that these two statements were materially false and misleading

22   because "defendants did not genuinely believe that the December Projections and the

23   assumptions upon which they were generated were reasonable or reflected

24   management's best available estimates."  Compl. ¶ 106.  These allegations are

25   misplaced.

26        **1.    Plaintiffs misrepresent the Proxy's disclosure of the Advisor Assumptions.**

27

28        As an initial matter, the Proxy does *not* state that the December Projections

                                        17

1    were reasonably prepared or reflected best current estimates.  Rather, it disclosed that

2    the bankers "assumed" that to be the case.  Proxy at 26, 33.  Plaintiffs do not allege

3    that the bankers did not so assume, and on that basis alone this claim fails.  In *In re*

4    *Keryx Biopharmaceuticals, Inc.*, the court found nearly identical language to be non-

5    actionable on this basis alone:

6        The Proxy actually represented that "[i]n arriving at its opinion, *MTS*
         *Securities assumed* . . . that [the Projections] . . . reflected the best
7        currently available estimates and judgments of Keryx
         management[.]" . . . This representation is . . . a true statement of fact if
8        MTS assumed at the time it formed its fairness opinion that the
         Projections reflected the best then-available estimates and judgments of
9        Keryx's management . . . . Plaintiffs do not allege that MTS did not
         assume that the Projections reflected the best currently available
10       estimates and judgments of Keryx management.

11   454 F. Supp. 3d 407, 414 (D. Del. 2020); *see also Laborers' Loc. #231 Pension Fund*

12   v. *PharMerica Corp.*, 2019 WL 4645583, at *9-10 (W.D. Ky. Sept. 24, 2019)

13   (refusing to treat similar language as an "affirmative statement which endorsed the

14   revised forecasts").

15           **2.    The Advisor Assumptions are forward-looking statements
                     accompanied by cautionary language.**

16           **a.    The Advisor Assumptions are forward-looking.**

17           The Advisor Assumptions are also non-actionable as protected forward-

18   looking statements.  "[S]tatements which merely endorse or state a speaker's belief in

19   a certain future outlook satisfy the PSLRA forward-looking requirement."  *Gray* v.

20   *Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 387 (S.D.N.Y. 2020), *aff'd*, 847

21   F. App'x 35 (2d Cir. 2021).  On this basis, the *Wesco* court rejected a challenge to

22   virtually identical disclosures, making the obvious point that "all statements of

23   projections come with the implied statement that they are believed and based on recent

24   trends . . . .  That is inherent in the notion of a projection."  *Id.* at 390.

25           Other cases are in accord.  *See Golub*, 372 F. Supp. 3d at 1047 (disclosure that

26   lower projections "appeared to reflect a better estimate of [the company's] long-term

27   prospects" held to be forward-looking); *In re Analogic Corp. S'holder Litig.*, 2019

28   WL 4804800, at *8 (D. Mass. Sept. 30, 2019) (disclosure that lower projections were

"the best currently available estimates and judgments" of management "as to the future financial performance of [the company]" held to be a forward-looking statement); *In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d 518, 532 (S.D.N.Y. 2021) (disclosure that forecasts "reflect[ed] the best currently available estimates and judgment of management" held to be forward-looking).

### b.   The Advisor Assumptions are accompanied by cautionary language.

The cautionary language discussed *supra*, p. 12, is fully applicable to the Advisor Assumptions as well. *See, e.g.*, *Wesco*, 454 F. Supp. 3d at 392 (applying similar cautionary language about projections to nearly identical statements); *Analogic*, 2019 WL 4804800, at *8-*9 (same); *Bemis*, 512 F. Supp. 3d at 533-34 (same); *Golub*, 372 F. Supp. 3d at 1048-49 (applying similar cautionary language to disclosure that lower projections "appeared to reflect a better estimate of [the company's] long-term prospects"). Because the Advisor Assumptions are forward-looking statements accompanied by cautionary language, they are subject to the PSLRA safe harbor and are non-actionable.

### C.   Plaintiffs fail to plead any actionable misstatement in the Present Value Ranges.

Finally, plaintiffs challenge the implied "Present Value Ranges" that the financial advisors calculated from the December Projections, alleging that the Present Value Ranges "dramatically misled shareholders regarding the present value of GW." Compl. ¶ 108. Though the Complaint cites to *all* of the valuation analyses, only the discounted cash flow analyses relied on the full December Projections.

#### 1.   The Present Value Ranges are forward-looking statements accompanied by cautionary language.

##### a.   The Present Value Ranges are forward-looking.

Each of the financial advisors conducted a discounted cash flow analysis ("DCF") as part of its assessment of the fairness of the transaction. A DCF is a standard valuation methodology: it is a mathematical calculation intended to translate a future stream of projected cash flows into a single present value. The Proxy

19

1  explained that the "[p]resent value" in a DCF analysis refers to the "current value of
2  future cash flows and is obtained by discounting those future cash flows by a discount
3  rate that takes into account macroeconomic assumptions and estimates of risk, the
4  opportunity cost of capital, expected returns and other appropriate factors."  Proxy at
5  30; *see also* JONATHAN BERK & PETER DEMARZO, CORPORATE FINANCE 103 (4th ed.
6  2017) (explaining that in a DCF analysis, present value is arrived at by "discounting,"
7  which is the "process of moving a value or cash flow backward in time—finding the
8  equivalent value today of a future cash flow").

9       The Present Value Ranges derived from the DCF analyses are clearly forward-
10  looking statements; the nomenclature is shorthand for present value of *future cash
11  flows*.  They are "statement[s] regarding (1) financial projections, . . . [and] (3) future
12  economic performance," falling squarely within the PSLRA definition of forward-
13  looking statements.  *Am. W.*, 320 F.3d at 936 (citing 15 U.S.C. § 78u-5(i)).  They are
14  certainly not "concrete factual assertions about a specific present or past
15  circumstance."  *Wochos*, 985 F.3d at 1192; *see also Trahan*, 308 F. Supp. 3d at 997
16  ("The [financial advisor] Analysis is clearly a forward-looking statement within the
17  meaning the PSLRA.  In respect of the DCF analysis, the [financial advisor] Analysis
18  is a projection of value or future economic performance.").

19       Two of the other financial analyses—Centerview's Selected Public Company
20  Analysis and Selected Transaction Analysis—rely on the 2022 revenue line of the
21  December Projections, but no other part of those projections.  Proxy at 29, 30.  Those
22  analyses, like the DCF analyses, are forward-looking statements accompanied by
23  cautionary language.  Beyond that, plaintiffs do not allege, nor could they, that any
24  difference in 2022 projected revenue attributable to the Projection Assumptions was
25  material.  The Projection Assumptions address *future* prospects for products not yet
26  approved.  Products not approved for sale in December 2020 (or even out of the
27  clinical trial stage) cannot credibly be assumed to generate material revenue in 2022.
28  None of the other analyses in the pages cited by plaintiffs rely on the December

1    Projections at all.

2                  **b.**    **The Present Value Ranges are accompanied by cautionary language.**

3        Plaintiffs' only challenge to the Present Value Ranges is that they were

4 "calculated by the Financial Advisors using the December Projections." Compl.

5 ¶ 108. The cautionary language accompanying the December Projections, Proxy at

6 9-10, 39-40, thus applies to the Present Value Ranges. *See Trahan*, 308 F. Supp. 3d

7 at 998 (applying Proxy's general cautionary language to DCF analysis).

8        The Present Value Ranges were further accompanied by additional cautionary

9 language specific to the financial advisors' analyses:

10        "Centerview may have deemed various assumptions more or less
        probable than other assumptions, so the reference ranges resulting from
11       any particular portion of the analyses summarized below should not be
        taken to be Centerview's view of the actual value of GW. . . . Centerview
12       made numerous assumptions with respect to industry performance,
        general business and economic conditions and other matters, many of
13       which are beyond the control of GW or any other parties to the
        Transaction." Proxy at 27; and
14

15        Goldman Sachs's "[a]nalyses based upon forecasts of future results are
        not necessarily indicative of actual future results, which may be
16       significantly more or less favorable than suggested by these analyses….
        [T]hese analyses are inherently subject to uncertainty, being based upon
17       numerous factors or events beyond the control of the parties or their
        respective advisors." Proxy at 38.

18        This cautionary language renders the Present Value Ranges non-actionable.

19 *Trahan*, 308 F. Supp. 3d at 998 (citing similar cautionary language).

20           **2.**    **The Proxy contained no material misstatements regarding the Present Value Ranges.**

21        Plaintiffs' challenge to the "Present Value Ranges" fails for another reason:

22 they do not contain any misstatement of fact. As disclosed in the Proxy, the DCF

23 analysis was a mathematical calculation. The inputs into that calculation were

24 disclosed, and the output is the Present Value Ranges. Proxy at 30, 34. The same is

25 true for all of the financial analyses. Proxy at 28-31, 34-37. All the Proxy disclosed

26 is that if you use certain inputs (including, for some of the analyses, some or all of the

27 December Projections), you get a particular output (the Present Value Ranges).

28 Indeed, the financial advisors did *not* make any representation regarding the actual

present value of the GW ADSs; they describe the output of their analyses as the "implied equity value[]" (Centerview) and "illustrative equity value[]" (GS) of GW's shares derived from their DCF formula and other analyses. *Id.* There is nothing false or misleading about those disclosures.

### D.    Plaintiffs fail to allege loss causation.

A Section 14(a) plaintiff must allege loss causation, which "requires a showing that the defendant 'caused the loss for which the plaintiff seeks to recover damages.'" *Jobs*, 593 F.3d at 1023 (quoting 15 U.S.C. § 78u-4(b)(4)). Thus "[i]n well-pleaded Section 14(a) claims, loss causation connects the proxy misstatements *with an actual economic harm*." *Id.* (emphasis added).

Plaintiffs allege that GW shareholders suffered "economic harm" by approving the Merger (and its 53% premium) because their shares were supposedly worth more than the $220/ADS Merger price. Compl. ¶¶ 116-26. That allegation is "speculative in the extreme" and inadequate as a matter of law. *Ocera*, 806 F. App'x at 605.

GW shares were trading at $144.08/ADS at the time the Merger was announced and spent most of 2020 trading below $120/ADS, just over *half* the amount offered by Jazz. Exs. H, M. Notwithstanding GW's enthusiasm for its future prospects, it was losing money every quarter and had only a single drug approved for use in the U.S. (and only for very rare diseases). *See supra* pp. 2-3. Despite the optimistic public disclosures touted by plaintiffs, the market continued to value the company significantly below the Merger price. The Complaint provides no basis to believe that the share price would have been anywhere close to $220/ADS, much less above it, had the GW shareholders rejected the Merger.

Plaintiffs' only support for their extravagant damages claim consists of (1) allegations that two analysts maintained future price targets above $220/ADS (Compl. ¶ 125), and (2) allegations that a DCF analysis using the July Projections would have yielded a higher value (*id.* ¶ 124). The Ninth Circuit recently rejected these same allegations as bases for alleging loss causation in a merger case. *See*

22

1   *Ocera*, 806 F. App'x at 605.

2          Analyst reports.  Plaintiffs allege that two "Wall Street analysts . . . maintained

3   price targets for GW" of \$271/ADS and \$275/ADS, and that those targets better

4   reflected GW's "true value" at the time of the Merger.  Compl. ¶¶ 46, 56, 125.  *Ocera*

5   rejected this argument on remarkably similar facts.

6          In *Ocera,* like here, a company prepared a second, lower set of projections

7   during a merger process, relied on those lower projections for the fairness opinion,

8   and disclosed those lower projections in the proxy.  806 F. App'x at 605.  There, like

9   here, plaintiff alleged that the lower projections misrepresented the company's "true

10  value."  *Id.*  And there, like here, plaintiff relied primarily on analyst reports with

11  target prices above the merger price to plead "actual economic loss[]."  *Id.* at 604-05.

12         The Ninth Circuit emphatically rejected that argument as "too speculative," and

13  affirmed dismissal of the action for failure to plead loss causation.  *Id.* at 605.  The

14  court held that "[t]he suggestion that the analysts' opinions of what the shares might

15  be worth . . . represented the share's true value, is too speculative to plead with

16  particularity that shareholders experienced losses—or to plead with particularity that

17  the required causal relationship existed between [the company's] purported

18  misrepresentations or omissions and those losses."  *Id.*; *see also Metzler Inv. GMBH*

19  v. *Corinthian Colls., Inc.*,  540 F.3d 1049, 1064-65 (9th Cir. 2008) (explaining that

20  courts will not "indulge unwarranted inferences" in support of loss causation "in order

21  to save a complaint from dismissal").[10]

22         Plaintiffs' reliance on the two analyst reports is particularly misplaced here.  In

23  *Ocera*, the cash merger price (of \$1.52, not including certain contingent value rights)

24  _____

25  [10] *See also Gray* v. *Wesco Aircraft Holdings, Inc.*, 847 F. App'x 35, 38 (2d Cir. 2021)
    (holding that plaintiff failed to allege loss causation where, among other things, the
26  merger price was within the range of analyst estimates disclosed in the proxy); *cf.
    Kuebler* v. *Vectren Corp.*, 13 F.4th 631, 647 (7th Cir. 2021) (plaintiff's attempt to
27  prove loss causation based on a "'Simply Wall Street' projection" failed, as such
    allegation "invites only speculation").  And \$220/ADS was also comfortably within
28  the range of all of the financial valuation analyses disclosed in the Proxy, regardless
    of whether they were reliant on the December Projections.  Proxy at 28-31, 34-37.

was significantly *below* the *consensus* analyst targets (ranging from $2.67 to $4.50/share), but the Ninth Circuit nonetheless rejected the invitation to rely on the analyst reports as indicative of true value. 806 F. App'x at 605. Here, by contrast, the $220/ADS Merger price was *well within the range of analyst targets*, and *well above* the median. The Proxy—in a section not challenged by plaintiffs—disclosed that "stock price targets for the GW ADSs in Wall Street research analyst reports publicly available as of February 1, 2021 . . . ranged from $125.00 per GW ADS to $270.00 per GW ADS, with the median of such price targets being $181.50." Proxy at 31; Ex. G at 118.[11] Plaintiffs' allegations rely entirely on cherry-picking two outlier reports.

The July Projections. Plaintiffs also rely on the superseded July Projections, which they alleged reflected the "true value" of GW. Compl. ¶ 119. The Ninth Circuit rejected that theory, too, in *Ocera*. Plaintiff there attacked a merger proxy by alleging (like plaintiffs here) that an original, higher set of projections reflected the company's "true value," and argued that such "true value" was an adequate basis for pleading loss causation. *Ocera*, 806 F. App'x at 605. That theory was deemed "speculative in the extreme" and rejected. *Id.*

Other courts are in accord. In *Wesco*, the Second Circuit rejected similar loss causation allegations based on higher projections, holding that plaintiff's allegations that "the shares were intrinsically worth [more than the merger price] based on the Initial Projections is too speculative to plead economic loss." *Wesco*, 847 F. App'x at 37; *see also Mack* v. *Resolute Energy Corp.*, 2020 WL 1286175, at *11, *13 (D. Del. Mar. 18, 2020) (holding that "[r]eferences to optimistic prospects do not allege economic loss" because "the merger consideration is usually going to be greater than the market value or actual value of the shares without consideration of the merger,"

---

[11] Though plaintiffs allege that Evercore and GS "maintained" targets of $275/ADS and $271/ADS, respectively (Compl. ¶¶ 46, 56, 125), those targets from the summer of 2020 had been lowered in November 2020 to $270/ADS and $234/ADS, respectively. *See* Exs. I, J.

so it is "virtually impossible to plausibly allege that if the merger had been voted down," the stock would have traded above the premium), *aff'd sub nom. In re Resolute Energy Corp. Sec. Litig.*, 2022 WL 260059 (3d Cir. Jan. 27, 2022); *Trahan*, 308 F. Supp. 3d at 1000 (rejecting plaintiff's argument that "absent the misleadingly pessimistic Proxy Statement, the shareholders would not have approved the Merger in hope that Interactive would prove more valuable as a going concern than the Merger consideration implied," because without "allegation of a definite, immediately available, superior alternative to the Merger consideration" plaintiff "has alleged no more than a speculative possibility" of injury).

## II.    THE "CONTROL PERSON" CLAIM MUST BE DISMISSED.

Because plaintiffs fail to state a claim under Section 14(a), their Section 20(a) claim also fails. *Golub*, 372 F. Supp. 3d at 1053, *aff'd*, 847 F. App'x 368 (2021).

**CONCLUSION**

For the foregoing reasons, the action should be dismissed.

Respectfully submitted

Dated:  June 3, 2022          **DLA PIPER LLP (US)**

By: */s/Noah A. Katsell* _____
NOAH A. KATSELL

Dated:  June 3, 2022          **WACHTELL, LIPTON, ROSEN & KATZ**

By: */s/Rachelle Silverberg* _____
RACHELLE SILVERBERG
(*pro hac vice*)

Counsel for Defendants
GW Pharmaceuticals, PLC, Justin Gover,
Geoffrey Guy, Cabot Brown, David
Gryska, Catherine Mackey, James Noble,
Alicia Secor, and William Waldegrave